IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No: 3:17-CV-00652

| | |
|---|---|
| SNYDER'S-LANCE, INC. and PRINCETON VANGUARD, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> FRITO-LAY NORTH AMERICA, INC., <br><br> Defendant. | FRITO-LAY NORTH AMERICA, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS |

Frito-Lay's Request for Production No. 7 is simple—it requests communications since the close of discovery in the TTAB proceeding in which Plaintiffs' own consumers use the term "pretzel crisps" and related terms in lowercase letters. While such documents are not relevant to the genericness of the term "pretzel crisps" in 2004 when Plaintiffs adopted the name for their product (the primary issue raised in Frito-Lay's Motion for Summary Judgment), they are certainly relevant to—and necessary to rebut—the various arguments and the thousands of pages of documents that Plaintiffs have submitted in opposition to Frito-Lay's Motion for Summary Judgment and in support of their own Motion for Summary Judgment. As such, it is no surprise that Plaintiffs wish to shield these documents from discovery, but their arguments against the Motion to Compel are unavailing.[1]

---

[1] As Plaintiffs noted in their Memorandum in Opposition to the Motion to Compel, the parties have reached agreement regarding Requests for Production Nos. 15 and 16, and as such the Court currently does not need to consider those requests in deciding Frito-Lay's Motion to Compel.

**ARGUMENT**

Plaintiffs proffer several arguments why they should not be required to produce documents responsive to Request No. 7, none of which justify withholding this important evidence. First, Plaintiffs attempt to transform the parties' Certification and Report of F.R.C.P. 26(f) Conference and Discovery Plan (the "IAC Report") (Dkt. 31), in which the parties attempted to offer their best estimation at what discovery might be required, into a binding agreement between the parties to limit discovery. However, even under Plaintiffs' interpretation of the purpose and effect of this report, the documents at issue are well within the scope of discovery that the parties predicted would be required in this case. Second, the documents Plaintiffs have produced that they claim are responsive to Request No. 7 are inadequate substitutes for actual consumer communications from the relevant timeframe. Third, Plaintiffs complain that it would be "costly" to search through the emails located on their "back-up system," but Plaintiffs exaggerate the burden that this would place on them. Additionally, Plaintiffs fail to mention that the only reason a search of the back-up system is necessary is because they failed to retain and/or actively destroyed relevant evidence—actual emails from consumers—while this litigation has been ongoing.

1. **The Initial Attorney Conference report is not an "explicit agreement" to limit discovery**

Plaintiffs attempt to cast the parties' IAC Report as some sort of agreement to limit discovery. (Dkt. 61 at 1–3, 7). However, the face of the IAC Report itself makes it clear that this is not the case. In the IAC Report, the parties stated that "[t]he only additional discovery the parties *believe* may be necessary will be limited to that which is directly related to, and necessary to evaluate, any declarations and accompanying exhibits to their respective dispositive motions." (Dkt. 31 ¶ 3) (emphasis added). Additionally, the parties requested a scheduling conference with the Court to discuss whether a discovery plan might be necessary, which conference was held on

October 22, 2018. *Id.* Indeed, even the local rules explain that the purpose of the IAC Report is to "serve as a guideline for the Court in issuing a Scheduling Order." W.D.N.C. Local Civil Rule 16.1.

Thus, the statement about what discovery the parties "believe" might be necessary was merely an estimation by the parties at that time and not an explicit agreement to limit discovery. At the time the IAC Report was filed, Frito-Lay had no way of knowing what arguments Plaintiffs might advance in their briefing, or what evidence they might offer in support. Frito-Lay did not agree to limit its right to full and fair discovery under these circumstances. The IAC Report was filed before Plaintiffs filed their Response to Frito-Lay's Motion for Summary Judgment, their own Motion for Summary Judgment, and the thousands of pages of evidence purporting to support the same. So while by its own terms the IAC Report expresses what the parties "believe[d]" at the time would be the necessary scope of discovery, no agreement was reached, either in the IAC Report or the 26(f) Conference with Plaintiffs, regarding any limitation on discovery in this case.

However, even if discovery were limited here to discovery "which is directly related to, and necessary to evaluate, any declarations and accompanying exhibits to their respective dispositive motions," Request No. 7 squarely fits this description. Request No. 7 seeks documents that will reveal how Plaintiffs' own consumers use and understand the term "pretzel crisps." As Plaintiffs themselves readily admit, consumer perception is a critical question in this litigation. *See* (Dkt. 61-2 at 21) (email from Plaintiffs' counsel stating that "[c]onsumer perception always has been a central issue in this case"); Plaintiffs' Memorandum of Law in Opposition to Frito-Lay's Motion for Summary Judgment at 11 (Dkt. 33, at 16) ("The controlling legal standard requires the [C]ourt . . . to assess the purchasing public's perception" of the term "pretzel crisps.").

Accordingly, Plaintiffs claim in their summary judgment briefs that "'PRETZEL CRISPS' is understood by the relevant public as a trademark" (*see* Plaintiffs' Cross-Motion for Summary Judgment at 1, Dkt. 34 at 1) and that "consumers recognize PRETZEL CRISPS as a brand name" (*see* Plaintiffs' Memorandum of Law in Opposition to Frito-Lay's Motion for Summary Judgement at 6, Dkt. 33 at 11), and they submitted several categories of evidence that they argue shows consumer perception of the term. *See, e.g.*, Plaintiffs' Memorandum of Law in Opposition to Frito-Lay's Motion for Summary Judgement at 7 (Dkt. 33 at 12) ("The new evidence Plaintiffs submit includes media and industry usage of PRETZEL CRISPS as a brand name"); Declaration of Elliot Beaver (Dkt. 44 at 1–2, ¶ 2) (assessing "a recent sample of consumer references to Pretzel Crisps" in Twitter results); Declaration of Christopher Lauzau (Dkts. 41–43) (including exhibits containing consumer comments from blogs, product reviews, and other media); Declaration of Rachel M. Sasser (Dkt. 45 at 5–6, ¶ 11) ("Snyder's-Lance's field marketing teams have traveled the country interacting with consumers to promote the PRETZEL CRISPS brand"); Declaration of John O'Donnell (Dkt. 37 at 2, ¶ 6) (claiming that "consumers seek out Pretzel Crisps and use the name to refer exclusively to Snyder's-Lance's pretzel cracker products"); Declaration of Mark Finocchio (Dkt. 38 at 2, ¶ 5) (claiming "customers and retailers do not use the term 'pretzel crisps' to describe a category of snack foods"); Declaration of Salvatore D'Agostino (Dkt. 39 at 2, ¶ 5) (claiming that "consumers refer to the category of products to which Pretzel Crisps belong as 'crackers,' or more generally, 'deli snacks'"). The discovery regarding consumer perception and use that Frito-Lay seeks with Request No. 7 is directly related to the evidence and the arguments advanced by Plaintiffs.

2.  **Plaintiffs' substitutes for the discovery sought by Frito-Lay are inadequate**

Over the weeks of discussion regarding discovery, Plaintiffs proffered several arguments regarding their refusal to produce documents responsive to Request No. 7.  First, on January 14, 2019, Plaintiffs' counsel indicated that Plaintiffs "maintain[] a consumer relations database that includes communications from consumers dating back to August 2016," but that "*individual documents are not maintained in the database*" and that "spreadsheet reports can be generated that *reflect the content* of the communications received."  (Dkt. 61-2 at 24) (emphasis added).  When counsel for Frito-Lay inquired about the remainder of the responsive documents, and whether underlying consumer communications were destroyed, counsel for Plaintiffs indicated on January 18, 2019, that Plaintiffs kept "*summary records* of customer *complaints*" from 2013-2016, but said nothing about the actual underlying communications from consumers in this timeframe.  (Dkt. 61-2 at 23).  After another inquiry from counsel for Frito-Lay regarding the missing documents, Plaintiffs' counsel stated on January 22, 2019, that "Snyder's-Lance does not agree to comb through all of its files to uncover every communication it has received from a consumer that contains the words 'pretzel crisps.'"  (Dkt. 61-2 at 20).  However, on January 25, 2019, Plaintiffs' counsel finally confirmed that Plaintiffs' practice from 2013 to the present was not to retain underlying letters and emails received from consumers.   (Dkt. 61-2 at 17).  It was not until February 13, 2019, after Frito-Lay expressed an intention to seek sanctions for spoliation of evidence, that Plaintiffs disclosed they had performed an investigation and discovered an automatic backup system that they believe contains responsive documents. (Dkt. 61-2 at 11).  Still, notwithstanding this revelation, Plaintiffs refused to produce responsive documents.

Throughout the weeks of discussions with Plaintiffs' counsel regarding Request No. 7, Frito-Lay did not know whether Plaintiffs' refusal to produce responsive documents was based on

their objections, or on the fact that the documents no longer existed, or on some combination of these factors. Meanwhile, Plaintiffs sought to avoid their responsibility to produce responsive documents by producing purported substitutes for the information requested by Frito-Lay. Plaintiffs now argue that these substitutes should be sufficient, but a close examination reveals that they fall far short.

The first substitute proposed by Plaintiffs consists of a database report of communications from January 2017. According to Plaintiffs, "communications submitted by consumers via Snyder's-Lance's website from January 2017 forward were automatically populated—verbatim— into that database." (Dkt. 61 at 5). During this time period, Plaintiffs claim that "text in emails or letters from customers was copied—verbatim—into that database" and that phone conversations "were manually logged into that database by consumer affairs specialists." However, there is no way to tell from the produced spreadsheets which communications are verbatim entries from Plaintiffs' website, which entries are from emails and letters (and whether the entire emails and/or letters were copied verbatim by the employee who entered them), and which entries are mere summaries entered by employees (for example, from phone conversations). The distinction is important, because a communication from a customer by email might look different from a communication entered by a customer that navigated to Plaintiffs' website, perhaps spent some time exploring the content of that website, and then eventually made his or her way to the contact submission form.

The second substitute from Plaintiffs includes "entries from a Microsoft Sharepoint site" that Plaintiffs "extracted" and compiled into a spreadsheet. (Dkt. 61 at 5). Plaintiffs claim that these entries include "some verbatim communications," but it is not clear from the production

which entries are verbatim and whether such entries are complete.  As such, the utility of this information is extremely limited.

The third substitute consists of "[a] spreadsheet from 2013 in which Snyder's-Lance entered *reports* of *consumer complaints* and *coupon requests*." (Dkt. 61 at 4) (emphasis added). By Plaintiffs' own description, it is clear that this spreadsheet does not contain actual communications from consumers but rather contains mere "reports" created by employees. Further, the reports do not reflect all consumer communications, only those that fall in the categories of "complaints" and "coupon requests."  Thus, this information is not useful for evaluating consumer perception.

Finally, Plaintiffs produced a handful of responsive emails from a consumer relations employee from March 21, 2012 through September 13, 2013.  However, the production in question consisted of only 109 pages across 50 document files.  Thus, while some of the documents appear to be responsive, given Plaintiffs' representation of the volume of emails sent and received from the email address info@pretzelcrisps.com over the years,[2] it would appear that this production does not represent the complete volume of consumer communications received in that 19-month period.

The clearest and best indication of consumer perception is actual communications from consumers themselves, not summary records maintained by Plaintiffs for their own separate business purposes.  Plaintiffs have produced very little in the way of actual communications, even though they state that such communications are in their possession, and as such, the documents Frito-Lay seeks in its Motion to Compel are not duplicative or redundant of the information

---

[2]  Plaintiffs claim that their backup system contains 31,000 emails to and from info@pretzelcrisps.com from 2006 to the present.  (Dkt. 61 at 6).

Plaintiffs have produced. Because Plaintiffs have the information sought by Frito-Lay, there should be no need to resort to the inadequate substitutes Plaintiffs have offered in this case.

3. **Plaintiffs exaggerate the burden of producing, which is entirely of their own doing**

Plaintiffs claim that responding to Frito-Lay's request would require it to search and review 31,000 emails on its backup system. *See* (Dkt. 61 at 2) ("But Frito-Lay now seeks to compel Snyder's-Lance to search through more than 31,000 documents that reside on a back-up recovery system for more instances of lowercase usage of these terms."); *id.* at 4 ("Frito-Lay seeks to compel Snyder's-Lance to undertake a costly search through 31,000 emails . . . ."); *id.* at 8 (Heading: "Searching Through 31,000 Emails On A Back-Up System In Response to Request No. 7 Would Be Cumulative, Duplicative, and Disproportionate To The Needs Of The Case.").

But the 31,000 emails to which Plaintiffs refer go back all the way to 2006. *See id.* at 6 ("The back-up system contains approximately 31,000 emails – some eight gigabytes of data – *from 2006 to the present*." (emphasis added)). Frito-Lay only seeks documents that were created since the close of discovery in the TTAB proceeding in February 2012. *See* Defendant's First Set of Requests for Production (Dkt. 54-2 at 5) ("[Y]ou need not produce documents that have already been produced to Defendant in response to prior discovery requests in the underlying TTAB proceedings."); Motion to Compel (Dkt. 54 at 2) ("Request No. 7 seeks the following documents from 2012 (the close of discovery at the TTAB) to the present: . . . ."). Plaintiffs have never informed Frito-Lay or the Court of the actual volume of documents that fall within this time frame that would need to be searched and produced.

Additionally, the fact that Frito-Lay's request requires Plaintiffs to perform a search of their emergency backup system is entirely a result of Plaintiffs' failure to properly preserve relevant evidence. As noted in the Motion to Compel, actual emails from consumers constituted

important evidence in the TTAB proceeding that was offered by Frito-Lay and cited in Frito-Lay's favor by the TTAB in support of its decision finding "pretzel crisps" generic. *See* (Dkt. 54 at 3). Thus, Plaintiffs should have anticipated that Frito-Lay would seek similar communications in this proceeding and any others following the TTAB decision. Additionally, because these communications constitute material evidence, Plaintiffs had an affirmative duty to preserve them. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."). Because the required search of the backup system is a direct result of Plaintiffs failure to preserve the relevant evidence in a more easily accessible medium, Plaintiffs' complaints are unwarranted, and their request that Frito-Lay bear any portion of the cost of searching, reviewing, and/or producing responsive documents is entirely inappropriate.

## CONCLUSION

For the reasons explained here and in Frito-Lay's Motion to Compel, Frito-Lay respectfully requests that this Court grant the Motion with respect to Request No. 7 and order that Plaintiffs produce documents responsive to that Request as they are kept in the ordinary course of business.

This 12th day of March, 2019.

/s/ Alice C. Richey
Alice C. Richey
N.C. Bar No. 13677
Abigail W. Henderson
N.C. Bar No. 52182
ALEXANDER RICKS PLLC
1420 E. 7th St., Suite 100
Charlotte, North Carolina 28204
Telephone: 980-335-0720
Facsimile: 704-365-3676
alice@alexanderricks.com
abbie@alexanderricks.com

William G. Barber*
David E. Armendariz*
PIRKEY BARBER PLLC
600 Congress Ave.; Suite 2120
Austin, Texas 78701
Telephone: (512) 482-5223
Facsimile: (512) 322-5201
bbarber@pirkeybarber.com
darmendariz@pirkeybarber.com

*Attorneys for Defendant*

\* admitted *pro hac vice*