# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISON
#### Civil Action No.: 3:17-CV-00652

SNYDER'S-LANCE, INC. and PRINCETON
VANGUARD, LLC,

          Plaintiffs,

  v.

FRITO-LAY NORTH AMERICA, INC.,

          Defendant.

## FRITO-LAY NORTH AMERICA, INC'S RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

<table>
<tr>
<td>

William G. Barber (*admitted pro hac vice*)
David E. Armendariz (*admitted pro hac vice*)
PIRKEY BARBER PLLC
600 Congress Ave.; Suite 2120
Austin, Texas 78701
Telephone: (512) 482-5223
Facsimile: (512) 322-5201
bbarber@pirkeybarber.com
darmendariz@pirkeybarber.com

</td>
<td>

Alice C. Richey
N.C. State Bar No.: 13677
Nathan A. White
N.C. State Bar No.: 48684
ALEXANDER RICKS PLLC
1420 East 7th Street, Suite 100
Charlotte, North Carolina 28204
Telephone: (980) 335-0720
Facsimile: (704) 365-3676
nathan@alexanderricks.com
alice@alexanderricks.com

</td>
</tr>
</table>

### Counsel for Defendant Frito-Lay North America

# TABLE OF CONTENTS

BACKGROUND……………………………………………………...………………………..2

    I.     Procedural History and Factual Background………………………………………...2

    II.    New Evidence in this Court…………………………………….………………………7

STANDARD OF REVIEW…………………………………………………...……………..12

    I.     District Court Review of TTAB Decisions under 15 U.S.C. § 1071(b)…………12

    II.    Summary Judgment Standard……………………………………………………14

    III.   Burden of Proof…………………………………………………….……………15

ARGUMENT…………………………………………………...………………………………16

    I.     The Relevant Public Uses and Understands "Pretzel Crisps" as a Generic Term.16

         A.     The Media Uses Pretzel Crisps Generically……………………………..17

         B.     Consumers Continue to Use Pretzel Crisps Generically…………………18

    II.    Plaintiffs Cannot Establish that "Pretzel Crisps" Has Secondary Meaning……..21

         A.     Survey Evidence Uniformly Confirms No Secondary Meaning……........22

         B.     Other Evidence Does Not Establish Secondary Meaning……………….23

CONCLUSION………………………………………………………………………………..25

# TABLE OF AUTHORITIES

## Cases

*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.,*
  205 F.3d 137 (4th Cir. 2000) .................................................................................. 16

*Am. Online, Inc. v. AT&T Corp.,*
  243 F.3d 812 (4th Cir. 2001) .................................................................................. 14

*Belmora, LLC v. Bayer Consumer Care AG,*
  338 F. Supp. 3d 477 (E.D. Va. 2018) ............................................................... 12, 13

*Booking.com v. Matal,*
  278 F. Supp. 3d 891 (E.D. Va. 2017) ............................................................... 14, 15

*Booking.com v. Iancu,*
  915 F.3d 171 (4th Cir. 2019) ........................................................... 3, 13, 15, 21

*Dick's Sporting Goods, Inc. v. Dick's Clothing and Sporting Goods, Inc.,*
  188 F.3d 501 (table), 1999 WL 639165 (unpub. op.) (4th Cir. 1999) ................... 16

*Frito-Lay N. Am., Inc. v. Princeton Vanguard LLC,*
  124 U.S.P.Q.2d 1184 (TTAB 2017) ................................................................ passim

*Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC,*
  109 U.S.P.Q.2d 1949 (TTAB 2014) ......................................................................... 3

*George & Co. LLC v. Imagination Entm't Ltd.,*
  575 F.3d 383 (4th Cir. 2009) .................................................................................. 15

*Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.,*
  240 F.3d 251 (4th Cir. 2001) .................................................................................... 6

*In re Carl Walther GmbH,*
  Serial No. 77096523, 2010 WL 4502071 .............................................................. 23

*In re Hershey Chocolate & Confectionary Corp.,*
  Serial No. 77809223, 2012 WL 2930639 .............................................................. 23

*In re Steelbuilding.com,*
  415 F.3d 1293 (Fed. Cir. 2005) .............................................................................. 22

*Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco,*
  329 F.3d 359 (4th Cir. 2003) .................................................................................. 13

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982) ................................................................................................ 21

*Kappos v. Hyatt*,
566 U.S. 431 (2012) ........................................................................................ 12, 13

*Kelly Servs., Inc. v. Creative Harbor, LLC*,
846 F.3d 857 (6th Cir. 2017) ................................................................................ 13

*Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*,
No. 3:08-CV-573-HEH, 2019 WL 2013599 (E.D. Va. July 10, 2009) .................. 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................................ 14

*McNeil-PPC, Inc. v. Granitic, Inc.*,
919 F. Supp. 198 (E.D.N.C. 1995) ........................................................................ 23

*Monsieur Henry Wines, Ltd. v. Duran*,
204 U.S.P.Q. 601 (TTAB 1979) ............................................................................ 23

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ............................................................................ 3, 4

*Putt-Putt, LLC v. 416 Constant Friendship, LLC*,
936 F. Supp. 2d 648 (D. Md. 2013) ...................................................................... 15

*Sara Lee Corp. v. Kayser-Roth Corp.*,
No. 6:92CV00460, 1992 WL 436279 (M.D.N.C. Dec. 1, 1992) .......................... 22

*Shuffle Master Inc. v. Awada*,
83 U.S.P.Q.2d 1054 (D. Nev. 2006) ...................................................................... 23

*Swatch AG v. Beehive Wholesale, LLC*,
739 F.3d 150 (4th Cir. 2014) ........................................................................ 13, 14

*Tri-Star Pictures, Inc. v. Unger*,
14 F. Supp. 2d 339 (S.D.N.Y. 1998) ...................................................................... 23

*U.S. Search, LLC v. U.S. Search.com Inc.*,
300 F.3d 517 (4th Cir. 2002) ........................................................................ 16, 21

*Winchester Fed. Sav. Bank v. Winchester Bank, Inc.*,
359 F. Supp. 2d 561 (E.D. Ky. 2004) .................................................................... 23

**Statutes**

15 U.S.C. § 1052(f) ................................................................................................................ 2

15 U.S.C. § 1057(b) .............................................................................................................. 15

15 U.S.C. § 1071(b) .............................................................................................................. 13

15 U.S.C. § 1091 .................................................................................................................... 2

15 U.S.C. § 1092 .................................................................................................................... 2

15 U.S.C. § 1094 .................................................................................................................... 2

35 U.S.C. § 145 .................................................................................................................... 13

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 14

Plaintiffs claim to have "created an innovative product" when they launched their pretzel crackers in 2004. Pls.' Cross-Motion Br. ("Cross-Motion") at 1 [Doc. 35]. But this alleged innovation did not extend to selecting a brand name because Plaintiffs chose a generic term already in public use—"pretzel crisps." It was generic when Plaintiffs adopted it, and as a matter of law it has remained so, as a generic term can never become a trademark.

Plaintiffs have long been aware of their chosen name's unsuitability for registration as a trademark. In 2005, after failing to secure a registration for "pretzel crisps" on the Principal Register of the United States Patent and Trademark Office ("PTO"), Princeton Vanguard ("Princeton") instead accepted a registration on the Supplemental Register, a concession that the name was not distinctive. Opp'n No. 92053001 at A259–60. In 2009, Princeton's VP of Marketing even sought help from an outside marketing firm to come up with a new name for their product because "pretzel crisps" consists of "two pretty generic words." Opp'n No. 91195552 at A2092–94. Still, despite Plaintiffs' early awareness of the genericness of "pretzel crisps," they never transitioned to a mark that is actually distinctive.

The Trademark Trial and Appeal Board ("TTAB" or "Board") has twice confirmed—in precedential opinions—that "pretzel crisps" is generic for pretzel crackers. The TTAB also held in the alternative that even if "pretzel crisps" were not generic, the term is at best "highly descriptive" and has not acquired distinctiveness—i.e., secondary meaning in the minds of consumers—sufficient for registration on the Principal Register.

No amount of secondary meaning can convert a generic term into a protectable mark. As such, if this Court affirms the finding that "pretzel crisps" is generic, the inquiry into acquired distinctiveness is unnecessary. However, even if "pretzel crisps" were not generic, Plaintiffs' new evidence only further confirms what the evidence before the TTAB already made clear—

consumers do not perceive "pretzel crisps" primarily as a source identifier for Plaintiffs' products.

## BACKGROUND

I.    **Procedural History and Factual Background**

Princeton's first attempt to register PRETZEL CRISPS for "pretzels" in 2004 was rejected by the PTO on the basis that the term "merely describes the goods." Opp'n No. 92053001 at A239. In response, Princeton disclaimed exclusive rights in the term "pretzel," changed its description of goods to "pretzel crackers," and amended its application to the Supplemental Register.[1] *Id.* at A257–60. Princeton's acceptance of a Supplemental Registration was an implicit concession that its purported mark did not have secondary meaning and thus not registrable on the Principal Register. In 2009, Princeton filed a new application seeking once again to register PRETZEL CRISPS on the Principal Register, this time claiming that the term had acquired distinctiveness under 15 U.S.C. § 1052(f). Opp'n No. 91195552 at A5152.

Frito-Lay was concerned about the potential limitations that registration of a generic term could have on the snack-food industry, especially in the pretzel-cracker/pretzel-crisp category. Since food manufacturers must include an appropriate Statement of Identity on products, Frito-Lay was concerned that Princeton's attempt to commandeer a common generic product descriptor would render an otherwise useful and accurate name unavailable to the snack-food industry. Thus, Frito-Lay opposed Princeton's new application and petitioned to cancel its Supplemental Registration on the grounds that the term is generic and, alternatively, is highly descriptive and has not and cannot acquire distinctiveness.[2] The proceedings were consolidated, and the parties

---

[1] The Supplemental Register is available for certain marks (e.g. descriptive terms) that have not met the requirements of the Principal Register. Marks on the Supplemental Register are not published for opposition and do not enjoy the benefits of those on the Principal Register, including a statutory presumption of validity. *See* 15 U.S.C. §§ 1091, 1092, 1094.

[2] Plaintiffs make the baseless assertions that Frito-Lay was "threatened by commercial success of the PRETZEL CRISPS brand" and filed these proceedings "at the same time it was bidding to

stipulated to a trial on the papers before the TTAB.

On February 28, 2014, the TTAB held that "pretzel crisps" was a generic term for pretzel crackers. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 109 U.S.P.Q.2d 1949, 1960 (TTAB 2014). On appeal, the Federal Circuit vacated and remanded[3] the decision for the TTAB to "consider evidence of the relevant public's understanding of the term PRETZEL CRISPS in its entirety." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 969 (Fed. Cir. 2015).

On remand, and after a renewed round of briefing, the TTAB undertook its analysis again based on the Federal Circuit's mandate and came to the same conclusion—"pretzel crisps" is generic. *Frito-Lay N. Am., Inc. v. Princeton Vanguard LLC*, 124 U.S.P.Q.2d 1184, 1206 (TTAB 2017). The TTAB also held, in the alternative, that "pretzel crisps" is "highly descriptive" and Princeton did not carry its burden of showing that the term has acquired distinctiveness. *Id.*

Contrary to Plaintiffs' mischaracterization, the TTAB's precedential, 53-page decision on remand took great care to analyze the meaning of "pretzel crisps" as a whole. The TTAB looked first at the evidence regarding the meaning of the constituent terms "pretzel" and "crisps," an appropriate first step in the analysis under both Fourth Circuit and Federal Circuit precedent. *See Booking.com v. Iancu*, 915 F.3d 171, 184–85 (4th Cir. 2019) ("When confronted with a compound term like PRETZEL CRISPS, courts may consider as a first step the meaning of each of the term's

_____

acquire the PRETZEL CRISPS brand." Cross-Motion at 1. Plaintiffs do not say what they mean to imply through these allegations, but they admit they have no evidence that Frito-Lay's challenges had anything to do with any desire to acquire the alleged "brand." *See* Declaration of David E. Armendariz ("Armendariz Decl.") ¶ 4, Ex. 3, at 9 (Plaintiffs' Response to RFP No. 9). Even under Plaintiffs' own (unsupported) timeline, they allege that acquisition discussions occurred "in 2011," well after these proceedings were initiated in 2009 and 2010. *See* Pls.' Compl. ¶ 5 [Doc. 1]. In reality, the decision to file these proceedings was made by Frito-Lay's Trademark Department, and the person responsible for making the decision had no knowledge of, and would not have been influenced by, any discussions involving a potential acquisition of Plaintiffs' business. *See* Declaration of Jeanette Zimmer (filed contemporaneously).
[3] Plaintiffs mischaracterize the Federal Circuit's decision as a reversal, but the court did not reverse the TTAB's decision—it vacated and remanded. *Princeton Vanguard*, 786 F.3d at 971.

component marks."); *Princeton Vanguard*, 786 F.3d at 969 (acknowledging analysis of constituent terms as a "first step" in the analysis of a compound term). The TTAB concluded that both "pretzel" and "crisps" are generic for Plaintiffs' products, explaining that "there is no question that 'PRETZEL' would be understood by the relevant public primarily as referring to any 'pretzel,' including a pretzel cracker and that 'CRISPS' would be understood by the relevant public primarily as referring to 'crackers,' also including pretzel crackers."). *Frito-Lay*, 124 U.S.P.Q.2d at 1201. The TTAB's conclusion with respect to "pretzel" was based on dictionary definitions and Princeton's own descriptions of its products, and Plaintiffs have never disputed that the term is generic. *Id.* at 1188. The TTAB's finding that "crisps" is generic was based on dictionary definitions and witness testimony regarding generic use of the term for snack products, as well as Princeton's own uses and admissions. *Id.* at 1188–89. For example, the TTAB noted that Princeton itself used "crisps" generically on its packaging to refer to its product, and that Princeton admitted in discovery that "crisps" can be used as a term for its product. *Id.*[4]

The TTAB next considered the multitude of evidence regarding the use and perception of the combined term "pretzel crisps." First, the TTAB considered evidence of third-party use and concluded that "media references, product reviews, and . . . consumer feedback support a conclusion that the term 'PRETZEL CRISPS' is more likely to be perceived by the relevant public as a name for a type of snack product that may derive from multiple sources, rather than as a brand name that emanates from a single source." *Id.* at 1194.

Princeton's media evidence was submitted through a declaration from Christopher Lauzau, a "Senior Legal Research Analyst" at the law firm of Plaintiffs' counsel, who purported to

---

[4] Frito-Lay submitted much more evidence of genericness of the constituent terms that the TTAB considered but did not mention explicitly in its opinion. That evidence is recounted in greater detail in Frito-Lay's Motion for Summary Judgment [Doc. 28-1, at 5–10], though Plaintiffs do not appear to dispute in this Court that "pretzel" and "crisps" are generic terms for its products.

categorize references to "pretzel crisps" based on whether they constituted a trademark use or a generic use. However, the TTAB noted that "Mr. Lauzau . . . has not been qualified or presented as an expert in the field of trademark law" and that there were flaws in his categorizations. *Id.* at 1190. As a result, the TTAB declined to "substitute his legal conclusions for [its] own" and gave no weight to his finding as to percentages of generic or trademark uses. *Id.*

Analyzing Princeton's media evidence, the Board noted that the term "pretzel crisps" was already in use before Princeton claimed to have adopted it, which belies Plaintiffs' claim that they "coined" the term. *Id.* at 1203; *see also id.* at 1202 n.58 ("Although [Princeton] maintains that it created the term 'PRETZEL CRISPS,' it asserts rights in the term under Section 2(f) acquired distinctiveness, not as a coined term."). The Board also analyzed the multitude of lower-case uses of "pretzel crisps," which indicate "an understanding that the term 'pretzel crisps' refers to a product rather than to a single producer thereof," and listed several examples in its decision. *Id.* at 1190–94. Examples also included articles that clearly reference Princeton's products but nevertheless include "pretzel crisps" in lower-case letters, "an apparent indication that the authors, including those writing for trade or industry publications, view [Princeton] as only one of several potential sources of a 'pretzel crisps' product, i.e., as a genus of product, not a brand." *Id.* at 1193. The TTAB concluded that this media evidence "indicates that consumers reading these articles may see [Princeton] as a potential source of 'pretzel crisps,' or 'pretzel crackers,' but would not view the applied-for mark 'PRETZEL CRISPS' as a trademark identifying the source of the goods." *Id.*[5] The TTAB also noted evidence of third party generic use submitted by Frito-Lay, including product reviews and consumer feedback, citing several examples of consumer emails using the term in lower case letters or otherwise in a generic sense. *Id.* at 1193–94.

---

[5] The Board considered other evidence from Mr. Lauzau, including dictionary excerpts and Google search results, but found that it was not probative. *Frito-Lay*, 124 U.S.P.Q.2d at 1193.

The Board also analyzed use of the term by Princeton itself, finding that while Princeton has obviously used the term to identify source, "it has also used the term 'pretzel crisps' to identify the type of goods, which has contributed to and otherwise reflects a generic understanding of the term." *Id.* at 1195. Princeton also submitted declarations from four of its distributors purporting to testify that the term is not used generically in the industry. The Board noted that these potentially "interested" declarants are distributors, not end consumers (and even then represent but a "very small subsection of snack food distributors"). *Id.* at 1194–95. Further, the Board noted that "to the extent they purport to convey the views and comments of such consumers, such commentary constitutes speculation and inadmissible hearsay." *Id.* at 1195. Thus, the Board found the declarations, "which were created for the purpose of this proceeding and may be from interested declarants, to be of limited probative value."[6] *Id.*

The Board then considered the surveys submitted by the parties—two on genericness and one purportedly on secondary meaning. As an initial matter, the Board held, citing Fourth Circuit precedent, that surveys were not relevant to the question of whether "pretzel crisps" is generic in this case. *Id.* at 1196, 1202 (citing *Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.*, 240 F.3d 251, 255 (4th Cir. 2001)). Nevertheless, the Board went on to analyze the surveys, concluding that both parties' surveys would have been accorded "less probative value" and "limited weight" respectively had they been considered on the question of genericness. *Id.* at 1197, 1199.

The Board then analyzed Princeton's survey from George Mantis purporting to measure secondary meaning, which concluded that while 38.7% of survey respondents associated the name "PRETZEL CRISPS" with only one company, an even higher percentage (47.8%) associated the name with more than one company. *Id.* at 1200. The Board concluded that the survey did not

---

[6] Plaintiffs have submitted "updated" declarations in this proceeding from these same interested distributors, all of which contain the same deficiencies identified by the Board, as discussed *infra*.

establish that "pretzel crisps" has secondary meaning, and further noted based on the survey's instructions that it was conducted in the "Teflon" format, which is typically for genericness surveys; thus, had it considered the other surveys on the question of genericness, it would have considered this one on that question as well. *Id.* The Board explained that "[s]ince substantially less than half of the Mantis survey respondents associated the term 'PRETZEL CRISPS' with a single source, this survey weighs in favor of finding genericness." *Id.*

Finally, the Board considered the alternative ground that even if "pretzel crisps" were not generic, it has not acquired distinctiveness as required for registration on the Principal Register. The Board began by noting that the term has been shown to be generic, so for purposes of the secondary meaning analysis, the term is at best highly descriptive, a finding that Plaintiffs have not disputed. *Id.* at 1204. Thus, it held, Princeton has "a heavy burden of showing acquired distinctiveness," which Princeton did not satisfy. *Id.* at 1205. The Board found that while Princeton's evidence of sales and advertising was "impressive," it was "significantly undercut by the evidence discussed previously that the relevant public and many survey respondents, including more than half the respondents to the Mantis survey, perceive the term 'pretzel crisps' as referring to a product that may derive from multiple sources." *Id.* at 1205–06. The Board went on to explain that "the question is not the extent of advertising and promotion, but the success of it in establishing brand recognition." *Id.* at 1206. "[B]ased upon consideration of all of the evidence of record," the Board concluded Princeton failed to establish that "pretzel crisps" acquired distinctiveness. *Id.*

Accordingly, the Board granted Frito-Lay's petition to cancel Princeton's Supplemental Registration and sustained Frito-Lay's opposition to Princeton's application.

## II.     New Evidence in this Court

Plaintiffs appealed the Board's decision to this Court and have introduced "new" evidence

consisting of "facts developed since 2012[7] and submitted here, for the first time." Cross-Motion at 13. Because none of Plaintiffs' new evidence was before the Board, and none of it contains facts relevant to the time period considered by the Board, this new evidence is not relevant to the Board's determination that "pretzel crisps" is generic. Notwithstanding the irrelevance of the new evidence on the question of genericness, such evidence only confirms that the relevant public continues to use and understand "pretzel crisps" as a generic term describing a type of product.

Plaintiffs submitted with their Cross-Motion a declaration from Elliot Beaver, a "litigation case manager" at Plaintiffs' counsel's law firm, purporting to present data from search results on Twitter for the term "pretzel crisps" in tweets and hashtags in 2018. Beaver Decl. [Doc. 44]. Mr. Beaver claims that he "personally reviewed each of the tweets" in the searches, and despite no allegation that he is a trademark expert or practitioner or otherwise qualified to evaluate the trademark nature of a given use, like Mr. Lauzau at the TTAB, he purports to categorize each tweet and hashtag in the search results based on whether he thought the term "pretzel crisps" was used generically. As explained in greater detail below, Mr. Beaver's methodology for categorization is flawed and inflates the number of alleged "brand references" in the results. What's more, even as inflated under this flawed methodology, after excluding tweets from Plaintiffs themselves (which are obviously irrelevant to consumer perception), Plaintiffs only count 51% of tweets as alleged "brand references," hardly impressive (let alone dispositive) evidence that the public understands the term primarily as a source identifier. *Id.* ¶ 4.

Plaintiffs also submitted media references from 2012 to 2018 including the term "pretzel crisps," submitted again through Mr. Lauzau. [Docs. 41–43]. Like in the TTAB proceedings below, and like Mr. Beaver's analysis, Mr. Lauzau's categorization of these references is

---

[7] 2012 was when discovery closed in the underlying TTAB proceeding.

inherently flawed and biased. Mr. Lauzau did not reveal his methodology for categorization, but he did indicate which category he assigned to most articles. As explained below, he erroneously included as trademark references numerous generic references (presumably because some also mentioned Plaintiffs in some capacity), hundreds of articles that are clearly press releases from Plaintiffs themselves, articles about the underlying litigation regarding whether "pretzel crisps" is generic, and dozens of duplicates. Nevertheless, Mr. Lauzau's evidence includes over a hundred articles showing that the public and the media use and understand the term in a generic sense. Declaration of David E. Armendariz ("Amendariz Decl.") ¶ 3, Ex. 2 (filed contemporaneously).

In addition, Plaintiffs submitted articles from trade publications regarding their products through Rachel Sasser, Director of Marketing for Snyder's-Lance. Sasser Decl. ¶ 12 [Doc. 45]. Ms. Sasser describes these articles as "unsolicited," but many of them appear to be press releases issued by Plaintiffs themselves. *See, e.g.*, [Doc. 45-5] at 29, 30, 32, 33; [Doc. 45-6] at 4, 5, 15, 27, 33; [Doc. 45-7] at 19, 20–21; [Doc. 45-8] at 26, 35. Additionally, some of the articles actually use "pretzel crisps" generically or identify Snack Factory, rather than "pretzel crisps," as the brand. *See, e.g.*, [Doc. 45-5] at 8 ("New pretzel crisp flavor"), 17 (headline that reads "Snack Factory previews organic pretzel crisps"); [Doc. 45-8] at 13 (referring to "Snack Factory brand Pretzel Crisps"), 20 ("Snack Factory, a Snyder's Lance brand, has released Bacon Habanero Pretzel Crisps."), 21 ("Snack Factory, a Snyder's Lance brand, has expanded its Gluten Free Pretzel Crisps line").

Plaintiffs have also submitted "updated" declarations from their same four distributors from the TTAB proceeding, purporting to testify to consumer use and perception but featuring the same shortcomings in terms of reliability and relevance. Despite Plaintiffs' description of these declarants as "independent distributors," their declarations reveal that they are anything but. *See*

Decl. of Gary Plutchok ¶ 4 [Doc. 36] ("I began working with Snack Factory as one of its first distributors of PRETZEL CRISPS in 2005, and I have been worked [sic] with Snack Factory and Snyder's-Lance ever since."); Decl. of John O'Donnell ¶ 4 [Doc. 37] (explaining that his company and Snyder's-Lance have been working together since 2004 and recounting the many millions of dollars of business it receives from Plaintiffs[8]); Decl. of Mark Finocchio ¶ 4 [Doc. 38] (noting that his company "has sold Snyder's-Lance Pretzel Crisps since 2004" and the millions of dollars of business it has done with Plaintiffs as a result); Decl. of Salvatore D'Agostino ¶ 4 [Doc. 39] ("I began working with Snack Factory as a broker of Pretzel Crisps brand crackers in 2004, and I have worked with Snyder's-Lance since it acquired the brand in 2012."). To the extent these declarations purport to testify about consumer perception, as the TTAB found, "such commentary constitutes speculation and inadmissible hearsay." *Frito-Lay*, 124 U.S.P.Q.2d at 1195. Additionally, to the extent they purport to speak on behalf of the distributors themselves, they are irrelevant. The relevant consuming public for purposes of this proceeding is "ordinary consumers who purchase and eat pretzel crackers," not distributors. *Id.* at 1187 & n.10.

To test Plaintiffs' characterizations of recent consumer perceptions, Frito-Lay reviewed recent emails between Plaintiffs and consumers.[9] These emails reveal that Plaintiffs' own customers continue to use and understand "pretzel crisps" as a generic term on a large scale. For example, in 2016 alone, over 1250 consumer emails contained generic use of "pretzel crisps." *See*

---

[8] Mr. O'Donnell also notes that in the time after he provided a declaration for Princeton in the TTAB proceeding, his business with Plaintiffs increased from $2.5 million in the period before 2012 to $71.5 million since 2012, and that they now generally sell about $14.3 million a year.

[9] These documents were produced pursuant to the Court's Order on a motion to compel filed by Frito-Lay directing Plaintiffs to produce the documents ***and*** identify any responsive documents that were not retained during the course of litigation. [Doc. 65]. Though Plaintiffs did not identify any documents not retained (other than physical letters), it appears that at the very least emails to and from Plaintiffs' consumer-facing email address (info@pretzelcrisps.com) prior to 2015 were not retained. Plaintiffs produced several thousand responsive documents for each year in 2015, 2016, and 2017, but only around 26 from 2012, 93 from 2013, and 325 from 2014.

Armendariz Decl. ¶ 6, Ex. 5. This generic use includes lower case type as well as other contextual indications. *See, e.g.*, *id.* at 21 (comparing Plaintiffs' "pretzel crisps" to those from "another brand"); 137 ("SNACK FACTORY Pretzel Crisps," showing understanding that "SNACK FACTORY," not "pretzel crisps," is the brand); 1144 (Subject line: "Snack Factory pretzel crisps," and lower-case use of "pretzel crisps" in body). The documents also reveal that Plaintiffs' own employees often use "pretzel crisps" generically. *See, e.g., id.* at 1, 150, 222, 708, 712, 804, 917, 919, 921, 955, 1058, 1107, 1278, 1283, 1357.

Frito-Lay engaged Dr. Isabella Cunningham (the Stan Richards Chair in Advertising and Public Relations at The University of Texas at Austin) to perform a new consumer survey directed to the issue of secondary meaning. Her survey confirmed that "pretzel crisps" still has not acquired secondary meaning and that, in fact, even fewer consumers associate the term with only one company today than when Mr. Mantis performed his survey almost eight years ago. Dr. Cunningham performed a double-blind survey with a test stimulus and a control stimulus and screened participants to include only consumers that recently purchased (in the last three months) or planned to purchase (in the next three months) pretzels and crackers. Expert Report and Declaration of Professsor Isabella Cunningham ("Cunningham Decl.") at 3–4 (filed contemporaneously). Subjects in the test group were asked whether they associate Plaintiffs' claimed trademark—PRETZEL CRISPS—with one company, more than one company, no company, or whether they did not know. *Id.* at 4. Participants in the control group were asked the same questions, but with the control term CRACKER THINS substituted for PRETZEL CRISPS.[10] *Id.*

The survey revealed that a net of only 6.2% of respondents associated the name PRETZEL

---

[10] The control is designed to estimate the amount of "noise" attributable to the overall survey to arrive at a more reliable result in the test survey.

CRISPS with only one company after adjusting for noise.[11]  *Id.* at 7.  (29.1% of respondents in the test survey attributed PRETZEL CRISPS to only one company, while 22.9% of subjects in the control survey attributed CRACKER THINS to only one company; subtracting the control percentage from the test percentage yields the net percentage for assessing secondary meaning).  *Id.* at 6.  By contrast, 53.5% of respondents in the test survey attributed PRETZEL CRISPS to more than one company (28.1%) or no company (25.4%).  *Id.*  Dr. Cunningham concluded that "these results clearly demonstrate the name PRETZEL CRISPS has not acquired secondary meaning, as they fail to show that the primary significance of PRETZEL CRISPS among relevant consumers is to identify the source of the product rather than the product itself."  *Id.* at 7.

## **STANDARD OF REVIEW**

I.     **District Court Review of TTAB Decisions under 15 U.S.C. § 1071(b)**

The standard of review for a TTAB decision appealed to a district court depends on the TTAB findings at issue and the evidence under consideration by the Court.  Where the Court is considering the same record that was before the TTAB on a particular finding—that is, where no new evidence has been introduced that is relevant to that finding—the Court reviews the TTAB's finding under the deferential "substantial evidence" standard.  *See Belmora, LLC v. Bayer Consumer Care AG*, 338 F. Supp. 3d 477, 484 (E.D. Va. 2018) ("[F]actual findings made by the Board which are untouched by new evidence presented to the court are reviewed under the substantial evidence standard mandated by the Administrative Procedure Act.").  Under this standard, TTAB findings may only be set aside if they are "unsupported by substantial evidence," *Kappos v. Hyatt*, 566 U.S. 431, 434–35 (2012), or are "arbitrary, capricious, or otherwise not in

---

[11] Additionally, only 9 of the 35 respondents who answered the question "From what you know, what company do you associate with PRETZEL CRISPS" responded with Snack Factory or Snyder's-Lance (and none responded with Princeton Vanguard).  Cunningham Decl. at 6.

accordance with law," *Belmora*, 338 F. Supp. 3d at 488.

Where new evidence is introduced on appeal that is relevant to a disputed fact finding of the TTAB, the Court reviews that finding *de novo*. *Kappos*, 566 U.S. at 433 (analyzing 35 U.S.C. § 145, the patent analogue to 15 U.S.C. § 1071(b)). Still, even where new evidence is introduced on a disputed fact issue, "the district court may, in its discretion, 'consider the proceedings before and findings of the [TTAB] in deciding what weight to afford an applicant's newly-admitted evidence.'" *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014) (quoting *Kappos*, 566 U.S. at 445). While the Fourth Circuit acknowledged that "it is not obvious from *Kappos* exactly what this means," *id* at 155 n.6, TTAB decisions are generally given "great weight" as persuasive authority based on the TTAB's trademark expertise. *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 386 (4th Cir. 2003) (Motz, C.J., dissenting); *see also Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 863 n.1 (6th Cir. 2017) ("[O]ur sister Circuits have generally treated TTAB decisions as persuasive authority entitled to respect because of the TTAB's expertise in trademark disputes" (quotation marks and citations omitted)).

At issue in Plaintiffs' Cross-Motion are two findings from the TTAB decision below. The first is that "pretzel crisps" is generic for pretzel crackers, and this finding should be reviewed by this Court for substantial evidence. It is well settled that "[g]eneric terms can *never* obtain trademark protection." *Booking.com*, 915 F.3d at 177 (emphasis added). All of Plaintiffs' new evidence is from after the record at the TTAB closed in 2012. Because a generic term can never become a trademark, none of Plaintiffs' more recent evidence is relevant to this Court's review of the TTAB's determination, based on the record before it, that "pretzel crisps" was generic at that time. *See id.* at 180 ("Once a term is deemed generic, it cannot subsequently become non-generic"

and "subsequent consumer recognition of the term as brand-specific cannot change that determination."). Thus, the TTAB's finding on genericness should only be disturbed if it was not supported by substantial evidence or was arbitrary, capricious, or not in accordance with the law.

The second TTAB finding challenged by Plaintiffs is that the term "pretzel crisps" has not acquired secondary meaning. That finding, while correct, need not even be reached unless the Court first determines that the term is descriptive and not generic. As the Fourth Circuit has explained, so-called "de facto secondary meaning" cannot create trademark protection for a generic term. *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 822 (4th Cir. 2001). As such, secondary meaning is only relevant for a term that is not generic. If the Court does reach this question, it can decide for itself what weight to afford Plaintiffs' newly-admitted evidence given the TTAB's expertise in trademark matters. *Swatch AG*, 739 F.3d at 155.

## II. Summary Judgment Standard

Summary judgment is appropriate only where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Inferences drawn from the evidence considered must be viewed in light of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). "No genuine issue for trial" exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587.

Plaintiffs cite three non-binding cases for their claim that "[c]ourts in the Fourth Circuit have not hesitated to reject genericness challenges on motions for summary judgment and to instead hold, as a matter of law, that the mark at issue is registerable." Cross-Motion at 12. However, none of those cases apply here. *Booking.com v. Matal* was an appeal of a trademark examiner's refusal during the registration process, where the burden of proof is different than in

inter partes proceedings like this one. 278 F. Supp. 3d 891, 918 (E.D. Va. 2017) (noting that the PTO has the burden to prove genericness by "clear evidence"); *Booking.com*, 915 F.3d at 179 ("[I]n registration proceedings, the USPTO always bears the burden of establishing that a proposed mark is generic."). The other two cases involved Principal Registrations, which carry a statutory presumption of validity. *See Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 656 (D. Md. 2013); *Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*, No. 3:08-CV-573-HEH, 2019 WL 2013599, *5 (E.D. Va. July 10, 2009).[12] Supplemental Registrations like Plaintiffs' enjoy no such presumption. *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 n.8 (4th Cir. 2009) ("[U]nlike principal registration, supplemental registration is not prima facie evidence of the validity of the registered mark." (citing 15 U.S.C. § 1057(b))).

There is no genuine factual dispute regarding the TTAB's finding that "pretzel crisps" is generic, and because substantial evidence supports that finding, this Court should affirm the TTAB's decision, as requested by Frito-Lay in its Motion for Summary Judgment. The finding of genericness was based on a fully developed record in the TTAB proceeding, and evidence developed following the close of the TTAB record cannot change that finding.

However, the record on secondary meaning (should that issue be reached) is still being developed. Plaintiffs introduced new evidence purporting to bear on the question, Frito-Lay has submitted a new survey on secondary meaning, and it is not yet known what more, if anything, Plaintiffs will offer. As such, summary judgment on secondary meaning would be premature.

## III.    Burden of Proof

Under Fourth Circuit law, because Plaintiffs do not have a Principal Registration, the

---

[12] Plaintiffs also misleadingly state that the *Lumber Liquidators* court "reject[ed] defendant's proffer of separate dictionary definitions of component words," which is wrong. The court merely held that "lumber" and "liquidators" were not generic for specific products at issue. In contrast, the evidence here establishes that both "pretzel" and "crisps" are generic for Plaintiffs' products.

burden is on them to prove that their purported mark is not generic. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002); *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir. 2000) ("[B]ecause Raleigh Ale House suggests that the term 'ale house' is generic and AHM has not registered it, AHM bears the burden of establishing that it is not generic.").

Likewise, the burden is on Plaintiffs to prove that their alleged mark has acquired distinctiveness. *See U.S. Search,* 300 F.3d at 525–26 ("[T]he burden of proving secondary meaning is on the party asserting it."); *Dick's Sporting Goods, Inc. v. Dick's Clothing and Sporting Goods, Inc.*, 188 F.3d 501 (table), 1999 WL 639165, at *4 (unpub. op.) (4th Cir. 1999) ("The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action o*r the applicant for federal trademark registration*." (emphasis added)).

## **ARGUMENT**

### I.    **The Relevant Public Uses and Understands "Pretzel Crisps" as a Generic Term**

The TTAB determined, based on a careful analysis of all of the evidence before it, that "pretzel crisps" is a generic term for Plaintiffs' products. The TTAB's decision was based on evidence gathered and submitted through 2012, the close of discovery in the TTAB proceeding.

Because this action is an appeal of the TTAB's decision, this Court must evaluate that decision considering the evidence that was before the Board. The question before this Court on genericness in particular is whether the TTAB was correct in finding that "pretzel crisps" was generic based on evidence from the time period before Plaintiffs adopted the term up until the record closed in 2012. Further, because a generic term can never become a trademark, evidence developed after the close of discovery at the TTAB is not relevant to that question. Because later-developed evidence cannot convert a generic term into a protectable trademark, this Court must

necessarily review the TTAB's genericness finding on the same record that was before that body. As such, that finding should be reviewed in this Court for substantial evidence. Still, even if new evidence were considered, it only confirms that "pretzel crisps" continues to be used and understood as a generic term and not as a source identifier.

A.    **The Media Uses Pretzel Crisps Generically**

As Frito-Lay outlined in great detail in its Motion for Summary Judgment, the evidence before the TTAB shows that the media routinely uses "pretzel crisps" in a generic way. *See* Frito-Lay's Motion at 10–12 [Doc. 28-1]. For example, before Plaintiffs even claim to have adopted the term in 2004, the media had been using "pretzel crisps" as a generic descriptor. Specifically, in 1998 and 2001 two publications included "pretzel crisps" as an ingredient or accompaniment for recipes. Opp'n No. 91195552 A1458, A1462–63. In 1999, the *San Francisco Chronicle* put "Honey-mustard pretzel crisps" in its list of "Hot" grocery items. *Id.* at A1460 –61.

Generic usage continued after Plaintiffs began using the term, as recounted in the TTAB decision and in Frito-Lay's Motion. Plaintiffs point to various percentages calculated by Mr. Lauzau purporting to represent articles that use the term "as a trademark" both before the TTAB and in Plaintiffs' new evidence, but they do not explain how he is qualified to classify references as trademark or generic uses, despite the TTAB's criticism in this regard, nor do they explain the methodology used to assign categories to the articles presented.

Additionally, an analysis of the new media evidence submitted by Plaintiffs reveals that their categorization process is critically flawed. For example, contrary to Plaintiffs' totals, Frito-Lay has identified at least 113 articles featuring generic use of "pretzel crisps." *See* Armendariz Decl. ¶ 3, Ex. 2. Further, among Plaintiffs' count of trademark uses are hundreds of articles that are clearly press releases from them (and presumably many more that may be press releases but

are not labeled as such), contradicting Plaintiffs' repeated claim that their media evidence consists of "unsolicited" media mentions of "pretzel crisps." *Id.* ¶ 7. Also included among Plaintiffs' claimed trademark uses are over two-dozen articles about the underlying litigation in this dispute, including articles with titles like "*Are pretzel crisps crumbling into genericness*" (using "pretzel crisps" in lower-case letters in the title and throughout the article), [Doc. 41-5] at 214, or "*Pretzel Crisps Found Generic and Unregistrable*," [Doc. 42-3] at 125, and articles otherwise discussing Frito-Lay's litigation success in challenging the mark as generic. Armendariz Decl. ¶ 8. Plaintiffs also included as trademark uses duplicate articles and over a dozen articles featuring generic use that were miscategorized, and Plaintiffs excluded from their results references to other companies providing "pretzel crisps." *See, e.g.*, [Doc 42-2] at 253 (referring to "Stacy's Pretzel Crisps"); [Doc. 42-6] at 131 (using the term "Pretzel Crisps" to refer to "Stacy's Bake Shop crisps.").

These problems severely undermine the credibility and reliability of the conclusions drawn by Mr. Lauzau at the TTAB and in this Court. As before the TTAB, his non-expert opinion cannot substitute for this Court's analysis. The TTAB performed its own analysis of the media evidence and concluded, based on the nature and extent of the generic uses in the record, that it weighed in favor of finding "pretzel crisps" generic. An analysis of the new evidence reveals the same.

### B. Consumers Continue to Use Pretzel Crisps Generically

Consumers continue to use and understand "pretzel crisps" as a generic term describing a type of product. The TTAB's conclusion in this regard was supported by emails from Plaintiffs' own consumers using the term generically to refer to Plaintiffs' products. More recent emails produced by Plaintiffs confirm that their customers (and even their employees) continue to use "pretzel crisps" generically, with over 1250 instances in 2016 alone. Armendariz Decl. ¶ 6, Ex. 5.

Plaintiffs also submitted social media posts from Twitter mentioning "pretzel crisps"

during a period in 2018, but Mr. Beaver's methodology for categorization of the search results is flawed. For instance, he explains that he counted as "brand references" the following categories:

- All tweets posted by Plaintiffs
- All tweets with Plaintiffs' twitter handle (@pretzelcrisps) or the hashtag #snackfactory
- All tweets that reference "Snack Factory" or include an image of Snack Factory products

Beaver Decl. ¶¶ 6–8. All of these categories completely miss the question being evaluated.

Even ignoring the obvious potential for manipulation of the results posed by including tweets from Plaintiffs themselves, Plaintiffs' own use and understanding of the term is irrelevant and should not have been included in any measure of the results. Almost a quarter of the tweets and over three-quarters of the hashtags fall in this category. *Id.* ¶ 6. Including Plaintiffs' own posts shares another flaw with the other categories listed above—a mere reference to Plaintiffs does not necessarily make the use of "pretzel crisps" in a tweet a brand reference. Under that logic, a post that mentions "pretzel cracker"—the term that Plaintiffs agree is clearly generic—along with Plaintiffs' product would count as a "brand reference." Every post referencing Plaintiffs is likely to also reference the product being sold; that does not make the product type a trademark.

Also included as "brand references" are tweets from third parties that include Plaintiffs' @pretzelcrisps Twitter handle. *Id.* ¶ 7. Presumably, this includes replies to posts from Plaintiffs, regardless of context, like the post below on the left, which has nothing to do with Plaintiffs or its products (and may simply be a spam post):

 

[Doc. 44-3] at 32. Also presumably included as brand references (and not counted as posts from Plaintiffs) are posts sponsored by Plaintiffs, like the post above on the right, which appears in the results **as many as 16 times** in substantially the same form (sometimes, but not always, clearly indicating a sponsor relationship). [Doc. 44-2] at 13; *see also, e.g.*, [Doc 44-2] at 12–13, 15, 13; [Doc 44-3] at 10–11; 21, 22, 25; [Doc. 44-4] at 8, 19, 22–23; [Doc. 44-5] at 3, 13, 15.

Additionally (and inexplicably), excluded from the results entirely were 329 tweets (18% of results) and 7 hashtags (5%) where it was apparently "not clear whether or not the person tweeting was referring to Snack Factory Pretzel Crisps." Beaver Decl. ¶ 10. Below is one example:



The author appears to be referencing a type of product generically, and is even indicating that he or she does not identify "pretzel crisps" with any single source. This is the only example provided in this category, so it is unknown how many more generic references were improperly excluded.

Critically, in the nearly 400 pages of tweets, Plaintiffs do not indicate which ones they identify as brand references, generic references, neither, or false positives. More importantly, they do not identify how many of the tweets fall into each category and thus might have been erroneously counted as brand references merely for containing a reference to Plaintiffs without further context. After excluding tweets from Plaintiffs themselves, Plaintiffs estimate that even under this inflating methodology only 51% of the tweets used "pretzel crisps" as a brand reference. Beaver Decl. ¶ 4. Given the unreliability of Plaintiffs' methodology, the actual percentage is likely to be far lower, indicating that consumers consider the term generically and not as a brand.

Substantial evidence supports the TTAB's finding that "pretzel crisps" is generic, and as such, the TTAB's decision should be affirmed. However, even under a de novo review of the new

evidence, it is clear that "pretzel crisps" continues to be used and understood as a generic term in the minds of consumers.[13]

## II.   Plaintiffs Cannot Establish that "Pretzel Crisps" Has Secondary Meaning

Even if "pretzel crisps" were merely descriptive rather than generic (which it is not), Plaintiffs cannot show that the term has acquired distinctiveness. The proponent of a descriptive term must show acquired distinctiveness (or secondary meaning) before it is eligible for registration on the Principal Register. This burden requires a showing that "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). "Secondary meaning indicates that a term has become sufficiently distinctive to establish a mental association in the relevant public's minds between the proposed mark and the source of the product or service." *Booking.com*, 915 F.3d at 177.

"Proof of secondary meaning entails a rigorous evidentiary standard." *U.S. Search,* 300 F.3d at 525. The factors relevant to secondary meaning are "1) advertising expenditures, 2) consumer studies linking the mark to a source, 3) sales success, 4) unsolicited media coverage of the product, 5) attempts to plagiarize the mark, and 6) the length and exclusivity of the mark's use." *Id.* "No single factor is determinative," but "[s]urvey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." *Id.* at 525–26 & n.13.

Additionally, because Plaintiffs' applied-for mark is "highly descriptive" (a TTAB finding that Plaintiffs do not dispute), Plaintiffs face a heavy burden to show that "pretzel crisps" has

---

[13] Plaintiffs also cite surveys offered at the TTAB to argue that "pretzel crisps" is not generic, but as explained by the TTAB and in Frito-Lay's Motion for Summary Judgment, those surveys are not relevant to the analysis of the TTAB's decision on genericness. Further, the TTAB's decision that the surveys have little probative value even if considered is entitled to deferential review. Still, even if the surveys were relevant and were considered by this Court de novo, they would at the very least raise genuine factual disputes precluding summary judgment in favor of Plaintiffs.

acquired distinctiveness. *See In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2005) ("[T]he applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning.").

### A. Survey Evidence Uniformly Confirms No Secondary Meaning

Beginning with the "most direct and persuasive" factor, the survey evidence in this case, from *both* parties, uniformly shows that "pretzel crisps" does not have secondary meaning. The Mantis survey showed that far more respondents associate the term "pretzel crisps" with more than one company (47.8%) than those who associate the term with only one company (38.7%). These results, even taken at face value, confirm that the primary significance of "pretzel crisps" is not to identify the source of Plaintiffs' products, as the TTAB correctly found. *See Frito-Lay*, 124 U.S.P.Q.2d at 1205-06.[14]

Dr. Cunningham's more recent survey confirms that "pretzel crisps" continues to lack secondary meaning. Her results showed that only 29.1% of respondents associated "PRETZEL CRISPS" with only one company, compared with 53.5% who associated the term with either more than one company or no company. Cunningham Decl. at 6. Further (and unlike Mr. Mantis), Dr. Cunningham properly included an external control to measure the amount of noise in the survey and eliminate it from the test results. *Id.* After eliminating noise (the 22.9% of respondents in the control group who associated "CRACKER THINS" with only one company), the net result was only 6.2% of respondents who associated "PRETZEL CRISPS" with only one company. *Id.* at 7. Based on these results, Dr. Cunningham concluded that "[t]he name PRETZEL CRISPS has not acquired secondary meaning among buyers and prospective buyers of crackers and pretzels."

---

[14] Further, Mr. Mantis failed to include an external control to account for "noise" in the results, meaning that even the low 38.7% figure is potentially inflated. *See Sara Lee Corp. v. Kayser-Roth Corp.*, No. 6:92CV00460, 1992 WL 436279, at *26 n.3 (M.D.N.C. Dec. 1, 1992) ("The lack of a control in a survey has been a basis for courts to significantly discount a survey study.").

Both surveys confirm that far fewer respondents associate "pretzel crisps" with a single company than those who do not. Plaintiffs cite several cases for the proposition that survey percentages in the range of those reported in the Mantis survey can establish secondary meaning, but those cases are inapposite. None involved the type of one-company vs. more-than-one-company tests performed by Mr. Mantis and Dr. Cunningham. Rather, those cases involved fundamentally different types of surveys, e.g. testing for likelihood of confusion or brand awareness or asking customers to actually identify the source of a particular mark or trade dress.[15]

## B. Other Evidence Does Not Establish Secondary Meaning

The survey evidence here definitively shows that "pretzel crisps" lacks secondary meaning because consumers do not primarily associate it with a single source, and Plaintiffs' purported evidence on the other factors does not change that result. For example, in support of their claim of acquired distinctiveness, Plaintiffs offer information regarding their sales, market share, and advertising. Cross-Motion at 21–22. However, it is not clear that any of that data is tied to Plaintiffs' claimed "pretzel crisps" brand as distinguished from other elements of their packaging

---

[15] *See McNeil-PPC, Inc. v. Granitic, Inc.*, 919 F. Supp. 198 (E.D.N.C. 1995) (discussing use of an "Ever-Ready" survey, which is used to test whether respondents name the plaintiff in an infringement case as the source when prompted with a particular trade dress or mark); *Shuffle Master Inc. v. Awada*, 83 U.S.P.Q.2d 1054, 1057 (D. Nev. 2006) (likelihood of confusion case that does not reveal the survey methodology); *Winchester Fed. Sav. Bank v. Winchester Bank, Inc.*, 359 F. Supp. 2d 561, 566 (E.D. Ky. 2004) ("The survey consisted of open-ended questions, such as asking respondents to identify financial institutions in Clark County and their location."); *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 349 (S.D.N.Y. 1998) (42% represents the percentage of respondents who "had heard of or seen a motion picture with the words 'River Kwai' in the title"); *Monsieur Henry Wines, Ltd. v. Duran*, 204 U.S.P.Q. 601, 605 (TTAB 1979) (37% of respondents identified the brand in question when shown the prompt); *In re Hershey Chocolate & Confectionary Corp.*, Serial No. 77809223, 2012 WL 2930639, at *6 (TTAB June 28, 2012) (non-precedential) ("42% of the survey participants correctly identified applicant as the maker of the candy bar"); *In re Carl Walther GmbH*, Serial No. 77096523, 2010 WL 4502071, at *3 (TTAB Oct. 26, 2010) (non-precedential) ("Approximately 54% of the participants who completed the survey stated that they were able to identify who makes applicant's PPK pistol based on the shape of the pistol; and 33% of survey participants correctly identified applicant, or its licensee, as the maker).

and advertising.  For example, Plaintiffs' packaging and advertising also features the registered SNACK FACTORY and RETHINK YOUR PRETZEL trademarks.[16] *See, e.g.*, [Doc. 45-2] at 2–7; [Doc. 45-3] at 2–4.  Additionally, Plaintiffs' packaging tends to follow a similar design, including, in addition to "Pretzel Crisps," colored lines on the top and bottom of the packaging, a picture of the product in a similar arrangement, the flavor listed in a box in a similar location, and several other non-trademark elements including other generic descriptors. Plaintiffs make no effort to explain or identify what aspects of their sales, promotion, or market share are tied to, and a result of, their alleged "Pretzel Crisps" brand as opposed to any of these other elements. In any event, despite all of Plaintiffs' advertising and promotion, the surveys objectively show that the majority of consumers still do not associate the term "pretzel crisps" exclusively with one company.

Plaintiffs also attempt to point to allegedly "unsolicited" media coverage, but as explained above, the evidence provided is rife with press releases and other statements from Plaintiffs themselves, which are not probative of secondary meaning. Additionally, Plaintiffs' use has not been exclusive, as shown by the numerous generic uses by the media and third parties (and Plaintiffs have produced no evidence that they police generic media use).

Plaintiffs attempt to spin policing against third parties in its favor on the last factor—attempts to plagiarize the (purported) mark.  However, none of these uses constituted "copying" of Plaintiffs' "mark," as in each instance it is clear "pretzel crisps" was being used as a generic term. When Plaintiffs objected to Kraft's generic use of the term under Kraft's RITZ MUNCHABLES mark, Kraft agreed to no longer use "pretzel crisps" "as a product descriptor" and retained its right to resume generic use if a tribunal finds the term is generic. Opp'n No. 91195552 at A1795, A1798. Wish Farms included the term within the name of a recipe featuring

---

[16] U.S. Registration Nos. 3,918,021; 3,917,995; and 3,929,870.

traditional pretzels—"Blueberry Pretzel Crisps"—and not as a mark. [Doc. 45-9] at 3. Betty Jane Homemade Candies used the term generically to describe an ingredient in its "Betty Bites" snack (alongside other ingredients caramel, milk chocolate, and sea salt), and when threatened by Plaintiffs, the owner explained that he "assumed it was a descriptor for the type of pretzel item (similar to pretzel rod, for example, describing the pretzel product)." Armendariz Decl., ¶ 5, Ex. 4, at 7. And finally, Snyder's-Lance's own Assistant General Counsel admitted that Columbia County Bread was using "pretzel crisps" "as a generic term." [Doc. 45-10] at 11.

Given the rigorous nature of the secondary meaning inquiry, as well as the highly descriptive nature of Plaintiffs' claimed mark, Plaintiffs have not carried their heavy burden to show that "pretzel crisps" has acquired secondary meaning.

## CONCLUSION

The Court should deny Plaintiffs' request for summary judgment on secondary meaning, and instead grant summary judgment affirming the TTAB's decision that Plaintiff's purported mark is generic.

This the 14th day of June, 2019.          Respectfully submitted,


<table>
<tr><td>

William G. Barber (*admitted pro hac vice*)<br>
David E. Armendariz (*admitted pro hac vice*)<br>
PIRKEY BARBER PLLC<br>
600 Congress Ave.; Suite 2120<br>
Austin, Texas 78701<br>
Telephone: (512) 482-5223<br>
Facsimile: (512) 322-5201<br>
bbarber@pirkeybarber.com<br>
darmendariz@pirkeybarber.com

</td><td>

  /s/ Nathan A. White<br>
Nathan A. White<br>
N.C. State Bar No.: 48684<br>
Alice C. Richey<br>
N.C. State Bar No.: 13677<br>
ALEXANDER RICKS PLLC<br>
1420 East 7th Street, Suite 100<br>
Charlotte, North Carolina 28204<br>
Telephone:   (704) 365-3656<br>
Facsimile:   (704) 365-3676<br>
nathan@alexanderricks.com<br>
alice@alexanderricks.com

</td></tr>
</table>