**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISON**
**Civil Action No.: 3:17-CV-00652**

SNYDER'S-LANCE, INC. and PRINCETON
VANGUARD, LLC,

                Plaintiffs,

    v.

FRITO-LAY NORTH AMERICA, INC.,

                Defendant.

**DECLARATION OF DAVID E.**
**ARMENDARIZ**

**EXHIBIT 1**

01313-001/00172571-1

**16-2497**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆ ◆

CONVERSE, INC.,

*Appellant,*

—v.—

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

SKECHERS U.S.A., INC., WAL-MART STORES, INC., NEW BALANCE ATHLETICS, INC., fka New Balance Athletic Shoe, Inc., HU LIQUIDATION, LLC, fka Highline United LLC,

*Intervenors.*

ON APPEAL FROM THE UNITED STATES INTERNATIONAL TRADE COMMISSION
INVESTIGATION NO. 337-TA-936

**BRIEF OF *AMICI CURIAE* ALL MARKET INC., CASE-MATE INC., GENERAL MILLS, INC., HERMAN MILLER, INC., HONEYWELL INTERNATIONAL, INC., MARK ANTHONY INTERNATIONAL SRL, OWENS CORNING INTELLECTUAL CAPITAL, LLC, PRINCETON VANGUARD, LLC AND SNYDER'S-LANCE, INC. IN SUPPORT OF CONVERSE, INC.**

DAVID H. BERNSTEIN
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Counsel for Amici Curiae*

February 3, 2017

# CERTIFICATE OF INTEREST

Counsel for *amici curiae* All Market Inc., Case-Mate Inc., General Mills, Inc., Herman Miller, Inc., Honeywell International Inc., Mark Anthony International SRL, Owens Corning Intellectual Capital, LLC, Princeton Vanguard, LLC, and Snyder's-Lance, Inc., certify the following:

1.    The full name of every *amicus curiae* represented by me is:

>    All Market Inc.
>    Case-Mate Inc.
>    General Mills, Inc.
>    Herman Miller, Inc.
>    Honeywell International Inc.
>    Mark Anthony International SRL
>    Owens Corning Intellectual Capital, LLC
>    Princeton Vanguard, LLC
>    Snyder's-Lance, Inc.

2.    The name of the real parties in interest (if the party named in the caption above is not the real party in interest) represented by me are:

>    Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of an amicus curiae represented by me are as follows:

>    Mark Anthony International SRL is a direct wholly-owned subsidiary of Mark Anthony Presents…Inc., a private company.

>    Owens Corning Intellectual Capital, LLC is a direct wholly-owned subsidiary of Owens Corning, a publicly traded company.

>    Princeton Vanguard, LLC is an indirect wholly-owned subsidiary of Snyder's-Lance, Inc., a publicly traded company.

>    No other *amicus curiae* has parent corporations or publicly held companies that own 10 percent or more of their stock.

4.    The names of all law firms and the partners or associates appearing for the
amici curiae now represented by me in the trial court or are expected to appear
in this Court are:

> David H. Bernstein
> *Counsel of Record*
> DEBEVOISE & PLIMPTON LLP
> 919 Third Avenue
> New York, NY 10022
> (212) 909-6000

                                                    Respectfully submitted,


Date: February 3, 2017

                                    /s/ David H. Bernstein
                                    David H. Bernstein
                                        *Counsel of Record*
                                    DEBEVOISE & PLIMPTON LLP
                                    919 Third Avenue
                                    New York, NY 10022
                                    (212) 909-6000

# <u>TABLE OF CONTENTS</u>

**Page**

I.    **UNDER THE LANHAM ACT, CHALLENGERS SQUARELY BEAR THE BURDEN OF PROOF WHEN ATTACKING THE VALIDITY OF A REGISTERED MARK.**..................................................4

II.   **A STRONG PRESUMPTION OF VALIDITY BENEFITS TRADEMARK OWNERS AND CONSUMERS.** ....................................14

    A.    Trademarks are critical to brands and their consumers, reflected in massive investment in trademarks in the modern economy. ..........14

    B.    Efficient and predictable trademark enforcement rights add value for businesses and consumers...................................................19

    C.    The ITC's legal errors promise to increase costs and unpredictability for trademark owners and consumers. ......................22

        1.    Evidence of third-party use must be weighed with caution .....................................................................................23

        2.    Evidence of secondary meaning is time sensitive and should be weighed accordingly................................................26

        3.    Surveys should be weighed alongside traditional forms of evidence. ................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple Inc. v. Samsung Elecs. Co. Ltd.*,
  786 F.3d 983 (Fed. Cir. 2015) ............................................................6

*Cartier, Inc. v. Sardell Jewelry, Inc.*,
  294 F. App'x 615 (2d Cir. 2008) .......................................................25

*Centaur Commc'ns., Ltd. v. A/S/M Commc'ns., Inc.*,
  830 F. 2d 1217 (2d Cir. 1987) ...........................................................28

*Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*,
  892 F.2d 1021 (Fed. Cir. 1989) ...........................................................5

*Cold War Museum, Inc. v. Cold War Air Museum, Inc.*,
  586 F.3d 1352 (Fed. Cir. 2009) ........................................................5, 7

*Commerce Nat'l. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*,
  214 F.3d 432 (3d Cir. 2000) ..............................................................29

*Cunningham v. Laser Golf Corp.*,
  222 F.3d 943 (Fed. Cir. 2000) .............................................................5

*Door Sys., Inc. v. Pro-Line Door Sys., Inc.*,
  83 F.3d 169 (7th Cir. 1996) .........................................................10, 12

*Gen. Motors Corp. v. Lanard Toys, Inc.*,
  468 F.3d 405 (6th Cir. 2006) .............................................................29

*Han Beauty, Inc. v. Alberto-Culver Co.*,
  236 F.3d 1333 (Fed. Cir. 2001) .........................................................24

*In re Hehr Mfg. Co.*,
  279 F.2d 526 (C.C.P.A. 1960) ...........................................................12

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
  10 F. Supp. 2d 271 (S.D.N.Y. 1998) .................................................24

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010) ...............................................25

Case 3:17-cv-00652-KDB-DSC   Document 71-3   Filed 06/14/19   Page 6 of 41

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*,
   396 F. 3d 1369 (Fed. Cir. 2005) ........................................................................24

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
   469 U.S. 189 (1985)...............................................................................12, 14

*Perma Ceram Enters., Inc. v. Preco Indus. Ltd.*,
   23 U.S.P.Q.2d 1134 (T.T.A.B. 1992) ..............................................................27

*Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*,
   486 F. Supp. 414 (S.D.N.Y. 1980) ...................................................................25

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
   544 F.2d 1167 (2d Cir. 1976) ..........................................................................24

*West Fla. Seafood, Inc. v. Jet Rests., Inc.*,
   31 F.3d 1122 (Fed. Cir. 1994) .............................................................................5

*Yamaha Intern. Corp. v. Hoshino Gakki Co., Ltd.*,
   840 F. 2d 1572 (Fed. Cir. 1988) ..........................................................10, 12, 28

## FEDERAL STATUTES

15 U.S.C. § 1057(b) ...........................................................................5, 6, 8, 9

15 U.S.C. § 1115(a) .............................................................................5, 6, 9

## RULES

Fed. R. App. P. 29(c)(5)..................................................................................1

## OTHER AUTHORITIES

George A. Akerlof, *The Market for "Lemons": Quality Uncertainty and the
   Market Mechanism*,
   84 Q. J. Econ. 488 (1970) ................................................................................15

Barton Beebe, *An Empirical Study of the Multifactor Tests for Trademark
   Infringement*,
   94 Cal. L. Rev. 1581 (2006) ............................................................................21

Charles L. Cook & Theodore H. Davis, Jr., *Litigating the Meaning of "Prima
   Facie Evidence" Under the Lanham Act: The Fog and Art of War*,
   103 Trademark Rep. 437 (2013).........................................................................9

iii

Courts & Tribunals Subcommittee of the International Trademark
    Association, *Report on Best Practices in Conducting Surveys in
    Trademark Matters* (2013)................................................................20

Richard W. Goldstein & Donika P. Pentcheva, *2015 Report of the Economic
    Survey*, American Intellectual Property Law Association..................................19

William M. Landes & Richard A. Posner, *The Economics of Trademark Law*
    78 Trademark Rep. 267 (1988)............................................................15, 16, 19

Tony Lisanti, *Top 150 Global Licensors*, License! Global, May 2016...................18

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    (4th ed. 2016)............................................................................6, 12, 26, 29, 30

Matthew Shum, *Does Advertising Overcome Brand Loyalty? Evidence from
    the Breakfast-Cereals Market*,
    13 J. of Econ. & Mgmt. Strategy 241 (2004) ....................................................16

World Intellectual Property Organization, *World Intellectual Property
    Report: Brands – Reputation and Image in the Global Marketplace*,
    WIPO Economics & Statistics Series, 2013..........................................14, 17, 18

Case 3:17-cv-00652-KDB-DSC    Document 71-3    Filed 06/14/19    Page 8 of 41

## STATEMENT OF INTEREST OF THE *AMICI CURIAE*[1]

Amici represent a cross-section of substantial companies, representing many sectors of the economy and serving consumers at all economic levels. Each amicus operates a business that depends on registered trademarks that are reliably enforceable. Among amici's trademarks are VITA COCO, CASE-MATE, CHEERIOS, PILLSBURY, HÄAGEN-DAZS, ANNIE'S, BETTY CROCKER, BISQUICK, HERMAN MILLER, AERON, EAMES, HONEYWELL, LYRIC, MIKE'S HARD LEMONADE, OWENS CORNING, PRETZEL CRISPS, SNYDER'S OF HANOVER, LANCE, EMERALD, and POP-SECRET. Without such marks, amici could not create and sustain the value they contribute in the competitive U.S. and global economies. Amici are acutely aware of the adverse impacts to trademark registrants, consumers and the marketplace that will flow from the doctrinal errors reflected in the opinion below, if not corrected by this Court.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(c)(5), amici curiae state that this brief was authored solely by All Market Inc., Case-Mate Inc., General Mills, Inc., Herman Miller, Inc., Honeywell International Inc., Mark Anthony International SRL, Owens Corning Intellectual Capital, LLC, Princeton Vanguard, LLC, and Snyder's-Lance, Inc., and their counsel, and no part of this brief was authored by counsel to a party. No party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae and their counsel made such a monetary contribution to its preparation or submission.

## SUMMARY OF ARGUMENT

Predictably enforceable trademarks are important to amici, and to their consumers, because they are crucial to fair competition in the marketplace. Trademarks – including the unique and distinctive designs that serve as indicators of source – distinguish the products of different producers, help consumers easily find the products they are looking for, and efficiently communicate both source and quality to consumers. These valuable benefits are provided by both unregistered and registered marks, but registered trademarks enjoy special benefits including, most critically to this case, a presumption of validity. That presumption attaches after a mark has gone through the registration process – a process that includes substantive review by the U.S. Patent and Trademark Office ("PTO") and publication in the *Official Gazette*.

The registration process puts the marketplace on notice of the trademarks and provides competitors with an opportunity to challenge any marks that might otherwise be improvidently registered. The presumption of validity that attaches is rebuttable – including, for example, by showing that a trademark has become generic or has been abandoned. But subject to such rebuttal, the presumption of validity serves the valuable function of enhancing predictability and stability of trademarks. The robustness of the presumption makes marks easier to enforce, and

2

thus more valuable to license and to sell, for brand owners. This, in turn, makes marks more reliable as source and quality indicators for consumers.

Amici are concerned that the decision below by the International Trade Commission (the "Opinion" of the "ITC") makes a number of doctrinal errors that significantly undercut the presumption of validity. The Opinion did not clearly shift the burden of *persuasion* to the parties challenging the validity of the registered trademark. Rather, the ITC suggested it was unnecessary to distinguish between the burden of persuasion and the much lighter burden of *production*. In the analysis that followed, however, the ITC evaluated the evidence only as it tended to weigh for or against an affirmative "finding of secondary meaning" instead of requiring the challengers to prove its absence. The net effect of this approach, if accepted, would be a regime where the challenger can turn trademark disputes into a toss-up simply by producing some evidence of invalidity. This approach not only departs from the majority rule, but its narrow view of the presumption of validity threatens to make trademark disputes more costly and less predictable.

The Opinion compounds this core doctrinal error in three other ways. First, it effectively requires mark owners to police third-party usage of their marks to a degree that is burdensome and impractical. Second, it assesses the acquisition of secondary meaning at the wrong time for purposes of its finding that the registered

trademark is invalid.  Third, it elevates survey evidence from the important role that it plays in appropriate trademark cases to the status of a virtual requirement in routine disputes about validity – suggesting that expert evidence developed years later can and should routinely overcome the PTO's contemporaneous conclusion that the mark is distinctive at the time of registration.

Each of these legal errors by the ITC is certain to directly and substantially increase the cost of trademark enforcement and decrease its predictability.  This is inconsistent with the purposes of the presumption.  The ITC's approach would deprive mark owners and consumers of the benefits that – as a matter of law and sound policy – the presumption of validity is designed to afford.  These are doctrinal errors with major commercial consequences, and they should be corrected by this Court.

## ARGUMENT

### I.  UNDER THE LANHAM ACT, CHALLENGERS SQUARELY BEAR THE BURDEN OF PROOF WHEN ATTACKING THE VALIDITY OF A REGISTERED MARK.

Like any registered mark, the design mark at issue here (registered in 2013) is entitled to the presumption of validity.  In particular, Section 7(b) of the Lanham Act provides that registration is "prima facie evidence" of the validity of the underlying mark.  Among other things, this means that the mark either is inherently

4

distinctive or, as here, has acquired distinctiveness (also known as secondary meaning).

The central legal question raised by the Opinion is the meaning of the phrase "prima facie evidence." This Court has already answered that question, consistently with the majority of other Circuits: the presumption of validity requires a challenger to bear the burden of proof to invalidate a registered mark (e.g., because the mark is merely descriptive and lacks secondary meaning). *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009) ("A mark registered on the Principal Register is presumed to be valid. 15 U.S.C. § 1057(b). Due to this presumption of validity, the burden of persuasion in a cancellation proceeding rests on the party seeking to cancel the registration."); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000) ("The party seeking cancellation must prove . . . that there are valid grounds for canceling the registration."); *West Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1125 (Fed. Cir. 1994) ("[A] presumption of validity attaches to a . . . registration, and the party seeking cancellation must rebut this presumption by a preponderance of the evidence.") (citing 15 U.S.C. § 1057(b)); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed. Cir. 1989) ("Because a trademark owner's certification of registration is 'prima facie evidence of the

5

validity of the registration' . . . the burden of proof is placed upon those who seek cancellation.") (quoting 15 U.S.C. § 1057(b)).

In other words, to prevail in challenging the validity of a registered mark on the ground that the mark is merely descriptive, the challenger must come forward with evidence that affirmatively proves, by a preponderance, that the mark lacks secondary meaning. *See generally* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:138 (4th ed. 2016) (First, Second, Sixth, Eighth, Tenth and Federal Circuits consistently follow the "Majority Rule" that the presumption imposes a burden of proof squarely on a party challenging a registered trademark). The alternative view – that the Lanham Act's presumption shifts only the burden of production – has been followed by courts in the Fourth, Fifth, Seventh and Ninth Circuits. *Id.* (noting this as the "Minority Rule").[2]

The distinction between burden of persuasion and burden of production has enormous practical impact that the Opinion of the ITC disregards. "Persuasion" means that the burden rests firmly and persistently with the challenger, such that

---

[2]     The Opinion appears to read this Court's decision in *Apple Inc. v. Samsung Elecs. Co. Ltd.*, 786 F.3d 983 (Fed. Cir. 2015), a patent dispute, as an endorsement of the Minority Rule. Amici respectfully suggest that the brief discussion in the *Apple* case could not have been meant to overrule this Court's own precedent on this critical issue. In any event, *Apple* is properly read as limited to stating the law of the Ninth Circuit and not this one. *Id.* at 990 ("we look to the law of the regional circuit where the district court sits").

6

disputes where the evidence is mixed will generally tend to be resolved in favor of the registrant.  In contrast, "production" means that if a challenger musters some evidence of invalidity, the dispute is pushed to equipoise – greatly increasing the decision-maker's discretion and creating significant incentive for the registrant to settle (or to not enforce in the first place).  The choice of burden thus is not an academic difference, but one that in amici's experience and judgment will often be case-determinative.  *See*, *e.g.*, *Cold War Museum*, 586 F.3d at 1359 (reversing due to assessment that challenger failed to meet its burden of proving the absence of acquired distinctiveness).

Consistent with this Circuit's caselaw, the Chief Administrative Law Judge's Initial Determination noted that the registered mark was presumed valid, and "Respondents [had] not met their burden in proving that it is not."  Initial Det. at 56.  The Opinion reversed that conclusion based on a crucial legal error: the ITC failed to apply the Majority Rule and evaluated the evidence of secondary meaning as if the registrant bore the burden of persuasion on this issue, consistent with those courts that have adopted the Minority Rule.

This was legal error.  Amici ask the Federal Circuit to maintain and confirm its commitment to the Majority Rule.  Not only has this Court already indicated its support of the Majority Rule, but also, the Majority Rule is compelled by the plain language of the Lanham Act.  Further, the Majority Rule is good policy (in that it

7

encourages parties to seek registration of their marks) and is consistent with the settled expectations of trademark owners. That is because the Majority Rule promotes the certainty and security of investment in a branding strategy. These benefits accrue to companies, their investors, and their consumers. The benefits are diminished, if not all but eliminated, if the meaning of the presumption is limited to a burden of production, which would require merely some evidence from a challenger tending to undermine secondary meaning.

The plain language of the Lanham Act supports the Majority Rule. It addresses the presumption of validity to be afforded a trademark registration in two places. First, Section 7(b) of the Act describes the effect of a certificate of registration:

> A certificate of registration of a mark upon the principal register provided by this chapter shall be *prima facie evidence* of the validity of the registered mark . . . .

15 U.S.C. § 1057(b) (emphasis added). Second, Section 33(a) of the Act expands on this concept:

> Any registration . . . of a mark registered on the principal register . . . shall be *prima facie evidence* of the validity of the registered mark . . . , but shall not preclude another person from *proving* any legal or equitable defense *or defect*, including those set forth in subsection (b), which might have been asserted if such mark had not been registered.

8

*Id.* § 1115(a) (emphasis added).  Section 33(a) makes plain that the "prima facie evidence" may be rebutted by "*proving*" a "*defect*."  The logical reading of this is to assign the challenger a burden of *proof* that never varies and is not satisfied merely by mustering some evidence.

History confirms the import of the plain language.  The Lanham Act's drafters affirmatively revised the draft statute to adopt the term "prima facie" instead of the less-certain "presumptive" because the former was understood to shift the burden of proof.  *See* Charles L. Cook & Theodore H. Davis, Jr., *Litigating the Meaning of "Prima Facie Evidence" Under the Lanham Act: The Fog and Art of War*, 103 Trademark Rep. 437, 470-71 (2013) (articulating a detailed argument for the Majority Rule from historical usage and legislative history).

The structure of the Lanham Act further supports the Majority Rule.  An applicant may submit to administrative and public scrutiny through the registration process.   That provides multiple opportunities for the proposed mark to be challenged, both by the PTO and by third parties.  In exchange for opening itself to this scrutiny, the registrant obtains tangible benefits once registration is granted.  Placement of the burden of persuasion on future challengers is one of the key benefits.

9

If an applicant seeks to register a mark that requires a showing of secondary meaning, the PTO will refuse the application unless the applicant can assert facts or make an evidentiary showing that satisfies the PTO.  Even before the PTO has completed this initial review, an interested party may offer contrary evidence for the PTO to consider by submitting a Letter of Protest.  If the Letter of Protest is accepted by the PTO, the examiner will consider the evidence submitted during the PTO's ex parte review.  Once the PTO reviews and is satisfied that the applicant has established that the applied-for mark has acquired secondary meaning, the PTO publishes the application for opposition.  At this stage, anyone that would be injured by the ultimate registration can oppose the application.

Importantly, in this adversarial "inter partes" proceeding before the PTO's Trademark Trial and Appeal Board, though the applicant bears the ultimate burden of proof that its mark has acquired distinctiveness, the *opposer* is first required to come forward with enough evidence that "the board could conclude that the applicant has not met its ultimate burden of showing acquired distinctiveness." *Yamaha Intern. Corp. v. Hoshino Gakki Co., Ltd.*, 840 F. 2d 1572, 1576 (Fed. Cir. 1988).  This is plainly more substantial than a burden of production – which, in contrast to the burden of persuasion, is satisfied "as soon as evidence of invalidity is presented."  *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 172 (7th Cir. 1996).  If a potential challenger fails to take any of these steps, and the mark

10

achieves registration, the registration assumes its status as "prima facie evidence" of validity.

If a third party (such as a competitor who may have an interest in being able to use a mark or design that is merely descriptive or lacks secondary meaning) has remained silent through the public application process, it can still seek to cancel the registration. If the trademark owner challenges the third party's use of a similar mark, the defendant may defend on the basis that the plaintiff's mark lacks secondary meaning – but at that point it is required to meet and rebut the "prima facie evidence" of validity in the registration.

Once a mark has been registered for five years, the Lanham Act forecloses an infringer's right to challenge its validity on all but a handful of bases. Even if a challenger can present overwhelming evidence of the absence of secondary meaning, once a registration has become incontestable, it is conclusive on the question, and the challenger – whether attacking a registration or merely defending against a claim of infringement – has no recourse on this issue. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985).

If the phrase "prima facie evidence" created a presumption that imposed only a burden of producing some evidence of invalidity, the incremental benefit of a trademark registration would be practically meaningless during the first five years of registration. A potential infringer considering a challenge on validity

11

actually would be well advised to wait for the registration to issue rather than bear the more substantial burden in a contested opposition.

Moreover, secondary meaning is notoriously fact-specific and almost always will involve an evaluation of conflicting evidence. *Yamaha*, 840 F.2d at 1581 ("[The] exact kind and amount of evidence [required to establish secondary meaning] necessarily depends on the circumstances of the particular case.") (quoting *In re Hehr Mfg. Co.*, 279 F.2d 526, 528 (C.C.P.A. 1960)); 6 McCarthy § 32:119 ("[B]ecause of the intangible and ephemeral nature of secondary meaning . . . [c]ourts often deny a motion for summary judgment on the ground that the existence or non-existence of secondary meaning can only be determined at a full fact-finding trial."). If merely producing some conflicting evidence were truly enough to overcome the presumption of validity granted as the result of publicly obtaining a trademark registration, the presumption would amount to no protection at all.

The Minority Rule assumes, implausibly, that Congress meant to provide only an easily-burst bubble of protection to trademark registrants. *See Door Systems*, 83 F.3d at 172 ("The presumption of validity that federal registration confers evaporates as soon as evidence of invalidity is presented. Its only function is to incite such evidence, and when the function has been performed the presumption drops out of the case.") (internal citations omitted). This approach is

inconsistent with the powerful and absolute foreclosure of the right to challenge a registration on all but a handful of bases after five years, where the registration becomes "conclusive evidence" of several aspects of validity, including secondary meaning. It makes far greater sense of the statutory structure of the Lanham Act if the "prima facie evidence" language is construed to reflect a *meaningful* shift in the burden of proof in favor of registrants, rather than an illusory shift in the burden of production.

The presumption of validity rewards companies that invest in developing and registering their marks with important evidentiary and procedural protections for the marks' value. A clear endorsement of the Majority Rule in this case would give those protections the force that Congress intended – a particularly important statement in this critical Circuit Court, where so many trademark disputes of national and global significance are litigated. Disputes over secondary meaning can easily devolve into close debates over the importance of survey evidence, evidence of third-party usage, and other factually intense matters. Treated as a burden of proof, the presumption provides clarity and a rule of decision that tends to make such disputes shorter, less expensive, and more predictable.

## II.    A STRONG PRESUMPTION OF VALIDITY BENEFITS TRADEMARK OWNERS AND CONSUMERS.

### A.    Trademarks are critical to brands and their consumers, reflected in massive investment in trademarks in the modern economy.

Placing the burden of proof squarely on the trademark challenger is not only consistent with the text and structure of the Lanham Act – it also serves the purposes of the Act.  A strong presumption of validity permits mark owners and consumers to enjoy the efficiencies and security that registration under the Lanham Act has come to represent in the majority of circuits.

A system that robustly protects trademarks provides critical benefits to consumers.  *See Park 'N Fly*, 469 U.S. at 193 ("Because trademarks desirably promote competition and the maintenance of product quality, Congress determined that 'a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them.'") (quoting S. Rep. No. 1333, 79th Cong., 2d Sess., at 6 (1946));  World Intellectual Property Organization, *World Intellectual Property Report: Brands – Reputation and Image in the Global Marketplace*, WIPO Economics & Statistics Series, 2013, at 6 ("WIPO 2013 Report") ("Brands [as protected by trademarks] help consumers to exercise their preferences in the marketplace. They come with a reputation for quality, functionality, reliability and other attributes, ultimately enabling consumers to exercise choice in their decisionmaking.").  Trademarks provide consumers with

14

value by reducing search costs – meaning that (for example) rather than attempting to find a favorite beverage by examining ingredient statements, a consumer can immediately reach for the bottle with contour-fluted lines and a red cap and continue shopping. *See* William M. Landes & Richard A. Posner, *The Economics of Trademark Law*, 78 Trademark Rep. 267, 271 (1988) ("[A] trademark conveys information that allows the consumer to say to himself, 'I need not investigate the attributes of the brand I am about to purchase because the trademark is a shorthand way of telling me that the attributes are the same as that of the brand I enjoyed earlier.'").  This, in turn, allows mark owners to invest in and reliably communicate intangible benefits like quality, avoiding a race to the bottom that would be destructive to firms and consumers alike. *See* George A. Akerlof*, The Market for "Lemons": Quality Uncertainty and the Market Mechanism*, 84 Q. J. Econ. 488, 499 (1970) (highlighting that brand names function as "an institution which counteracts the [adverse] effects of quality uncertainty").

A robust system of trademark law encourages brand owners to distinguish their products and services in ways that will be relevant and valuable to consumers. A brand owner will have a powerful incentive to continue to deliver the features that distinguish its goods or services, keeping its promise to its consumers, and preserving the informational value of its trademark to the benefit of consumers.

15

Consumers place tremendous value on the information communicated by a trusted brand and are willing to pay a significant premium over an unfamiliar good of the same type. This is confirmed by research on the effects of advertising in the highly differentiated and highly advertised market for breakfast cereals. Households that had a history of purchasing a single brand demonstrated a significantly lower likelihood of switching when exposed to advertising (which communicates the differentiating features of an unfamiliar brand). The average "switching cost" (that is, the premium consumers placed on the informational value conveyed by their known brand) exceeded the cost of the product itself. This meant that the average consumer would not be convinced to "switch" to a new brand even if it was given to him or her for free. *See* Matthew Shum, *Does Advertising Overcome Brand Loyalty? Evidence from the Breakfast-Cereals Market*, 13 J. of Econ. & Mgmt. Strategy 241, 260 n.25 (2004) (noting that this finding is "not inconsistent with the large number of coupons for 'free samples' dispensed in this industry"). Consumers highly value the ability to trust a producer and hold it accountable for delivering consistently on its brand promise.

Firms and their stakeholders (employees and shareholders) also benefit because a strong trademark increases the value of a company's brand and its shares. Landes & Posner at 272 ("Once the reputation is created, the firm will obtain greater profits because repeat purchases and word-of-mouth references will

16

generate higher sales, and because consumers will be willing to pay higher prices in exchange for lower search costs and greater assurance of consistent quality."). The importance and value of building strong brands through trademarks can be enormous, both in absolute terms (tens of billions of dollars) and in terms of the percentage of overall market capitalization of a company. The World Intellectual Property Organization compiled the table below from three leading private sector brand rankings in its 2013 Report:

| Interbrand | | | BrandZ | | | Brand Finance | | |
|---|---|---|---|---|---|---|---|---|
| Company | Brand value 2013 (in billion USD) | Brand value as a percentage of market capitalization | Company | Brand value 2013 (in billion USD) | Brand value as a percentage of market capitalization | Company | Brand value 2013 (in billion USD) | Brand value as a percentage of market capitalization |
| Apple | 98.3 | 58.0% | Apple | 185.1 | 41% | Apple | 87.3 | 19% |
| Google | 93.3 | 20.7% | Google | 113.7 | 39% | Samsung | 58.8 | 32% |
| Coca-Cola | 79.2 | 39.3% | IBM | 112.5 | 56% | Google | 52.1 | 18% |
| IBM | 78.8 | 26.9% | McDonald's | 90.3 | 94% | Microsoft | 45.5 | 18% |
| Microsoft | 59.6 | 22.9% | Coca-Cola | 78.4 | 46% | Wal-Mart | 42.3 | 18% |
| General Electric | 47 | 19.9% | AT&T | 75.5 | 43% | IBM | 37.2 | 19% |
| McDonald's | 42 | 43.9% | Microsoft | 69.8 | 27% | General Electric | 37.2 | 16% |
| Samsung | 39.6 | 35.2% | Marlboro | 69.4 | NA | Amazon | 36.8 | 27% |
| Intel | 37.3 | 20.0% | Visa | 56.1 | 49% | Coca-Cola | 34.2 | 20% |
| Toyota | 35.4 | 17.8% | China Mobile | 55.4 | 25% | Verizon | 30.7 | 23% |
| Average | 61 | 30.5% | | 91 | 46.7% | | 46 | 21% |

WIPO 2013 Report at 9. These collected data conservatively show that brand value amounted to an average (at a minimum) of one-fifth of each of these companies' market capitalization equaling tens of billions of dollars of value. This demonstrates the important economic role these rights play in today's economy and the relative importance of these investments to successful businesses across a wide range of industries.

In addition, the importance and value of predictably enforceable trademark rights is reflected in the significant revenues generated through brand licensing.

17

Data on revenues generated by top brand licensors in 2015 show sales of licensed merchandise in the billions of dollars annually:

| Rank | Company | Global sales of licensed merchandise (in billion USD) |
|---|---|---|
| 1 | The Walt Disney Company | 52.5 |
| 2 | Meredith | 20.1 |
| 3 | PVH Corp. | 18 |
| 4 | Iconix Brand Group | 13 |
| 5 | Warner Bros. Consumer Products | 6 |
| 6 | Hasbro | 5.9 |
| 7 | Sanrio, Inc. | 5.9 |
| 8 | Major League Baseball | 5.5 |
| 9 | Nickelodeon | 5.5 |
| 10 | Collegiate Licensing Company | 4.65 |

Tony Lisanti, *Top 150 Global Licensors*, License! Global, May 2016, at 5-11. This economic activity is driven by the enforceability of the underlying trademarks.

Trademarks also drive value in mergers and acquisitions. WIPO found that from 2004 to 2013, the value of the average brand-driven M&A transaction was 10 to 12 times higher than the value of the average global M&A deal. WIPO 2013 Report at 73. Firms regularly and actively seek to buy and sell brands as assets, and these large and important markets for licensing and acquiring trademark rights are directly impacted by the predictability with which these rights can be enforced.

18

While it is difficult to create a brand's reputation, "the cost of duplicating someone else's trademark is small." Landes & Posner at 272.  If enforcement rights are too costly or unpredictable, it will reduce and "may therefore eliminate the incentive to develop a valuable trademark in the first place." *Id*.  A strong presumption of validity after a registration has been secured is a rule designed to make enforcement less costly and more predictable.  This rule encourages socially valuable investment in reputation, diverse and differentiated markets, and consistently delivered quality.

### B.    Efficient and predictable trademark enforcement rights add value for businesses and consumers.

The assignment of the burden of proof in a trademark dispute has direct consequences for the cost and predictability of trademark litigation, and thus for the ability of trademarks to serve their value-creating purposes.

Because the cost of enforcing trademark rights is substantial, in evaluating the choice of legal rules it is appropriate to consider the possibility that those costs will increase even further.  A survey of practitioners conducted by AIPLA in 2015 suggested that the cost of a trademark infringement suit frequently ranges from several hundred thousand dollars to well over several million dollars.  Richard W. Goldstein & Donika P. Pentcheva, *2015 Report of the Economic Survey*, American Intellectual Property Law Association, at 44.   To state the obvious, these costs –

substantial in the best of circumstances – will increase as legal rules promote the need for more evidence, more lawyering, and more discretionary decision-making by courts and other tribunals.

In addition, enforcement litigation can turn on several complex questions of consumer reaction.  Courts, as the ITC did below, can rely heavily on consumer survey evidence commissioned for litigation to assess such questions.  A single enforcement action might involve questions of likelihood of confusion, dilution, secondary meaning, fame and genericness, each of which is susceptible to accepted forms of consumer survey evidence.  A single litigation survey can easily cost a litigant more than $100,000.  Courts & Tribunals Subcommittee of the International Trademark Association, *Report on Best Practices in Conducting Surveys in Trademark Matters* 7 (2013) ("Costs [in the U.S.] for a complete survey, with expert reports suitable for use at trial can range from $25,000 to $150,000.").  Additional multiples of this expense can easily be incurred in cases where the survey expert not only submits a report, but each side's expert must be presented for deposition and/or hearing testimony and the consequences (or admissibility) of their reports must be briefed. These costs pose a substantial burden to trademark owners of all sizes and economic status, but particularly to small and medium-sized trademark owners.

Aside from the direct cost of litigation, enforcement efforts pose risk to mark owners.  To establish infringement, a trademark owner must always establish the complex legal-factual basis for infringement (likelihood of confusion) with respect to a particular defendant.  This question, based as it is on thirteen separate multi-factor standards in the thirteen circuit courts of appeal, is already difficult for trademark owners to handicap.  *See* Barton Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement*, 94 Cal. L. Rev. 1581 (2006).  If an enforcement effort is unsuccessful, a brand owner stands to have that precedent cited repeatedly against it by others seeking to encroach and capitalize on the brand's reputation.

A finding that the trademark owner has not established the validity of the mark is not simply an inconvenient but distinguishable precedent; this finding can destroy the trademark and zero-out any return on investment in the brand.

The presumption of validity alleviates this second group of risks, by allowing the registration to serve as "prima facie evidence" of validity and ownership.  If the presumption is not applied in a way that makes it *meaningful* (and on these intricate factual questions, a burden of production is, as discussed, all but meaningless), then the system of registration does not operate to reduce these risks, and the value of these registered trademark rights is depleted – across all of the important primary and secondary markets discussed above.

A strong presumption allows owners to enforce and defend their marks in litigation at reasonable cost and with far more predictable results. This allows mark owners to invest in their brands with confidence that their investments will be rewarded, creating important value that businesses well understand and vigorously pursue in practice. Consumers likewise benefit from these investments, which encourage and allow brand owners to reliably signal quality, safety, and unique differentiating attributes of their goods and services. A strong and predictable system of trademark leads to a safer, more diverse, and more optimized marketplace – all of which benefit consumers in tangible ways. The Federal Circuit has the opportunity in this case to speak clearly on this important issue.

### C.    The ITC's legal errors promise to increase costs and unpredictability for trademark owners and consumers.

The ITC's approach to secondary meaning in this case shows the practical perils of treating the presumption of validity as assigning something less than a burden of persuasion. Amici have no interest in the specific outcome of this dispute as it relates to Converse's sneaker mark; in particular, amici take no position on the specifics of the fact evidence or the survey evidence, or on how either type of evidence was presented or evaluated. Rather, the amici's concern is that, in three specific ways, the ITC chose a legal framework that promises to make

22

trademark litigation generally more expensive and less predictable for mark owners.

### 1.    Evidence of third-party use must be weighed with caution.

Amici are agnostic on the evidentiary particulars regarding third-party use in the record of this case.  Amici also are agnostic as to how exactly the ITC evaluated that evidence.  Rather, amici's concern is with the ITC's legal approach.  Specifically, its analytic framework not only undercuts the presumption of validity, but does so in a way that promises to unduly increase the day-to-day enforcement burden on mark owners.

The modern commercial reality is that any substantial trademark owner, particularly one with a multi-mark portfolio, is regularly barraged with infringements and threats of infringement.  If the law heightens the need to police such infringements, then companies will have no choice but to divert resources to enforcement and away from more socially useful endeavors like the development of new products.

To take one example, The Coca-Cola Company was among the leading brand owners cited above in 2013.  A simple search of the PTO online database for "live" trademark applications or registrations reveals that the Coca-Cola parent company, alone, is the owner of more than 400 active trademarks on file with the PTO.  The impact of a rule that would require brand owners to monitor and police

23

(perhaps with six- or seven-figure litigation costs) every potential third-party use of every registered mark in a brand portfolio of this size would require an enforcement budget of hundreds of millions of dollars.

For this reason, it has long been recognized that – as a matter of law – courts and tribunals should tread cautiously in this area.  Even an extensive list of third-party uses can fail to negate secondary meaning where evidence of the commercial significance of these uses is absent.  *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 1373-74 (Fed. Cir. 2005) ("where the record includes no evidence about the extent of third-party uses the probative value of this evidence is thus minimal") (quoting *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1338 (Fed. Cir. 2001)) (internal alterations omitted); *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 283 (S.D.N.Y. 1998) (evidence of 125 other "Lexington" businesses "is not competent evidence because it does not demonstrate that these marks are 'actually used by third-parties, that they were well promoted or that they were recognized by consumers'") (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976)).

Furthermore, the ITC's Opinion does not acknowledge an important legal rule that many courts have noted:  "[t]he owner of a mark is not required to police every conceivably related use" of its mark.  *New York City Triathlon, LLC v. NYC*

*Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 331 (S.D.N.Y. 2010) (failure to enforce against entity using NEW YORK TRIATHLON CLUB did not undermine secondary meaning in the NEW YORK CITY TRIATHLON mark, even though the former sponsored an annual triathlon in New York City's Central Park) (quoting *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 486 F. Supp. 414, 422-23 (S.D.N.Y. 1980)).

The ITC's legal approach here did not reflect this sort of caution. Amici urge this Court to underscore that it is critical to evaluate (for example) whether since-discontinued, historic third-party uses would have been known, or have any significance, to the relevant consumer population at the relevant time. The ITC's approach does not address the evidence on this issue one way or the other. An approach that does not cast the legally-mandated skeptical eye on laundry lists of third-party use threatens to require inefficient over-enforcement efforts that would clog courts and tribunals with commercially meaningless litigation.

An additional legal concern is the need to recognize that third-party use that amounts to deliberate copying actually supports secondary meaning in the copied mark. *See Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 618 (2d Cir. 2008) ("[P]laintiffs produced evidence that there are many different Tank Francaise knockoffs or lookalikes being sold by various merchants. That there are a number of merchants who use the words 'Cartier style' and 'Tank style' or even

'Tank Francaise' supports the plaintiffs' argument that Tank Francaise has acquired secondary meaning.").

The Initial Determination acknowledged widespread evidence of this type of third-party use, highlighted that the registrant had undertaken substantial expense to combat these infringements in the relevant time frame, and noted that this evidence weighed in favor of a finding of secondary meaning. Initial Det. at 55-56 ("The evidence shows that the CMT has been the subject of counterfeiting and close copying, particularly since 2001."). Yet the ITC did not address this point, thus casting still more doubt on its legal approach to the issue of third-party use.

### 2.    Evidence of secondary meaning is time sensitive and should be weighed accordingly.

In finding the trademark registration invalid, the ITC focused on evidence of third-party use "prior to the first alleged infringement in 2003." Opinion at 23. This was error. The validity of the registration turns on whether the trademark had acquired distinctiveness when it was registered (in 2013) and whether it remains distinctive today.

In focusing on evidence of secondary meaning prior to 2003, the ITC appears to have relied on a doctrine relating to priority: where the junior user of a descriptive mark can show it began using the mark in good faith before the senior user achieved secondary meaning, the senior user cannot show priority over that particular junior user, who is thus entitled to coexist. *See* 2 McCarthy § 16.34.

26

This does not equate to a finding that the senior mark itself is invalid or lacking in secondary meaning on the date of registration or thereafter. Rather, it represents a defense to infringement available only to the individual defendant under specific factual circumstances.

Importantly, this factual situation does not provide a right to challenge the registration of the senior user's mark. Only if the challenger can show that it achieved secondary meaning for itself at an earlier date than the applicant – irrespective of the dates of first use – will the TTAB permit a third party to block registration on this basis. *Perma Ceram Enters., Inc. v. Preco Indus. Ltd.*, 23 U.S.P.Q.2d 1134 (T.T.A.B. 1992) (holding that an opposer "must establish priority of acquired distinctiveness" to prevent registration of the challenged mark).

The ITC did not evaluate whether any of the respondents in this case met the criteria or were entitled to defend on the basis of their first use under this doctrine. By not evaluating each individual respondent's date of first use, the ITC appears to have believed mistakenly that the date of the "first alleged infringement" was relevant in some more general way to validity and enforceability.

### 3. Surveys should be weighed alongside other traditional forms of evidence.

Survey evidence can be critically important in appropriate trademark cases, as many courts have noted. Amici are agnostic as to the merits of the particular surveys presented in this case by the distinguished experts on both sides, and

27

agnostic as well to the ITC's particularized evaluation of the details of these surveys. Rather, amici's concern is precisely focused on the impact of the ITC's approach on the presumption of validity. The ITC appeared to suggest that, having established secondary meaning to the satisfaction of the PTO, a mark owner generally will not get the benefits of the presumption of validity if it does not bolster the record with a new consumer survey. *Yamaha*, 840 F.2d at 1583 (in the context of satisfying Section 2(f), "absence of consumer surveys need not preclude a finding of acquired distinctiveness").

As noted above, the Opinion effectively discarded at the outset the notion that the burden of proof matters – stating, without analysis, that the case would come out the same way whether the burden was one of persuasion or production. Unsurprisingly, then, the Opinion did not consider or acknowledge that the presumption of validity and non-survey evidence still have important roles to play, and should carry significant weight, once the battle of the survey experts begins. Amici urge this Court to underscore that proposition in its opinion.

Particularly in view of the strong presumption of validity flowing from the registration, a trademark registrant's traditional non-survey evidence of secondary meaning should be carefully considered and weighed. *See Centaur Commc'ns., Ltd. v. A/S/M Commc'ns., Inc.*, 830 F. 2d 1217, 1225 (2d Cir. 1987) (affirming finding of secondary meaning based on traditional, circumstantial evidence

notwithstanding two consumer surveys presented as contrary evidence);

2 McCarthy § 15:30 ("[S]urvey data is not a requirement and secondary meaning can be, and most often is, proven by circumstantial evidence.").  While the Initial Determination evaluated the substantial evidence presented by both parties, the Opinion focused exclusively on the Respondents' third-party evidence and survey to the exclusion of the registrant's submissions.  In disputes of this kind, the presumption of validity should allow for secondary meaning to be evaluated more efficiently, more predictably and less expensively.  A challenger should not be found to have carried its burden of proving the absence of secondary meaning without addressing the evidence in the record tending to show it exists.

In addition, depending on the nature of the issues and the case, surveys can often be centrally probative.  However, it is also notoriously difficult to use surveys as evidence of historic secondary meaning.  The relevant consumer population for assessing consumer attitudes at a point in the past is a group of consumers at that point in the past.  A contemporaneous survey commissioned for litigation obviously cannot access such a pool of respondents.  *Compare Commerce Nat'l. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc*., 214 F.3d 432, 440 (3d Cir. 2000) (recency of survey contributed to its being "wholly irrelevant to whether CBI established secondary meaning in the 'Commerce' mark as of 1983") *with Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006)

(remarking that "the question remains whether we should ignore all survey evidence conducted post-infringement or accept the evidence with the understanding that the survey does not reflect a pre-infringement world" and selecting the latter approach); *see also* 2 McCarthy § 16:34 ("The better view is to admit such [survey] evidence but give it weight appropriate to the extent that it sheds light on consumer perceptions in the past.").  Furthermore, when historic secondary meaning is at issue, the relevant date of secondary meaning for enforcement purposes can be the first date of use by each infringer (which a mark owner is not likely to discover immediately).  Were courts routinely to evaluate survey evidence to the exclusion of traditional evidence of secondary meaning, a prudent trademark owner would have to consider undertaking litigation-style surveys as a regular aspect of its business.

Survey evidence of this kind is often entitled to weight, but it should not be accepted as dispositive without evaluating the weight of other, traditional forms of evidence of secondary meaning as well.

## CONCLUSION

For the reasons stated above, amici believe that the Chief Administrative Law Judge applied appropriate legal principles in the Initial Determination, and that the ITC's Opinion departed from long-accepted, legally correct and

30

commercially important positions on the presumption of validity. For that reason,

amici support reversal.

Respectfully submitted,

Date: February 3, 2017

/s/ David H. Bernstein
David H. Bernstein
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Counsel for Amici Curiae*
*All Market Inc., Case-Mate Inc.,*
*General Mills, Inc., Herman Miller,*
*Inc., Honeywell International Inc.,*
*Mark Anthony International SRL,*
*Owens Corning Intellectual Capital,*
*LLC, Princeton Vanguard, LLC, and*
*Snyder's-Lance, Inc.*

31

## **CERTIFICATE OF SERVICE**

I certify that I served a copy of the attached document on all counsel of record on February 3, 2017 by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

| | |
|---|---|
| David H. Bernstein | /s/ David H. Bernstein |
| Name of Counsel | Signature of Counsel |

Law Firm:          Debevoise & Plimpton LLP
Address:           919 Third Avenue
City, State, Zip:  New York, NY 10022
Telephone No.:     (212) 909-6696
Fax No.:           (212) 521-7696
E-mail Address:    dhbernstein@debevoise.com

32

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE <u>REQUIREMENTS</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(d) and 32(a) and Federal Circuit Rule 32(a).

☒ This brief contains _____6,978_____ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

☐ This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ This brief has been prepared in a proportionally spaced typeface using ___Microsoft Word 2010___ in ___14pt Times New Roman___ font, or

☐ This brief has been prepared in a monospaced typeface using [state name and version of word processing program] _____ with [state number of characters per inch and name of type style] _____.

Dated: February 3, 2017

/s/ David H. Bernstein
David H. Bernstein

*Counsel for Amici Curiae*
*All Market Inc., Case-Mate Inc.,*
*General Mills, Inc., Herman Miller,*
*Inc., Honeywell International Inc.,*
*Mark Anthony International SRL,*
*Owens Corning Intellectual Capital,*
*LLC, Princeton Vanguard, LLC, and*
*Snyder's-Lance, Inc.*