UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Action No.:3:17-CV-00652

SNYDER'S-LANCE, INC., and
PRINCETON VANGUARD, LLC,
    Plaintiffs
v.

FRITO-LAY NORTH AMERICA, INC.,
    Defendant

---

# EXPERT REPORT AND DECLARATION OF PROFESSOR ISABELLA CUNNINGHAM

**The Purpose of this Report:**

I have been retained by PIRKEY BARBER PLLC to determine whether the name PRETZEL CRISPS has acquired secondary meaning among U.S. consumers who are buyers or potential buyers of pretzels and crackers. This report contains a description of the survey, an analysis of the data collected through the survey, and my conclusions and expert opinion on the question of whether or not PRETZEL CRISPS has acquired secondary meaning. In my report, I use the term "secondary meaning" to refer to an association of a mark with the products of a single source in the minds of customers and prospective customers of pretzels and crackers.

**Trademarks and Secondary Meaning:**

Trademarks play an important role in a competitive market environment. McCarthy recognizes the economic importance of trademarks in creating an incentive to encourage manufacturers to maintain certain standards of quality, and by reducing consumers' search costs of collecting information about products.[1]

Marketing scholars often define a brand as a name, a trademark, a logo, or any other symbol. According to David Aaker, a brand is "a distinguishing name and/or symbol (such as a logo, trademark, or package design) intended to identify the goods or services or either one seller or a group of sellers, and to differentiate those goods or services from those of competitors."[2] The

---

[1] McCarthy, J. T., Trademarks and Unfair Competition, 2nd edition, Vol. 1, 1984 The Lawyers Cooperative Publishing Company, pp.45-47
[2] Aaker, D.A., Managing Brand Equity: Capitalizing on the Value of a Brand Name, 1991, p.7.

1

Lanham Act defines a trademark as: " any word, name, symbol or device or any combination thereof adopted and used by a manufacturer or merchant to identify its goods and distinguish them from those manufactured or sold by others."[3]

Companies and brands for centuries have distinguished themselves from competitors and have sought to be identified by customers and prospective customers through the use of trademarks. The objective of trademarks is to convey information about the company and/or its products and services, and for the purpose of indicating their origin or source. According to Jacoby: "A unique brand name and cohesive brand identity is probably the single most powerful piece of information for the consumer".[4]

Therefore, brands, trademarks, and trade dress are intended to protect against competitors who might want to pass off products or services by causing confusion as to their origin or source. Certain kind of trademarks are protected by the courts whenever they have acquired secondary meaning. Secondary meaning is achieved when a trademark or a trade dress has become affiliated with a specific source in the minds of the consumer. J. Thomas McCarthy explains: "acquired distinctiveness is known as 'secondary meaning' not because it is second in importance or in impact, but because it is a meaning acquired second in time."[5]

The primary element of secondary meaning, according to McCarthy, is "a mental association in the buyers' mind between the alleged mark and a single source of the product."[6] Secondary meaning is measured by determining the extent of the association of a trademark with the products of one producer; therefore, secondary meaning is established if single source identification is the "primary" association in the buyers' mind.[7] Berger and Halligan state that just because a mark is registered that does not necessarily establish it has achieved secondary meaning, therefore: "a defendant can overcome a presumption of secondary meaning by proving that secondary meaning does not exist."[8]

According to Brennan: "The current broad scope of trademark protection does have limits. Before a producer may obtain a trademark, she must demonstrate that her mark is distinctive."[9] McCarthy states that: "…a mark is 'descriptive' if it is descriptive of: the intended purpose, function or use of the goods, of the size of the goods, of the class of users of the goods, of a desirable characteristic of the goods, or of the end effect upon the user"[10] But Palladino states

---

[3] Lanham Act, 45, 15, USCS, 1127.
[4] Jacoby, J.: The Psychological Foundations of Trademark Law: Secondary Meaning, acquired Distinctiveness, Genericism, Fame, Confusion and Dilution, Based on a *Presentation at The Gottlieb, Rackman & Riesman Seminar in Intellectual Property, School of Law, New York University*, November 3, 1998, p.17.
[5] McCarthy, J. T., McCarthy on Trademarks and Unfair Competition, 15:1 (4th ed., 2003).
[6] McCarthy, J.T., Trademarks and Unfair Competition, 2nd edition, *The Lawyers Co-Operative Publishing Co.*, 1984, Vol. 1, p. 152.
[7] Palladino, V.N., Secondary Meaning Surveys in Light of Lund, *The Trademark Reporter*, Vol 91, p. 585
[8] Berger, J.T. and Halligan R.M., Trademark Surveys 2015, *Lexis Nexis*, 2015, p.131
[9] Brennan H., The Cost of Confusion: The Paradox of Trademarked Pharmaceuticals, Michigan Telecommunication and Technology Law Review, 2015, Vol 22, #1, pp.6-7.
[10] McCarthy, J.T., Trademarks and Unfair Competition, 2nd edition, *The Lawyers Co-Operative Publishing Co.*, 1984, Vol. 1, p. 442-443.

that: "…a trademark and a descriptive term are mutually exclusive in that a descriptive term lacks the source-indicating distinctiveness that characterizes a trademark"[11]

In order to obtain protection descriptive terms must be proven to have acquired secondary meaning. In fact, according to McCarthy: "Trademark protection for descriptive marks is extended only in recognition of consumer acceptance and recognition of such marks as denoting only one seller or source. That is, trademark protection is extended only when the user has proved secondary meaning in a descriptive mark."[12] Furthermore, in Genesee Brewing Company, Inc., v. Stroh Brewing Company, the Court stated: "When a producer creates a new product that differs from an established product class in a particular characteristic, the law of trademark will not grant the producer the exclusive right to label its product with words that are necessary to describe that new characteristic."[13]

The acquired secondary meaning by a trademark may be established in many ways, including through consumer surveys. Consumer surveys must show that the trademark has established the necessary connection between then product and its source.[14] Market survey data is the most effective way of providing evidence of secondary meaning. The survey must show that in the mind of consumers, the "primary significance of a…term is to identify the source of the product rather than the product itself."[15] To provide evidence of secondary meaning, the survey must be conducted according to accepted research principles and statistical methods.[16]

In order to assess whether the name: "Pretzel Crisps" (used by Snyder's Lance, Inc. and Princeton Vanguard, LLC to describe the features of their product that combines the characteristics of a pretzel and a cracker)[17] has acquired secondary meaning, I developed a survey. The survey I developed, and its results are described in the next sections of this report.

**The Survey:**

In order to determine whether Snyder's Lance, Inc.'s, and Princeton Vanguard, LLC's, claimed mark PRETZEL CRISPS has acquired secondary meaning among U.S. customers or prospective customers of crackers and pretzels, I designed a double-blind survey with one test stimulus and

---

[11] Palladino, V.N., Assessing Trademark Significance: Genericness, Secondary Meaning and Surveys, *The Trademark Reporter*, Vol. 92, No 4, July-August 2002, p.859

[12] McCarthy, ibid. p.453-454

[13] *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 140 (2d Cir. 1997).

[14] Caslowitz, C. Trade Dress and Section 43(A) of the Lanham Act: Protection for "Total Image" of the Visual Displays of Software Applications, *The Journal of Law and Technology*, 1993, p.187; Slamowitz, C.L.I., Adjusting the Dress Code: Implementing Trade Dress reform to Burgeon User experience (UX) Protections, *Columbia Journal of Law and the Arts*, 2017, 99, pp. 99-123; Misterovich, E., Secondary Meaning of Trade Dress, *Revision/Legal*; https://revisionlegal.com/trademark-law/secondary-meaning-of-trade-dress/.

[15] Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,456 U.S. 844,851n 11 (1982), citing Kellogg Co. v. National Biscuit Co., 305 US 111,118, 39 USPQ 296,299 (1938).

[16] Gaske, W.F., Trade Dress protection: Inherent Distinctiveness as an Alternative to Secondary Meaning, *Fordham Law Review*, 1989, 57, 6, p 1135.

[17] Case3:17-cv-00652-RJC-DSC Document 35 Filed 10/29/18 page 6 of 31

3

one control stimulus.[18] Double-blind surveys are developed to ensure that neither the respondents nor the company that provided the emails are aware of the purpose of the survey or its sponsor.[19]

The participants in the survey were recruited from the members of the panel company Research Now SSI and were screened to include only consumers that were buyers or prospective buyers of crackers and pretzels. The screening questions used both in the test and control questionnaires can be seen in Appendix 1 which includes the hard copies and the screenshots of the test and control questionnaires used in the survey. The survey data were collected from December 7 to December 13, 2018.

A total of 1,495 subjects opened the survey and of these 655 successfully completed the survey while others either did not qualify or failed to follow the survey instructions. Appendix 2 shows the disposition of the sample.

The test and control questionnaires were identical; only the stimuli used in each of the two surveys were different. The test questionnaire showed the name: PRETZEL CRISPS, which Snyder's Lance, Inc. and Princeton Vanguard, LLC. claim has acquired secondary meaning. The control questionnaire substituted PRETZEL CRISPS with the term: CRACKER THINS. The test and control questionnaires were otherwise identical. The control stimulus was chosen to be a term containing words that would be descriptive of a product in the same category of the PRETZEL CRISPS product to customers and prospective customers of pretzels and crackers. As Shari Diamond recommends: "In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristics whose influence is being assessed."[20] The purpose of the control stimulus was to ensure that the test results were reliable and valid. Appendix 1 shows the test and control stimuli used in the survey.

The survey was programmed using the Qualtrics platform and the data were collected and analyzed by AustinTrends, a market research company, whom I supervised. AustinTrends staff also conducted the statistical analysis of the survey data under my direction. Appendix 1 shows the screenshots of the programmed survey as they would be seen by the survey participants.

The subjects in the test group were shown the test stimulus and were then asked the substantive question Q1 for which the order of responses (a/b/c/d) were randomly presented to avoid order bias followed by questions Q2, Q2a, Q3, Q3a, Q3b, Q4, Q4a, Q5, and Q5a.[21] The subjects in the control group were asked the same questions but were presented with the control stimulus.

---

[18] Shashank Upadhye, Trademark Surveys: Identifying the Relevant Universe of Confused Consumers, *Fordham Intellectual Property, Media and Entertainment Law Journal*, Vol. VIII, Book 2, p. 559, 1997.
[19] Keller, B.P., Survey Evidence in False Advertising Cases, Trademarks and Deceptive Advertising Surveys Law, Science and Design, Shari Seidman Diamond and Jerre B. Swann eds., ABA, 2012, p.181.

[20] Seidman Diamond, S., Reference Guide on Survey Research, in Reference Manual of Scientific Evidence, Third Edition, The National Academies Press, p. 400, 2011.

[21] Palladino, V.N., Secondary Meaning Surveys, in Trademark and Deceptive Advertising Surveys, Law, Science and Design, Shari Seidman Diamond and Jerre B. Swann eds., p. 89, ABA Section of Intellectual Property Law, 2012.

4

The following are the substantive questions asked of both the test and the control groups:

Q1. From what you know, when used in connection with crackers or similar products, do you associate PRETZEL CRISPS (for the test) or CRACKER THINS (for the control) with only one company, or do you associate PRETZEL CRISPS (for the test) or CRACKER THINS (for the control) with more than one company, or do you associate PRETZEL CRISPS (for the test) or CRACKER THINS (for the control) with no company, or don't you know?

*(Order of response options are randomized into three sets: a/b/c/d or c/a/b/d or b/a/c/d)*

(a) __I associate PRETZEL CRISPS (for the test) or CRACKER THINS (for the control) with only one company.
(b) __I associate PRETZEL CRISPS (for the test) or CRACKER THINS (for the control) with more than one company.
(c) __I associate PRETZEL CRISPS (for the test) or CRACKER THINS (for the control) with no company.
(d) __Don't know / no opinion


Questions Q2, Q2a, Q3, Q3a, Q3b, Q4, Q4a, Q5, and Q5a were probative questions designed to elicit any additional information the respondents may be willing to provide or to clarify their answers to Q1 (a/b/c/or d). [22]

The control survey was administered for the purpose of estimating potential "noise" (for example, guessing and other external factors) that might be included in the results of the overall test survey. By estimating "noise" in the control survey, we assume the same level of "noise" occurs in the test survey. Subtracting the "noise" from the test results allows us to obtain the net "noise-less" results from the test. Subtraction of "noise" is a standard survey procedure used to arrive at reliable results.[23]

The subjects in both the test and the control groups were buyers and prospective buyers of crackers and pretzels[24] (See screening questions S9 and S10 in both the test and control questionnaires in Appendix 1). The subjects were residents of the United States. Appendix 3 shows the demographic distribution of the subjects in both surveys and the geographic distribution of the respondents.

Before proceeding to the substantive questions of the survey, the subjects were given a visual test to ensure that they could clearly read the questions on the computer/tablet or smartphone and that they could clearly see the stimuli. The participants in the survey were randomly assigned to the test and the control groups in order to avoid potential bias. Respondents were not permitted to

---

[22] Jacoby, J., Trademark Surveys, Vol. 1, pp. 675-678, ABA Section of Intellectual Property Law, First Edition, 2013.
[23] Jacoby, J., Trademark Surveys, Vol. 1, p. 502, ABA Section of Intellectual Property Law, First Edition, 2013.
[24] Scalise, D., Koenig, A., Carr, B., Protecting Descriptive Brands in Trademark and Trade Dress Law, https://gbr.pepperdine.edu/2011/09/protecting-descriptive-brands-in-trademark-and-trade-dress-law/

5

review their answers or to return to previous questions once they started the survey. In addition, the subjects were offered an opportunity to state that they did not know the answer to Q1(a/b/c/d).[25] The results of the substantive questions and the probing questions are reported in Appendix 4.

**The Secondary Meaning Survey Results:**

The survey was successfully completed by 327 test subjects and 328 control subjects. A total of 1,495 subjects were asked to participate in the surveys; 13 subjects were eliminated because they had duplicate IP addresses, 23 voluntarily terminated the survey, 22 refused to answer or were of ineligible age, 123 did not qualify or failed one of the screening questions, 598 were not purchasers or prospective purchasers of crackers and pretzels, and 61 either did not agree to follow instructions or were unable to identify the image in the visual test, failed to follow instructions had previously participated in a survey concerning PRETZEL CRISPS or offered non-responsive verbatim answers(garbage data). Thus, a total of 655 surveys were completed and included in the tabulations. Appendix 1 shows the disposition of the sample.

An analysis of the survey results demonstrates that 29.1% of the respondents in the test survey attributed the name PRETZEL CRISPS to only one company, while 22.9% of the subjects in the control group attributed the name CRACKER THINS to only one company, yielding a maximum net secondary meaning result of 6.1 % for the PRETZEL CRISPS phrase. In addition, 53.5% of respondents in the test survey indicated they attributed the name PRETZEL CRISPS to either more than one company (28.1%) or no company (25.4%). In comparison, 64.9% of respondents in the control survey indicated they attributed the name CRACKER THINS to either more than one company (39.0%) or no company (25.9%). It is clear from these results that buyers and prospective buyers of pretzels and crackers did not primarily associate PRETZEL CRISPS with a single source, and therefore the name PRETZEL CRISPS has not acquired secondary meaning.

In addition, when the subjects in the test group were asked Q3 (From what you know, what company do you associate with PRETZEL CRISPS?) only 9 of the total 35 who answered that question actually mentioned Snyder's Lance or Snack Factory (none responded with Princeton Vanguard), while others either stated they were not sure or could not recall a company name or offered a number of other real and fictitious company names.

The subjects in the control group also showed a similar pattern of responses to Q3. Among the 75 subjects in the control group that associated CRACKER THINS with only one company, 11 stated they did not know, while others offered a number of names of companies they associated with that phrase

It is clear, therefore, that subjects in both the test and the control group did not attribute secondary meaning to either PRETZEL CRISPS or CRACKER THINS.

---

[25] Jacoby, J., Trademark Surveys, Vol. 1, p. 665, ABA Section of Intellectual Property Law, First Edition, 2013.

6

Even more revealing of the fact that subjects appeared to associate the phrase PRETZEL CRISPS with a type of product rather than a single source is evident from the verbatim responses by the test subjects that associated that phrase with <u>more than one</u> company:

> When one brand name company comes out with a new idea, then everyone else hops on the bandwagon and produces a similar product.
> Pretzel crisps sounds like a generic name and could be applied to any type of pretzel that is thin and crispy like a chip or thin cracker. And also, I don't think that's a brand name.
> Seems like I have seen in multiple store varieties
> Well, there are several companies that make "pretzel crisps" and I have purchased pretzels from more than one company that makes pretzels
> I have had many types of pretzel crisps from many companies
> There are multiple formulations shapes/sizes flavors that create pretzel crisps
> Because I have seen more than one company offering this type of snack in the grocery store

**Conclusions and Expert Opinion:**

After reviewing and analyzing the results from the survey described in this report, it is my expert opinion that:

The name PRETZEL CRISPS has not acquired secondary meaning among buyers and prospective buyers of crackers and pretzels. Furthermore, that subjects who were shown the stimulus name PRETZEL CRISPS often associated it with the appearance or substance/make up of a product rather than a single source.

A net 6.2% of. subjects in this survey associated PRETZEL CRISPS with <u>only one</u> company, which in my opinion is not indicative of secondary meaning, especially as such product is purchased by a very large segment of consumers in the United States. Also, a significant higher percentage of respondents associated PRETZEL CRISPS with either <u>more than one</u> company or <u>no</u> company (53.5%) than with <u>one</u> company (29.1%). In my opinion, these results clearly demonstrate the name PRETZEL CRISPS has not acquired secondary meaning, as they fail to show that the primary significance of PRETZEL CRISPS among relevant consumers it to identify the source of the product rather than the product itself.

**Qualification, Personal Background and Compensation:**

My name is Isabella Cunningham. I hold the Stan Richards Chair in Advertising and Public Relations in the Moody College of Communications at The University of Texas at Austin, in Austin, Texas. I am the past Chair of the Advertising and Public Relations Department in the Moody College of Communications, a position I held for 20 years.
I am the author and coauthor of several books and numerous academic articles in marketing and advertising. I have also published several refereed papers in academic proceedings and have made numerous presentations to both academic and professional audiences.
I am a member of several academic journal review boards and have served on numerous academic and professional committees as both a member and in leadership positions. I have also

served on the Board of Directors of three public and private corporations and am presently a member of the Board of Directors of a public corporation and of a private Texas financial company. I am also a member of the Advisory Board of two privately owned companies and am a member of the board of several non-profit organizations.

I have taught marketing and advertising courses at The University of Texas for the past 40 years and have served as Chair of the Department of Advertising from 1978 to 1985 from 2001 to 2013. Before joining the faculty at The University of Texas, I was an Assistant Professor of Marketing and the Acting Dean of the Business School at St. Edward's University.

I have been a marketing and advertising consultant to several businesses and have been retained as an expert witness in several lawsuits. I have offered expert opinions and have been deposed and/or testified in several of them. A short list of the cases in which I have testified/served as a witness in the past five years is shown in Appendix 5. A complete professional and academic resume is shown in Appendix 6.

I am being compensated for my work in this case at the rate of $600.00 per hour. My compensation is not contingent on the outcome of this matter nor on the opinion that I express.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on January 16, 2019.

*Isabella C...* (signature)

Isabella Cunningham
Stan Richards Chair in Advertising and Public Relations
The University of Texas at Austin