# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### Civil Action No: 3:17-CV-00652

SNYDER'S-LANCE, INC. and
PRINCETON VANGUARD, LLC,

    **Plaintiffs,**

  v.

FRITO-LAY NORTH AMERICA, INC.,

    **Defendant.**

## SNYDER'S-LANCE, INC. AND PRINCETON VANGUARD, LLC'S REPLY IN <u>SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT</u>

| | |
|---|---|
| DEBEVOISE & PLIMPTON LLP<br>David H. Bernstein*<br>James J. Pastore*<br>Jared I. Kagan*<br>Jeremy C. Beutler*<br>919 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 909-6696<br>dhbernstein@debevoise.com<br>jjpastore@debevoise.com<br>jikagan@debevoise.com<br>jcbeutler@debevoise.com<br><br>*admitted *pro hac vice* | WYRICK ROBBINS YATES & PONTON LLP<br>Alexander M. Pearce<br>N.C. State Bar No. 37208<br>4101 Lake Boone Trail, Suite 300<br>Raleigh, North Carolina 27607<br>Telephone: (919) 781-4000<br>apearce@wyrick.com |

*Counsel for Plaintiffs Snyder's-Lance, Inc. and Princeton Vanguard, LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 2

    I.    Frito-Lay Misstates The Relevant Standards Of Review. ................................... 2

        A.    The Court Reviews The Entire Record *De Novo*. ..................................... 3

        B.    Frito-Lay Bears The Burden Of Proving Genericness. ................................... 7

        C.    Frito-Lay Bears The Burden Of Proving Lack Of Secondary Meaning. ......................... 8

    II.    The Primary Significance Of The PRETZEL CRISPS Mark Is As A Brand Name. .......... 9

        A.    The Evidence Shows That PRETZEL CRISPS Is A Brand Name. .............................. 10

        B.    Frito-Lay Offers No Evidence That PRETZEL CRISPS Is Generic. ........................... 11

    III.   The Trademark Office Correctly Concluded That PRETZEL CRISPS Has Acquired Secondary Meaning. ....................................................................... 16

        A.    Frito-Lay's Critiques Of Snyder's-Lance's Evidence On Secondary Meaning Are Without Merit. ............................................................. 17

        B.    Frito-Lay's Attacks On Snyder's-Lance's Survey Evidence Are Without Merit. ......... 18

        C.    Frito-Lay's Survey Fails To Rebut The Trademark Office's Finding That PRETZEL CRISPS Has Acquired Secondary Meaning. ....................................... 19

    CONCLUSION ........................................................................................................ 23

Case 3:17-cv-00652-KDB-DSC   Document 78   Filed 08/28/19   Page 2 of 28

**TABLE OF AUTHORITIES**

CASES

*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*,
    205 F.3d 137 (4th Cir. 2000) ...........................................................................7, 8

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
    135 S. Ct. 1293 (2015)......................................................................................5, 8

*Belmora, LLC v. Bayer Consumer Care AG*,
    338 F. Supp. 3d 477 (E.D. Va. 2018) ................................................................. 6

*Booking.com B.V. v. Matal*,
    278 F. Supp. 3d 891 (E.D. Va. 2017) ........................................................5, 6, 14

*Booking.com v. U.S. Patent and Trademark Office*,
    915 F.3d 171 (4th Cir. 2019) .................................................................... *passim*

*Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*,
    382 F. Supp. 3d 429 (E.D. Va. May 23, 2019) ..................................................5, 6

*Express Diagnostics Int'l, Inc. v. Tydings*,
    No. C 06-01346 JW, 2009 WL 111736 (N.D. Cal. Jan. 15, 2009)...........................8

*Hershey Co. v. Promotion in Motion, Inc.*,
    No. 07-cv-1601 (SDW) (MCA), 2010 WL 11570674 (D. N.J. Oct. 4, 2010)..................14, 16

*Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*,
    240 F.3d 251 (4th Cir. 2001) ...........................................................................10

*Hyatt v. Kappos*,
    625 F.3d 1320 (Fed. Cir. 2010), *aff'd* 566 U.S. 431 (2012) ................................4, 5

*In re Am. Online, Inc.*,
    77 U.S.P.Q.2d (BNA) 1618 (T.T.A.B. 2006) ......................................................13

*In re Driven Innovations, Inc.*,
    674 Fed. App'x 996 (Fed. Cir. 2017).................................................................10

*Innovation Ventures, LLC v. NVE, Inc.*,
    90 F. Supp. 3d 703 (E.D. Mich. 2015)................................................................21

*Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*,
    329 F.3d 359 (4th Cir. 2003) ...............................................................................5

1

*JFJ Toys, Inc. v. Sears Holdings Corp.*,
   237 F. Supp. 3d 311 (D. Md. 2017) ...................................................................18

*Kappos v. Hyatt*,
   566 U.S. 431 (2012) ...............................................................................3, 4, 5

*Kellogg Co. v. Toucan Golf, Inc.*,
   337 F.3d 616 (6th Cir. 2003) ........................................................................5

*Kelly Servs., Inc. v. Creative Harbor, LLC*,
   468 F.3d 857 (6th Cir. 2017) ........................................................................5

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
   786 F.3d 960 (Fed. Cir. 2015) .........................................................2, 7, 8, 10

*Swatch AG v. Beehive Wholesale, LLC*,
   739 F.3d 150 (4th Cir. 2014) ..............................................................3, 4, 5, 6

*Teaching Co. v. Unapix Entm't*,
   87 F. Supp. 2d 567 (E.D. Va. 2000) ...........................................................18

*U.S. Search, LLC v. U.S. Search.com Inc.*,
   300 F.3d 517 (4th Cir. 2002) .....................................................................7, 8

*United States v. Aramony*,
   166 F.3d 655 (4th Cir. 1999) ........................................................................7

*Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*,
   511 F. Supp. 2d 482 (E.D. Pa. 2007) .........................................................20

*Venetian Casino Resort, LLC v. VenetianGold.com*,
   380 F. Supp. 2d 737 (E.D. Va. 2005) .........................................................16

*Winchester Fed. Sav. Ank v. Winchester Bank, Inc.*,
   359 F. Supp. 2d 561 (E.D. Ky. 2004) .........................................................21

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*,
   840 F.2d 1572 (Fed. Cir. 1988) ....................................................9, 10, 17

**STATUTES**

15 U.S.C. § 1052(f) .......................................................................................9

15 U.S.C. § 1071(b) ..............................................................................4, 5, 12

15 U.S.C. § 1091 ..........................................................................................8

35 U.S.C. § 145 ................................................................................................................5

**OTHER AUTHORITIES**

J. Thomas McCarthy, *McCarthy on Trademark and Unfair Competition* § 12:58 (5th ed.)............8

Mike Rappeport, *Design Issues for Controls, in* Trademark and Deceptive Advertising
    Surveys: Law, Science, and Design 217
    (Shari Seidman Diamond & Jerre B. Swann eds., 2012).......................................................18

S. Rep. No. 98-627 (1984) .............................................................................................14

Shari Seidman Diamond, *Control Foundations: Rationales and Approaches, in*
    Trademark and Deceptive Advertising Surveys: Law, Science, and Design 201
    (Shari Seidman Diamond & Jerre B. Swann eds., 2012)...............................................19, 20

William G. Barber, *The Universe, in* Trademark and Deceptive Advertising Surveys:
    Law, Science, and Design 27 (Shari Seidman Diamond & Jerre B. Swann eds., 2012).........22

Case 3:17-cv-00652-KDB-DSC   Document 78   Filed 08/28/19   Page 5 of 28

<u>**PRELIMINARY STATEMENT**</u>

Defendant Frito-Lay North America, Inc.'s ("Frito-Lay") Response to Plaintiffs Snyder's-Lance, Inc. and Princeton Vanguard LLC's (together, "Snyder's-Lance") Cross-Motion for Summary Judgment (the "Opposition") fails to raise a disputed issue of material fact. Summary judgment is appropriate because the evidence overwhelmingly shows that consumers primarily perceive PRETZEL CRISPS as a brand name.[1]

The essence of Frito-Lay's Opposition is that this Court should simply defer to the Trademark Trial and Appeal Board's ("TTAB's") analysis. That analysis erroneously dissected the PRETZEL CRISPS mark into its component parts, in direct contravention of the Federal Circuit's decision. Frito-Lay misstates the standard of review, and urges the Court to afford deference to the TTAB decision. Fourth Circuit law is clear, however, that *de novo* review applies to the entire record in light of the new evidence both parties have submitted to the Court.

Frito-Lay further errs by relying on several trademark *infringement* cases in an attempt to shift the burden of proof to Snyder's-Lance. The law is clear, however, that, in trademark opposition proceedings like this one, the challenger to registration—here Frito-Lay—bears the burden to establish, by a preponderance of the evidence, that the mark is generic and lacks secondary meaning.

Procedural faults aside, the fatal flaw in Frito-Lay's position—and the TTAB's analysis—is the attempt to split the PRETZEL CRISPS mark into component terms without consideration of the mark as a whole. As Frito-Lay acknowledges, "[t]he TTAB looked first at the evidence regarding the meaning of the constituent terms 'pretzel' and 'crisps' . . . ." Opp'n

---

[1] As explained in its opening brief, Snyder's-Lance remains willing to stipulate that the Court may find facts on the papers submitted without the need for a trial, should it decide that factual disputes are raised by the parties' motions. Snyder's-Lance Br. [D.E. 35] at 13 n.5.

Br. [D.E. 71] at 3. Though Frito-Lay argues that this is "an appropriate first step in the analysis under both Fourth Circuit and Federal Circuit precedent," *id.*, the Federal Circuit held, *in this case*, that it was "unclear why the Board would resort to analyzing the terms individually or why it would believe doing so would aid its analysis" given that the record is "replete with evidence of the public's perception of the term PRETZEL CRISPS as a whole." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 969 (Fed. Cir. 2015). Under the approach used by the TTAB and advocated by Frito-Lay, a litany of well-known and protectable trademarks such as AMERICAN AIRLINES, GENERAL ELECTRIC, WHEAT THINS, CHEESE NIPS, BAGEL CRISPS, and VITAMIN WATER could not be registered on the Principal Register.

The record evidence establishes that PRETZEL CRISPS, like those marks, is entitled to registration based upon: (1) the vast majority of consumers, the media, and the snack food industry using PRETZEL CRISPS primarily to refer to Snyder's-Lance's products; (2) the massive sales of PRETZEL CRISPS branded products over the last 15 years; (3) substantial advertising investment in the brand; and (4) surveys that plainly demonstrate consumers understand PRETZEL CRISPS primarily as a brand name. Fifteen years after Princeton Vanguard, LLC introduced its innovative product, Snyder's-Lance remains the *only* pretzel-cracker maker that uses the PRETZEL CRISPS mark.

Considering the record and the mark in its entirety, the Court should grant summary judgment in favor of Snyder's-Lance and order that its PRETZEL CRISPS mark be registered on the Principal Register.

## ARGUMENT

### I.     Frito-Lay Misstates The Relevant Standards Of Review.

Frito-Lay makes various arguments regarding the relevant standards of review that contravene settled case law. To that end, Frito-Lay advances an incorrect standard of review

2

with respect to this Court's consideration of the TTAB's findings, and urges the Court to shift to Snyder's-Lance the burden of proving the PRETZEL CRISPS mark is not generic. *See* Opp'n Br. at 12–13, 15–16. Frito-Lay resorts to incorrectly characterizing the standard of review and burden of proof because taking any other approach to the record evidence leads to the inescapable conclusion that the public recognizes PRETZEL CRISPS as a brand name for Snyder's-Lance's pretzel crackers. As explained below, and in Snyder's-Lance's opening brief, the law is clear that the standard of review is *de novo*, and that Frito-Lay bears the burden of proving that PRETZEL CRISPS is generic and of rebutting Snyder's-Lance's *prima facie* evidence of secondary meaning that the Trademark Examiner accepted.

## A. The Court Reviews The Entire Record *De Novo*.

Frito-Lay's argument that "the Court reviews the TTAB's finding under the deferential 'substantial evidence' standard" is wrong. *Id.* at 12 (citation omitted). Rather, where, as here, new evidence is submitted, the court reviews the entire record *de novo*. *See* Snyder's-Lance Br. at 11–12. As the Fourth Circuit has explained, "the district court 'cannot meaningfully defer to the [Patent and Trademark Office's ("PTO's")] findings if the PTO considered a different set of facts.'" *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 156 (4th Cir. 2014) (quoting *Kappos v. Hyatt*, 566 U.S. 431, 445 (2012)); *see also Booking.com v. U.S. Patent and Trademark Office*, 915 F.3d 171, 187 (4th Cir. 2019).

In urging this Court to apply an incorrect, deferential standard of review, Frito-Lay excerpts certain language from *Swatch* while excluding other language that provides crucial context. Specifically, Frito-Lay (i) cites *Swatch* for the proposition that the District Court may "consider the proceedings" before the TTAB in assessing "what weight to afford an applicant's newly-admitted evidence"; (ii) selectively quotes from a footnote in *Swatch* for the proposition that the Fourth Circuit has held that "it is not obvious from *Kappos* exactly what this means";

3

and (iii) goes on to suggest that the District Court can afford "great weight" to the TTAB's decision as "persuasive authority." Opp'n Br. at 18 (citation omitted). That argument, however, omits critical material from the remainder of the text in *Swatch*, which reads: "Although it is not obvious from *Kappos* exactly what this means, it is quite clearly explained in *Hyatt*, the underlying Federal Circuit decision." *Swatch*, 739 F.3d at 156 n.6. *Hyatt* explains that, if a party submits new evidence before the District Court that it withheld from the TTAB without explanation, the District Court may view that evidence skeptically. *Id.* (citing *Hyatt v. Kappos*, 625 F.3d 1320, 1335 (Fed. Cir. 2010), *aff'd and remanded* 566 U.S. 431 (2012)). *Swatch* in fact makes clear that "*Kappos* . . . explicitly defines the only situation where consideration of the TTAB decision is permitted." *Id.* Put simply, Frito-Lay's invitation for this Court to consider the TTAB's decision as precedential is an invitation to commit clear legal error. *Compare* Opp'n Br. at 16 ("Because this action is an appeal of the TTAB's decision, this Court must evaluate that decision considering the evidence that was before the Board."), *with Swatch*, 739 F.3d at 156 ("In sum, where new evidence is submitted, de novo review of the entire record is required.").

Fourth Circuit law also directly contradicts Frito-Lay's invitation to the Court to reject the newly submitted evidence. *See* Opp'n Br. at 16. To do so would render meaningless a party's "unrestricted right to submit further evidence" in section 1071 proceedings, as recognized by *Swatch*. 739 F.3d at 155. That right exists because, as the Fourth Circuit has held, in 1071(b) actions "the district court does *not* act as the reviewing court envisioned by the [Administrative Procedure Act ("APA")]." *Id.* at 156 (emphasis added) (citation and internal quotation marks omitted). A civil action under section 1071(b) "does not merely afford judicial review of agency action[; r]ather the statute directs that the district court may 'adjudge that such applicant is

entitled to receive'" a trademark registration. *Kappos*, 625 F. 3d at 1327 (quoting 35 U.S.C. § 145);[2] *see also* 15 U.S.C. § 1071(b).

District courts in section 1071(b) cases "ha[ve] authority independent of the [PTO] to grant or cancel registrations," and, for that reason, the entire record must be reviewed *de novo*. *Booking.com B.V. v. Matal*, 278 F. Supp. 3d 891, 899 (E.D. Va. 2017) (quoting *Swatch*, 739 F.3d at 155), *aff'd* 915 F.3d 171 (4th Cir. 2019); *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 443–44 (E.D. Va. May 23, 2019); *see also B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1301 (2015).

Contrary to that settled case law, Frito-Lay urges this Court to give the TTAB's decision "great weight." Opp'n Br. at 13. But Frito-Lay provides no support for that position aside from a *dissenting* opinion in *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 386 (4th Cir. 2003) (Motz, CJ, dissenting), and a Sixth Circuit decision where the court "assumed, without deciding, that TTAB decisions should be treated as persuasive, but not controlling, authority." *Kelly Servs., Inc. v. Creative Harbor, LLC*, 468 F.3d 857, 863 n.1 (6th Cir. 2017). Significantly, *Kelly* was not an action under section 1071(b). Had it been, the Sixth Circuit undoubtedly would have reviewed the decision of the TTAB "*de novo*," consistent with Sixth Circuit precedent. *See Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 623 (6th Cir. 2003).

Frito-Lay's reliance on *Belmora, LLC v. Bayer Consumer Care AG* fares no better. There, the parties failed to provide "*any* new evidence." 338 F. Supp. 3d 477, 488 (E.D. Va. 2018) (emphasis added). As the court recognized, had the parties "adduced *any* new evidence,"

---

[2] The Court in *Kappos* construed 35 U.S.C. § 145 proceedings in patent law. Section 145 is parallel to 15 U.S.C. § 1071 and the Fourth Circuit held the standard of review is the same in both contexts. *Swatch*, 739 F.3d at 155.

the law would have "require[d]" *de novo* review. *Id.* (emphasis added). Again, "*Kappos* . . . explicitly defines the only situation where consideration of TTAB decision *is permitted*." *Swatch*, 739 F.3d at 156, *compare with* Opp'n Br. at 16 ("Because this action is an appeal of the TTAB's decision, this Court *must* evaluate that decision considering the evidence that was before the Board." (emphasis added)).

Here, Snyder's-Lance has submitted extensive evidence that bears on the issues of genericness and secondary meaning. That evidence includes: (1) a declaration from Dr. E. Deborah Jay addressing the consumer survey submitted in the TTAB proceedings that showed consumers understand PRETZEL CRISPS to be a brand name; (2) hundreds of news articles using the term PRETZEL CRISPS as a trademark; (3) consumer communications concerning PRETZEL CRISPS; (4) social media evidence; (5) declarations from independent distributors; (6) Snyder's-Lance's efforts to protect its trademark from infringement; and (7) a declaration from George Mantis addressing the survey submitted in the TTAB proceedings that showed that PRETZEL CRISPS has acquired secondary meaning. Accordingly, *de novo* review plainly applies.[3] *See Booking.com*, 278 F. Supp. 3d at 899 n.2 (submission of a consumer survey and a rebuttal expert report on the issue of genericness required that the court review the entire record *de novo*); *see also Combe*, 382 F. Supp. 3d at 444 (finding that where new evidence was submitted in addition to the PTO record, "*de novo* review of the entire factual record" was required).

---

[3] Frito-Lay's contention that this evidence should not be considered is hard to fathom since Frito-Lay took additional discovery in this action and has itself submitted new evidence with its Opposition, *see* Declaration of David E. Armendariz ("Armendariz Decl.") [D.E. 71-1] ¶ 6; *id.* at Ex. 5 [D.E. 71-7]— evidence that, in fact, overwhelmingly demonstrates that consumers recognize PRETZEL CRISPS as a brand name for pretzel crackers made by Plaintiffs (*see infra* pp. 14–16).

Controlling authority mandates *de novo* review of all evidence in the record, and a full and fair review of that evidence inescapably leads to the conclusion that PRETZEL CRISPS is not generic. Accordingly, the Court should reject Frito-Lay's persistent and erroneous pleas that the Court give deference to the TTAB's prior, flawed ruling.

### B. Frito-Lay Bears The Burden Of Proving Genericness.

Relying on cases involving trademark infringement disputes, Frito-Lay erroneously argues the burden of proof in this proceeding is on Snyder's-Lance to prove that PRETZEL CRISPS is not generic. Opp'n Br. at 15–16. Both the TTAB and the Federal Circuit, however, unequivocally have rejected that approach *in this case*. As the Federal Circuit explained, "the burden was on Frito-Lay to prove genericness by a preponderance of the evidence." *Princeton Vanguard*, 786 F.3d at 965 n.2. That holding is the law of the case and "must be followed in all subsequent proceedings." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999); *see also Booking.com*, 915 F.3d at 179 (party opposing registration bears the burden).

Even if the Federal Circuit had not decided that Frito-Lay bears the burden of proof, Frito-Lay's reliance on infringement cases, *see* Opp'n Br. at 15–16, highlights Frito-Lay's error. In *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517 (4th Cir. 2002) and *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137 (4th Cir. 2000), the plaintiffs each lacked federal trademark registrations. When they sued for infringement, they bore the burden of proving (1) they owned a protectable mark (including that the mark was not generic) and (2) there was a likelihood of confusion between their marks and the defendants' marks. *See U.S. Search*, 300 F.3d at 523; *Ale House*, 205 F.3d at 140.

An opposition or cancellation proceeding before the TTAB, in contrast, is an action whereby an opposer challenges the Trademark Examiner's determination that the mark is registerable and, by necessity, not generic. Because "a generic name cannot be registered under

7

any circumstances," 2 J. Thomas McCarthy, *McCarthy on Trademark and Unfair Competition*

§ 12:58 (5th ed.), the PTO's registration of the PRETZEL CRISPS mark on the Supplemental

Register in July 2005 (Registration No. 2,980,303) constitutes *prima facie* evidence that the mark

is not generic. *See Express Diagnostics Int'l, Inc. v. Tydings*, No. C 06-01346 JW, 2009 WL

111736, at *4 (N.D. Cal. Jan. 15, 2009) ("Given that registration on the Supplemental Register is

only available to marks that are 'capable of distinguishing' and that generic marks are never

capable of distinguishing, the PTO has determined that the [plaintiff's] mark is descriptive and is

not generic." (quoting 15 U.S.C. § 1091)).

Accordingly, in a trademark opposition proceeding, the burden is on the opposer to prove

that the mark is generic. *See Booking.com*, 915 F.3d at 179; *Princeton Vanguard*, 786 F.3d at

965; *see also B & B Hardware, Inc.*, 135 S. Ct. 1293 at 1300 ("The party opposing registration

bears the burden of proof and if that burden cannot be met, the opposed mark must be registered."

(internal citations omitted)).   That burden does not shift merely because the forum has changed

from the TTAB to the District Court.  The burden remains on Frito-Lay to establish genericness

in order to successfully overturn the Examiner's decision to register PRETZEL CRISPS as a

trademark.

## C.  Frito-Lay Bears The Burden Of Proving Lack Of Secondary Meaning.

Frito-Lay also is wrong that it bears no burden on the issue of secondary meaning.  Opp'n

Br. at 16.  As discussed in Snyder's-Lance's opening brief, the Trademark Examiner reviewed

the evidence Snyder's-Lance submitted, found that evidence sufficient, and determined that

PRETZEL CRISPS merited registration on the Principal Register.  Snyder's-Lance Br. at 3.

Given that finding, an opposer, such as Frito-Lay,

> has the initial burden to establish prima facie that the applicant did
> not satisfy the acquired distinctiveness requirement of Section 2(f).
> If opposer does not provide sufficient grounds to at least place the

8

> matter in issue, the situation is indistinguishable from one in which no opposition was filed. Under such circumstances, there is insufficient basis in the record to indicate that the applicant's mark, contrary to the examiner's prior determination, has *not* "become distinctive of the applicant's goods in commerce."

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1577 (Fed. Cir. 1988) (emphasis in original) (quoting 15 U.S.C. § 1052(f)). If the opposer did not bear the burden, the "applicant's prior proof [to the PTO] would make a mere filing of a naked opposition the sole basis for delaying registration and prompting an applicant to reestablish acquired distinctiveness to the satisfaction of the PTO in the face of insufficient evidence or argument by the opposer." *Id.* at 1577–78. Put another way, if Frito-Lay's argument on the burden of proof were accepted, the mere filing of an opposition would be sufficient to overcome the Examiner's prior determination that the mark had acquired distinctiveness.

The cases that Frito-Lay cites for the proposition that Snyder's-Lance bears the burden of proof at this stage on the issue of secondary meaning again are infringement cases where the plaintiffs were required to demonstrate that they owned valid marks, including that their descriptive marks had acquired secondary meaning. Opp'n Br. at 16. Here, in contrast, Frito-Lay is an opposer challenging the Trademark Examiner's prior determination that PRETZEL CRISPS has, in fact, acquired secondary meaning. Accordingly, Frito-Lay now bears the burden to "present a *prima facie* case of no acquired distinctiveness by rebutting [Snyder's-Lance's] *prima facie* case of acquired distinctiveness made to the examiner." *See Yamaha*, 840 F.2d at 1583-84.

## II.     The Primary Significance Of The PRETZEL CRISPS Mark Is As A Brand Name.

Frito-Lay urges the Court to adopt the TTAB's decision, Opp'n Br. at 16, while continuing to ignore that the analysis upon which the TTAB relied has been flatly rejected by the Federal Circuit. The TTAB examined evidence "regarding the meaning of the constituent terms

9

'pretzel' and 'crisps,'" Opp'n Br. at 3, but the Federal Circuit rejected that analysis in this case because the record here is "replete with evidence of the public's perception of the term PRETZEL CRISPS as a whole." *Princeton Vanguard*, 786 F.3d at 969. Accordingly, as the Federal Circuit explained, it is "unclear why the Board would resort to analyzing the terms individually or why it would believe doing so would aid its analysis." *Id.*

The Federal Circuit held instead that the Court must "consider evidence of the relevant public's understanding of the term PRETZEL CRISPS *in its entirety*." *Id.* at 969 (emphasis added). Both the Federal Circuit and the Fourth Circuit have confirmed in other decisions that this is the correct approach. *See In re Driven Innovations, Inc.*, 674 Fed. App'x 996, 999 (Fed. Cir. 2017) (confirming that "we must . . . consider the mark *as a whole*") (emphasis added); *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 254 (4th Cir. 2001) (stating that "courts should not parse terms to determine that they are made up of generic components"); *Booking.com*, 915 F.3d at 184 (acknowledging that "the ultimate inquiry examines what the public primarily perceives the term *as a whole* to refer to").

When the PRETZEL CRISPS mark is considered in its entirety there can be no genuine dispute that the primary significance is as a brand name. Despite having the burden of proof, Frito-Lay fails to advance any independent evidence that shows PRETZEL CRISPS is generic, or to undermine the evidence offered by Snyder's-Lance.

## A. The Evidence Shows That PRETZEL CRISPS Is A Brand Name.

The evidence overwhelmingly shows that consumers understand PRETZEL CRISPS as a brand name for pretzel crackers that come from Snyder's-Lance. Snyder's-Lance has submitted voluminous evidence that the vast majority of media articles, Google search results, and social media references are to Snyder's-Lance's brand; that PRETZEL CRISPS is used in the industry exclusively to refer to PRETZEL CRISPS brand of pretzel crackers; and that the majority of

10

survey respondents understand PRETZEL CRISPS to be a brand name. *See generally* Snyder's-Lance Br. at 14–20.

Frito-Lay does not even contest much of Snyder's-Lance's evidence. For example, Frito-Lay does not dispute evidence showing that 90 percent of the first page results of a Google search for PRETZEL CRISPS used the term as brand name belonging to Snyder's-Lance, *id.* at 15, or that online grocers sell PRETZEL CRISPS products under categories such as "pretzel crackers," "pretzels," chips & pretzels," or "popcorn & pretzels," and do not recognize a "pretzel crisps" category of products. *Id.* at 17.

Frito-Lay also does not dispute on this motion the results of the survey conducted by Dr. E. Deborah Jay that showed 55 percent of consumers understood PRETZEL CRISPS as a brand name. *Id.* at 19–20. Nor does Frito-Lay criticize the survey methodology or offer its own rebuttal survey as to genericness. Given that PRETZEL CRISPS is a coined term (*i.e.*, not in common use when Snyder's-Lance adopted it), Dr. Jay's survey is yet another piece of unconverted evidence of the primary significance of PRETZEL CRISPS. *Id.* at 18–20.[4]

**B. Frito-Lay Offers No Evidence That PRETZEL CRISPS Is Generic.**

Rather than introduce its own evidence that the consuming public primarily understands PRETZEL CRISPS generically as a product category, as is Frito-Lay's burden, the Opposition is limited to four main critiques of Snyder's-Lance's evidence. Those critiques, however, do not satisfy Frito-Lay's burden of proof, much less raise a genuine dispute on material factual issues.

---

[4] Frito-Lay is wrong that PRETZEL CRISPS is not a coined term. Opp'n Br. at 5. The test for "coined terms" asks simply whether the term was in common usage prior to the Snyder's-Lance's adoption of it as a brand name. *See Booking.com*, 915 F.3d at 183 (BOOKING.COM, which consisted of the generic word "booking" with the generic top-level domain ".com," found not to have been "commonly used" prior to its association with the plaintiff's service). Three isolated uses of the term "pretzel crisps" prior to Snyder's-Lance's adoption of the PRETZEL CRISPS mark, Opp'n Br. at 17, does not create an issue of fact as to whether the term PRETZEL CRISPS was in "common use" prior to Snyder's-Lance's adoption of the mark.

*First*, in its Opposition, Frito-Lay argues that 113 of the 895 articles submitted by Snyder's-Lance show that PRETZEL CRISPS is used generically. Opp'n Br. at 17. Snyder's-Lance already had categorized 85 of the 113 articles as reflecting arguably generic use when it calculated that 87.8% of the articles that it submitted used PRETZEL CRISPS as a brand. *See* Declaration of Christopher Lauzau ("Lauzau Decl.") [D.E. 42] ¶ 7. That leaves just 28 articles where Frito-Lay challenges Snyder's-Lance's classification. The majority of those 28 articles clearly identify Snack Factory, Inc. or Snyder's-Lance as the source of PRETZEL CRISPS products or use PRETZEL CRISPS as a brand name.[5] *See, e.g.*, Armendariz Decl., Ex. 2 [DE. 71-4] at 2 ("Among the company's customers are Snyder's-Lance, drizzling and dipping chocolate on pretzels for the organization's chocolate-covered pretzel crisps."); *id.* at 47 (listing "Pretzel Crisps" among other brand names, including "Parmesan Whisps," which is a trademarked term, *see* WHISPS, Registration No. 4,761,966); *id.* at 56 ("Snack Factory chocolate-covered pretzel crisps, a Snyder's-Lance brand"); *id.* at 61 ("Snack Factory Pretzel Crisps"); *id.* at 71 ("Snack Factory pretzel crisps"); *id.* at 107 ("Snack Factory Original Pretzel Crisps, Thin, Crunchy Pretzel Crackers" and "The Snack Factory 30 oz. Original Pretzel Crisps"). These uses are no different than references to Nabisco's low-fat WHEAT THINS, for example, or even to Frito-Lay's cool ranch DORITOS, both of which are registered trademarks. *See* WHEAT THINS (Registration No. 1,022,799); DORITOS (Registration No. 792,667).

---

[5] Princeton Vanguard, LLC has granted Snack Factory, Inc. an exclusive license to use the PRETZEL CRISPS mark. In October 2012, Snack Factory, Inc. was acquired by Snyder's-Lance, Inc. Opp'n No. 91195552 at A1532 ¶ 4. Citations to the TTAB record refer to the proceeding number and Bates stamped page number. The TTAB record was admitted pursuant to 15 U.S.C. § 1071(b)(3) and the Court's August 7, 2018 order. [D.E. 17] The United States Patent and Trademark Office submitted the certified record of the proceedings before the TTAB to the Court on September 25, 2018. [D.E. 32]

Even crediting Frito-Lay's contention that the 28 disputed articles reflect generic usage, Frito-Lay does not dispute that at least 758 news articles (84.7 percent of the 895 news articles identified by Snyder's-Lance) use the term PRETZEL CRISPS as a trademark. *See* Opp'n Br. at 17. In other words, even by Frito-Lay's reckoning, more than three quarters of all articles submitted use the term PRETZEL CRISPS as a brand name, which demonstrates that its primary significance is as a brand name. *See, e.g.*, *In re Am. Online, Inc.*, 77 U.S.P.Q.2d (BNA) 1618, 1622–23 (T.T.A.B. 2006) (precedential) (Trademark Examiner in *ex parte* appeal failed to establish that INSTANT MESSENGER was generic where 61% of media articles used the term INSTANT MESSENGER as a trademark and identified the applicant as the source of the services offered). Frito-Lay quibbles that certain articles reference the underlying litigation or are Snyder's-Lance's own press releases, Opp'n Br. at 17–18, but fails to explain why that detracts from their evidentiary value establishing that both the media covering the dispute—and the public reading about it—perceive PRETZEL CRISPS as a brand name.

*Second*, Frito-Lay claims that it has identified 1,250 instances in which consumers who contacted Snyder's-Lance regarding PRETZEL CRISPS used the mark generically. Opp'n Br. at 10, 18. That argument appears to be based on the consumers' usage of the mark as a noun, and in lower case letters. *Id.* at 10–11; *see, e.g.*, Armendariz Decl., Ex. 5 [D.E. 73] at 8 ("I have become addicted to the jalapeno jack flavor of your pretzel crisps"); *id.* at 11 ("Dear pretzel crisp, the picture on the front of your mint pretzel package looked very appealing and delicious."); *id.* at 12 ("My wife got a couple bags of your dark chocolate / peppermint pretzel crisps and loved them. . . . [I]f possible I would like to get a few more [bags]").[6]

---

[6] The cited materials from Exhibit 5 to the Declaration of David Armendariz contain personal contact information for customers who submitted the identified communications, and to protect those individuals' privacy Snyder's-Lance designated the materials as "Confidential" when they

But Frito-Lay fails to cite a single case holding that lower case usage is synonymous with generic usage. More significantly, Frito-Lay ignores that, as a legal matter, "a mark may serve a 'dual function—that of identifying a product [or service] while at the same time indicating its source.'" *Booking.com*, 278 F. Supp. 3d at 902 (alteration in original) (quoting S. Rep. No. 98-627, at 5 (1984)); *see also Hershey Co. v. Promotion in Motion, Inc.*, No. 07-cv-1601 (SDW) (MCA), 2010 WL 11570674, *10 (D. N.J. Oct. 4, 2010) (explaining that the failure to capitalize a mark "does not necessarily indicate a belief that the term is generic"). As the Ninth Circuit explained in *Elliott v. Google, Inc.*, "a speaker might use a trademark as the name for a product, i.e., as a noun, and yet use the mark with a particular source in mind, i.e., as a trademark." 860 F.3d 1151, 1157–58 (9th Cir. 2017) (affirming summary judgment and holding that GOOGLE is not generic for internet searching), *cert denied*, 138 S. Ct. 362 (2017). For example, "[t]he mere fact that customers ordered 'a coke,' i.e., used the mark as a noun, failed to show what . . . customers [were] thinking, or whether they had a particular source in mind." *Id.* at 1158 (citation and quotations omitted) (alterations in original). The Ninth Circuit held that such evidence of noun usage fails to create a disputed issue of material fact on the question of genericness. *Id.* at 1162.

For the same reason, the consumer communications Frito-Lay cites fail to establish that consumers understand PRETZEL CRISPS primarily as a generic term. The only conclusion that can be drawn from communications addressed to Snyder's-Lance is that those consumers associate PRETZEL CRISPS with Snyder's-Lance. This is particularly so given that Frito-Lay offers no evidence, for example, of consumers referring to another company's products as

---

were produced to Frito-Lay pursuant to the Protective Order entered by the Court in this case [D.E. 50]. Consistent with the Protective Order, Frito-Lay has filed the materials under seal and Snyder's-Lance agrees that they should be maintained as such. The quotations above reflect only non-confidential information from those materials.

"pretzel crisps," or that consumers understand PRETZEL CRISPS to be a category of products. These communications no more establish that PRETZEL CRISPS is generic than a customer writing to Frito-Lay "I love your doritos" would establish DORITOS is generic. If anything, the communications demonstrate that consumers recognize Snyder's-Lance as the source of PRETZEL CRISPS branded products.

*Third*, Frito-Lay quibbles with the overwhelming social media evidence demonstrating that consumers use PRETZEL CRISPS as a brand name. An analysis of tweets in which the term "Pretzel Crisp" appeared showed that 63 percent refer to PRETZEL CRISPS as a brand; an analysis of tweets that included the hashtag "#pretzelcrisps" identified that 76 percent referenced PRETZEL CRISPS as a brand name. Snyder's-Lance Br. at 7; Declaration of Elliot Beaver ("Beaver Decl.") [D.E. 44] ¶¶ 3–4. Although Frito-Lay complains about Snyder's-Lance's methodology for calculating the percentages, Snyder's-Lance submitted all of the tweets, Beaver Decl., Exs. 1–2 [D.E. 44-2 to 44-10], which are available for review by the Court, and plainly show that the overwhelming majority of PRETZEL CRISPS references are to Snyder's-Lance. Frito-Lay also complains that Snyder's-Lance included in the analysis its own Twitter posts to identify its own products. Frito-Lay, however, offers no evidence that other companies apply the term "pretzel crisps" to their products. That omission speaks volumes and underscores that the primary significance of PRETZEL CRISPS is as a brand name.

*Fourth*, Frito-Lay argues that the third-party uses of PRETZEL CRISPS by Kraft, Wish Farms, and Betty Jane demonstrate that PRETZEL CRISPS is generic. Opp'n Br. at 24–25. That argument ignores that, when Snyder's-Lance demanded that those companies cease their infringing uses, they acquiesced and acknowledged Snyder's-Lance's trademark rights. Indeed, evidence that a mark holder was successful in "fending off" infringing uses by third parties is

evidence that the mark is strong and is not generic. *See Venetian Casino Resort, LLC v. VenetianGold.com*, 380 F. Supp. 2d 737, 743 (E.D. Va. 2005) (finding commercial strength where the plaintiff cited "at least two examples where [it] has prevailed in fending off persons who were plagiarizing or infringing on its marks"); *see also Hershey*, 2010 WL 11570674, at *12 ("successful enforcement of a mark can be evidence that the mark is strong and not generic"). Here, when Kraft agreed to no longer use the PRETZEL CRISPS mark on its packaging for its pretzel crackers, Kraft also acknowledged Snyder's-Lance's trademark registrations around the world, its U.S. registration for the stylized PRETZEL CRISPS mark, and its Supplemental Registration for the word mark PRETZEL CRISPS. Opp'n No. 91195552 at A1793. Kraft also agreed not to use PRETZEL CRISPS "*as a trademark*." *Id.* at A1795 (emphasis added). Wish Farms apologized for referring to Snyder's-Lance's "trademarked product," Declaration of Rachel Sasser ("Sasser Decl."), Ex. 5 [D.E. 45-9] at 7, and Betty Jane recognized the "validity" of PRETZEL CRISPS as a trademark. *Id.* Ex. 7 [D.E. 45-11] at 3. Even accepting Frito-Lay's argument that these third parties briefly used the term generically, isolated incidents that were quickly abandoned hardly raise an issue of fact as to the *primary significance* of the PRETZEL CRISPS mark.

### III. The Trademark Office Correctly Concluded That PRETZEL CRISPS Has Acquired Secondary Meaning.

Snyder's-Lance established before the Trademark Office that PRETZEL CRISPS has acquired secondary meaning. Snyder's-Lance Br. at 3. Accordingly, Frito-Lay bears the burden of rebutting that evidence. *See supra* at 9–10. As the Federal Circuit has explained, this requires Frito-Lay to "present[ ] some evidence that the mark has not acquired distinctiveness, such as others' use of the proposed mark or similar marks." *Yamaha*, 840 F.2d at 1581. Frito-Lay offers no such evidence. Instead, Frito-Lay merely critiques Snyder's-Lance's evidence, and relies on a

survey conducted by Dr. Isabella Cunningham (the "Cunningham Survey") that is so fundamentally flawed as to be useless to the secondary meaning inquiry.

    **A.**    **Frito-Lay's Critiques Of Snyder's-Lance's Evidence On Secondary Meaning Are Without Merit.**

In addition to the evidence that persuaded the Trademark Examiner that PRETZEL CRISPS acquired secondary meaning, Snyder's-Lance has, in this case, submitted (1) a survey that demonstrates 44.7 percent of those with an opinion associated PRETZEL CRISPS with only one company; (2) evidence of sales of more than $2.5 billion since the inception of Snyder's-Lance's pretzel cracker product; and (3) evidence of expenditures of more than $50 million on advertising, marketing and promoting the PRETZEL CRISPS brand. Snyder's-Lance Br. at 21–25.

Given that these facts are undisputed, Frito-Lay is left to argue that "it is not clear" how Snyder's-Lance's sales, market share, and advertising are tied to the PRETZEL CRISPS brand. Opp'n Br. at 23. But courts routinely consider these very factors in assessing whether a mark has acquired distinctiveness. *See*, *e.g.*, *Teaching Co. v. Unapix Entm't*, 87 F. Supp. 2d 567, 580 (E.D. Va. 2000) (finding secondary meaning based on uninterrupted use, advertising expenditure, sales figures, and media coverage); *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 335 (D. Md. 2017) (finding STOMPROCKET was commercially strong based on substantial revenues, use of the mark for twenty years, industry awards, and copying by others). Doing so accords with the common-sense reasoning that, as more consumers are exposed to PRETZEL CRISPS crackers' packaging prominently displaying the PRETZEL CRISPS mark, and encounter the mark in advertisements and on social media, they will naturally come to view it as the brand name that it is. *See* Sasser Decl. ¶¶ 8–10, Exs. 1–2 [D.E. 45-2 to 45-3]; Opp'n No. 91195552 at A1532 ¶ 5, A1551–55. That is equally true of the PRETZEL CRISPS print

advertisements, each of which displayed the PRETZEL CRISPS mark prominently. Opp'n No. 91195552 at A1536 ¶ 22, A1594–97. The additional evidence submitted by Snyder's-Lance in this case reinforces the Trademark Office's correct conclusion that PRETZEL CRISPS has secondary meaning.

> **B.  Frito-Lay's Attacks On Snyder's-Lance's Survey Evidence Are Without Merit.**

As discussed in Snyder's-Lance's opening brief, the Mantis Survey shows that PRETZEL CRISPS has acquired secondary meaning. Snyder's-Lance Br. at 23–24.[7] Although Frito-Lay criticizes the Mantis Survey for "fail[ing] to include an external control," Opp'n Br. at 22 n.14, a single test stimulus one-room array design—like the format Mr. Mantis used—is commonly used to test for secondary meaning. *See* Declaration of George Mantis ¶ 8 (Aug. 28, 2019) ("Mantis Decl.")[8]; Mike Rappeport, *Design Issues for Controls, in* Trademark and Deceptive Advertising Surveys: Law, Science, and Design 217, 233–35 (Shari Seidman Diamond & Jerre B. Swann eds., 2012). The one-room array format provides multiple control stimuli (e.g., SUN CHIPS, ONION RINGS) and an experimental stimulus (e.g. PRETZEL CRISPS). The multiple controls are used to "assess the meaningfulness of the survey's data, particularly in relation to the term being tested." Opp'n No. 91195552 at A4185. It is not appropriate to subtract the percentage associated with an internal control from the test percentage since internal controls are not a measure of "noise." Frito-Lay's former expert, Dr. Ivan Ross, agreed with this approach. Opp'n No. 91195552 at A4185–86.

---

[7] A full summary of the Mantis Survey is in the record at Opp'n No. 91195552 at A4192–4224.

[8] Mr. Mantis' Declaration is being filed contemporaneously with this Reply.

**C.      Frito-Lay's Survey Fails To Rebut The Trademark Office's Finding That PRETZEL CRISPS Has Acquired Secondary Meaning.**

Frito-Lay has submitted with its Opposition the Cunningham Survey. That survey uses a misleading and confusing control that so seriously affected the results that it "cannot provide a valid measure of secondary meaning." Mantis Decl. ¶ 33.

**1.      The Control Used In The Cunningham Survey Is Fundamentally Flawed.**

An alternative approach to the internal control (such as the one used in the Mantis Survey), is to use an "external" control that tries to measure the amount of "noise" in a survey. *Id*. ¶ 15; *see also* Shari Seidman Diamond, *Control Foundations: Rationales and Approaches, in* Trademark and Deceptive Advertising Surveys: Law, Science, and Design 201, 203–05 (Shari Seidman Diamond & Jerre B. Swann eds., 2012) ("Diamond"). Under this approach, one group of respondents is questioned about the experimental stimulus and a different group of respondents is questioned only about the external control stimulus. By holding everything else as constant as possible, including the questions asked and the characteristics of the sample of respondents, the external-control approach allows a surveyor to estimate the level of survey "noise" that results from causes other than the name at issue—for example, responses resulting from simply guessing, misunderstanding the questions asked, or respondents' preexisting beliefs. Mantis Decl. ¶ 15. The level of noise associated with the control responses is then subtracted from the test stimulus responses to arrive at a net result. *Id.* So, for instance, if 40 percent of respondents identified the test stimulus coming from one source, and 15 percent of respondents identified the control as coming from one source, the net association would be 25 percent.

The key to an appropriate control is that "[i]it should share as many characteristics with the experimental stimulus as possible, with the *key exception of the characteristic whose influence is being assessed*." Diamond at 210 (emphasis added); *see also* Mantis Decl. ¶ 16 ("[A]

stimulus no longer properly serves the function of a control if it causes the observed phenomenon"). For example, a secondary meaning survey should not use a control similar to existing brand names because consumers may mistakenly associate the control with one company (e.g., AMERICAN PEOPLE as applied to clothing is too similar to clothing brand AMERICAN EAGLE, and so it does not serve as an appropriate control in a secondary meaning survey). *Id.*; *see also Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 500 (E.D. Pa. 2007) (use of "American People" as a control was misleading since it likely reminded people of the brand name "American Eagle"). To do so would artificially—and improperly—inflate the number of people who associated the control with more than one company, resulting in a lower net level of association (e.g., if 35 percent of people identified American People as coming from one company when it was used as a control, the net level of association with one company in the example above would be 5 percent).

Yet, that is precisely what happened in the Cunningham survey. By using CRACKER THINS as the control, the survey yielded inflated numbers of individuals who erroneously identified the control as a brand name. The reason for this inflation is obvious from the respondents' answers: they immediately associated the control—CRACKER THINS—with the brand name WHEAT THINS, for which Nabisco, Inc. ("Nabisco") owns a registered trademark. Mantis Decl. ¶¶ 18–19; *see also* Registration No. 1,022,799. More than 60 percent of respondents—46 out of the 75 that associated CRACKER THINS with only one company— referenced WHEAT THINS or Nabisco in their verbatim responses. Mantis Decl. ¶ 21; *see also* Expert Report and Declaration of Professor Isabella Cunningham ("Cunningham Report"), App. 4 [D.E. 71-14] at 16–26. The similarity between the control and the trademark WHEAT THINS "significantly influenced 'one company' responses producing a level of reported survey 'noise'

beyond traditional measures" and, "[a]s a result, the CRACKER THINS control provides no control at all." Mantis Decl. ¶ 24.

It is not possible to measure the extent to which the reported survey "noise" generated by the CRACKER THINS control overestimates the level of survey "noise" and correspondingly underestimates net association. It is therefore not appropriate to use the Cunningham Survey's 22.9 percent estimate of survey "noise" in determining net association, and it is not appropriate to subtract that percentage from the proportion of respondents (29.1 percent) who associated the test name PRETZEL CRISPS with only one company. *Id.* Accordingly, the Cunningham Survey fails to raise an issue of fact as to the secondary meaning of PRETZEL CRISPS. *See Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 718–19 (E.D. Mich. 2015) (excluding a survey that included an inappropriate control).[9]

### 2. The Flawed Test Population In The Cunningham Survey Makes It Impossible To Draw A Comparison With The Mantis Survey.

Additional design flaws in the Cunningham Survey make it impossible to draw any "fair [or] objective comparison" with the Mantis Survey. Mantis Decl. ¶ 26. The Cunningham Survey therefore provides no basis to conclude that the acquired distinctiveness found by the Trademark Examiner and by the Mantis Survey has decreased over time. *Id.* ¶ 29.

Consistent with accepted practices, the Mantis Survey screened for individuals that fell within the age range of Snyder's-Lance's target customer. *See* Mantis Decl. ¶ 27; Opp'n No. 91195552 at A4177 ¶ 4; *see also* William G. Barber, *The Universe, in* Trademark and Deceptive

---

[9] Among Cunningham Survey respondents who had an opinion, 35.2 percent associated PRETZEL CRISPS with only one company. Cunningham Report, App. 4 at 2. To the extent the Cunningham Survey was not otherwise flawed—and, for the reasons cited, it was fundamentally flawed—this would indicate PRETZEL CRISPS has acquired secondary meaning. *See, e.g.*, *Winchester Fed. Sav. Ank v. Winchester Bank, Inc.*, 359 F. Supp. 2d 561, 566 (E.D. Ky. 2004) (finding that where 35 percent of survey respondents associated a mark with plaintiff, this established secondary meaning).

Advertising Surveys: Law, Science, and Design 27, 32 (in distinctiveness surveys, the relevant universe "should focus on the typical group(s) of consumers to whom the [markholder] markets its products or services"). The Mantis Survey also required that respondents (i) be the primary grocery shopper in their household, (ii) purchased crackers and pretzels in the past month, and (iii) planned to purchase crackers and pretzels in the next month. Mantis Decl. ¶ 27.

The Cunningham Survey, in contrast, screened for a broader set of respondents: individuals 18 years of age or older, who did any grocery shopping in their household, and who purchased crackers or pretzels in the past three months *or* planned to do so in the next three months. *Id.*; *see also* Cunningham Report, App. 1 [D.E. 71-11] at 2–4. Because the Cunningham Survey failed to survey the target customers who are primary grocery shoppers who regularly purchase crackers and pretzels and are in the target demographic, the Cunningham Survey includes people who are not in the target market and whose opinions are, therefore, less relevant. Not surprisingly, consumers who are not in the target market for these products are less likely to be familiar with brand names in the category. Mantis Decl. ¶ 27. In addition, the context in which the questions were asked in each survey was different: the Mantis Survey asked about the use of PRETZEL CRISPS in connection with salty snack food products. The Cunningham Survey, by contrast, asked about a broader, vaguer category of "crackers or similar products." *Id.* ¶ 28.

The design of a survey can and does influence its results. Surveys that differ on any one or more design elements can vary wildly in their results, rendering an objective comparison of those results difficult or impossible. Because the Cunningham Survey failed to mirror the Mantis Survey's design elements—including the survey universe—and the context in which questions were presented, a fair and objective comparison of the survey results cannot be made.

Accordingly, it is not possible to conclude, based on the Cunningham Survey, that the proportion of consumers who associate PRETZEL CRISPS with one company is any less in 2019 than it was when the Trademark Office found that the mark had acquired secondary meaning, and when the Mantis Survey was conducted. *Id.* ¶ 29.

## <u>CONCLUSION</u>

For the foregoing reasons, and as further explained in Snyder's-Lance's opening brief, Snyder's-Lance respectfully requests that the Court grant summary judgment in its favor, order the registration of the PRETZEL CRISPS mark, and deny Frito-Lay's motion for summary judgment.

Respectfully submitted, this 28th day of August, 2019.

DEBEVOISE & PLIMPTON LLP  
David H. Bernstein*  
James J. Pastore*  
Jared I. Kagan*  
Jeremy C. Beutler*  
919 Third Avenue  
New York, New York 10022  
Telephone: (212) 909-6696  
dhbernstein@debevoise.com  
jjpastore@debevoise.com  
jikagan@debevoise.com  
jcbeutler@debevoise.com  

*admitted *pro hac vice*

WYRICK ROBBINS YATES & PONTON LLP

/s/ Alexander M. Pearce  
Alexander M. Pearce  
N.C. State Bar No. 37208  
4101 Lake Boone Trail, Suite 300  
Raleigh, North Carolina 27607  
Telephone: (919) 781-4000  
apearce@wyrick.com  

*Counsel for Plaintiffs Snyder's-Lance, Inc. and Princeton Vanguard, LLC*