UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| SNYDER'S-LANCE, INC. and PRINCETON VANGUARD, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>FRITO-LAY NORTH AMERICA, INC.,<br><br>Defendant. | Case No. 3:17-CV-00652 |

### DECLARATION OF GEORGE MANTIS IN SUPPORT OF SNYDER'S-LANCE, INC. AND PRINCETON VANGUARD, LLC'S CROSS-MOTION FOR SUMMARY JUDGMENT

I, George Mantis, declare as follows:

I submit this declaration in support of Snyder's-Lance and Princeton Vanguard, L.L.C.'s ("Plaintiffs") cross-motion for summary judgment. I am over the age of 18 and competent to testify. I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

Through this declaration, I summarize the findings of a secondary meaning survey that I conducted in this case in 2011, and to rebut the conclusions contained in the report by Professor Cunningham that Defendant Frito-Lay North America, Inc. ("Frito-Lay") submitted in opposition to Plaintiffs' cross-motion for summary judgment.

## Background

1.      I am the founder and President of The Mantis Group, Inc., a marketing research and consulting firm headquartered in Chicago, Illinois.  The Mantis Group designs, executes and reports on surveys conducted for a wide variety of consumer and industrial product and service firms.  I have over 40 years of experience designing and conducting surveys of all types, including secondary meaning and genericness surveys for trademark cases.  I have testified in federal courts and before the Trademark Trial and Appeal Board ("TTAB") and have been qualified numerous times as an expert in survey methodology.  I have not authored any publications in the past ten years.  I am being compensated at the rate of $750 an hour.

## The 2011 Mantis Survey

2.       On September 15, 2011, I prepared a report that was submitted in the TTAB proceedings in this case, titled SECONDARY MEANING STUDY that summarized a study I conducted to determine whether the name PRETZEL CRISPS, used in conjunction with a salty snack food product, has acquired secondary meaning (the "Mantis Survey"). Among the total of 400 survey respondents, 155 (38.7%) associated the term PRETZEL CRISPS with only one company.  Among respondents who had an opinion, 44.7% of respondents associated the term with only one company.   In my opinion, these levels of association are sufficient to establish secondary meaning regarding the term PRETZEL CRISPS.

3. Potential respondents for the Mantis Survey completed an online survey hosted by Survey Sampling, Inc. ("SSI") between August 26, 2011 and August 30, 2011 (the "Internet Panel"). To be qualified for the survey, members of the Internet Panel had to meet the following criteria:

   a. The individuals are the primary grocery shopper for themselves or their households and are between the ages of 24 and 39. I selected the age-range criterion because I understand it to be the age range of Plaintiffs' target customer.

   b. The individuals have purchased crackers and pretzels in the past month and will purchase crackers and pretzels in the next month. I selected purchasers of crackers and pretzels as the universe for this survey because I understand that Plaintiff's product at the time was a relatively new product that combined attributes of crackers and pretzels and thus would likely appeal to consumers who purchase both crackers and pretzels, and that such purchasers were Plaintiffs' target customers.

   c. The individuals have not participated in any online survey in the past 2 weeks that took more than 3 to 5 minutes.

   d. The individuals do not have any members in their household who work for a company that makes or sells snack food, or an advertising

agency, sales promotion firm, public relations firm or marketing research organization.

4. SSI drew a sample of potential respondents from the Internet Panel. From this population, quotas were established to ensure that the sample of completed interviews is nationally representative of the U.S. population with regard to gender and geographic region. The sample was comprised of approximately an equal number of men and women and reflected the relative distribution of the population by U.S. Census region.

5. The key issue in assessing whether a term has achieved secondary meaning (also known as acquired distinctiveness) is whether a respondent associates the term at issue with products that come from one particular company (in which case the term has secondary meaning in that respondent's mind) or whether the respondent associates the term with products that come from more than one company (in which case the term has not yet developed secondary meaning in that respondent's mind).

6. To confirm that respondents understood the distinction between a name associated with one particular company and a name that refers to a type of product associated with more than one company, they were asked whether they associate BAKED TOSTITOS with only one company or with more than one company. Respondents were also asked the same question regarding TORTILLA CHIPS. Respondents who correctly associated the name BAKED TOSTITOS with only one company and TORTILLA

4

CHIPS with more than one company demonstrated that they understood this distinction, and they were therefore administered the remainder of the questionnaire.

7. The respondents who were qualified for the survey were then asked about three additional names: PRETZEL CRISPS (which was the name that was being tested in this survey, which also is referred to as the experimental stimulus) and two control names designed to measure the meaningfulness of the data with respect to PRETZEL CRISPS. The names used as control names (also referred to as control stimuli) were ONION RINGS and SUN CHIPS. To the extent most respondents properly categorized ONION RINGS as coming from more than one company, and properly categorized SUN CHIPS as coming from only one company, that reinforces that the respondents understood the distinction and were able to properly assess whether a snack name does or does not have secondary meaning, which validates their answers with respect to the test name, PRETZEL CRISPS.

8. This approach is consistent with the commonly used single test stimulus one-room array design for secondary meaning surveys (which is exactly what I did in this survey).[1] The one-room array format provides more than one control stimuli (*i.e.,* SUN CHIPS, ONION RINGS) and an experimental stimulus (*i.e.*, PRETZEL CRISPS). Consistent with this one-room array format, respondents were asked the standard question for testing secondary meaning with respect to both the experimental stimulus

---

[1] *See* Mike Rappeport, Design Issues for Controls, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN 217, 233–35 (Shari Seidman Diamond & Jerre B. Swann eds., 2012).

and the control stimuli: "do you associate ___ with only one company or do you associate ___ with more than one company?"

9.    As noted above, among the 400 survey respondents, 155 (38.7%) associated the term PRETZEL CRISPS with only one company. Among respondents who had an opinion (54 respondents indicated that they had no opinion), 44.7% of respondents associated the term with only one company. Based on my more than four decades of experience in this field, these levels of association are sufficient to establish secondary meaning regarding the term PRETZEL CRISPS.

10.   Respondents' answers with respect to the two control names demonstrates that the questionnaire was clear and unbiased: the majority of respondents (96.5% among all respondents and 97% among those with an opinion) correctly associated SUN CHIPS with only one company and the majority of respondents (72% among all respondents and 75.2% among those with an opinion) correctly associated ONION RINGS with more than one company. These findings demonstrate that respondents understood the distinction between a name associated with one particular company and a name which refers to a type of product associated with more than one company.

### The Cunningham Survey

11.   Frito-Lay has offered a counter-survey report, dated January 16, 2019, titled EXPERT REPORT AND DECLARATION OF ISABELLA CUNNINGHAM (the "Cunningham Survey"), purporting to show that the term PRETZEL CRISPS has not acquired secondary meaning. Citing the Cunningham Survey, Frito-Lay asserts that

fewer consumers associate the term PRETZEL CRISPS with one company today than when the Mantis Survey was performed eight years ago. Further, in its response to Plaintiffs' cross-motion for summary judgment, Frito-Lay questions the probative value of my survey based on the alleged criticism that I "failed to include an external control to account for 'noise'" in the Mantis Survey. Frito-Lay's critique of my survey is without merit.

12. As discussed in more detail below, the Cunningham Survey has a fatal flaw that renders it meaningless, and its results cannot be meaningfully compared to the results of my survey. Specifically, the absence of an appropriate control stimulus makes it impossible for the Cunningham Survey to assess whether PRETZEL CRISPS possesses secondary meaning. Additionally, because the Cunningham Survey did not replicate the Mantis Survey in every respect, it cannot be compared to the results of my survey as it is essentially comparing apples and oranges. For this reason, the results of the two surveys cannot be objectively compared to conclude that association of PRETZEL CRISPS with a single source is less today than it was eight years ago.

13. Equally unfounded is Frito-Lay's criticism of the design of my survey. Consistent with accepted practice, the Mantis Survey used a one-room array design to test for secondary meaning and included more than one internal control. These internal controls appropriately assess the meaningfulness of the survey's data, particularly in relation to the term being tested—here, PRETZEL CRISPS.

### An Inappropriate Control in the Cunningham Survey
### Resulted in Overstating Survey "Noise" to An Unknown Degree

14. As noted above, one way to ensure that a survey is measuring and reporting meaningful results is through the use of an internal control, such as the one-room array format used in the Mantis Survey. Under this approach, one group of respondents sees both the experimental and control stimuli; if the majority of respondents demonstrate through their reactions to the control stimuli that they understand the distinction being assessed, that validates the reactions to the experimental stimuli and shows that those reactions are meaningful.

15. Another approach used by some trademark surveys is to try to measure the amount of "noise" in a survey through the use of an external control stimulus. Under this approach, one group of respondents is questioned about the experimental stimulus and a different group of respondents is questioned about only the external control stimulus. By holding everything else as constant as possible, including the questions asked and the characteristics of the sample of respondents, this approach allows a surveyor to estimate the level of survey "noise" that results from causes other than the name at issue, *e.g.*, responses resulting from simply guessing, misunderstanding the questions asked, or respondents' preexisting beliefs rather than focusing on the survey stimulus. The primary method of estimating the level of survey "noise" is to ask the same questions for the control stimulus as for the test stimulus. The level of noise associated with the control responses is then subtracted from the test stimulus responses to arrive at a net result. For example, if a survey shows one group of respondents a blue piece of paper and asks

whether the paper is blue, yellow or red, and a second group of respondents is shown a yellow piece of paper and is asked the same set of questions, the number of respondents who answer "blue" when shown the yellow piece of paper would be a measure of noise, which may represent respondents who are just guessing, or are not paying attention, or do not understand written English, or who may have some preexisting condition that prevents them from answering appropriately (such as being color blind).

16. Although a control should share as many characteristics as possible with the test stimulus, it is well understood that a stimulus no longer properly serves the function of a control if it causes the observed phenomenon the survey was intended to study. For example, to continue the analogy above, if the control stimulus were a piece of paper that was periwinkle, responses that said the color of the paper was blue would not reflect noise but might instead reflect confusion as to whether periwinkle (which is a combination of blue, red and white, *see* https://en.wikipedia.org/wiki/Shades_of_blue#Periwinkle) is "blue" or not. A periwinkle color sample would therefore be an inappropriate control because it would include some blue, which is the very thing that needed to be controlled.

17. For a secondary meaning survey, the purpose of the study is to determine whether consumers associate a mark with only one company. To be an effective control, the control stimulus in a secondary meaning survey should not be a term that is

associated with only one company.[2] For example, a secondary meaning survey should not use brand names like CRACKER JACK as a control since consumers associate the brand name with one company.[3] Similarly, the control should not be similar to existing brand names because consumers may mistakenly associate the control with one company (*e.g.*, AMERICAN PEOPLE as applied to clothing is too similar to clothing brand AMERICAN EAGLE, and so it does not serve as an appropriate control in a secondary meaning survey).[4]

18. The control term used in the Cunningham Survey, CRACKER THINS, is an inappropriate control for the same reasons. It cannot serve as a proper control because it is too similar to the brand name WHEAT THINS. Nabisco, Inc. ("Nabisco") is the owner of the word mark WHEAT THINS for crackers. As part of its registration, Nabisco disclaimed the word "WHEAT" separate and apart from the mark.[5] A disclaimer serves "to permit the registration of a mark that is registrable as a whole but contains matter that would not be registrable standing alone."[6] WHEAT was likely disclaimed because it is descriptive of the product—a cracker made, in part, of wheat

---

[2] Vincent N. Palladino, *Secondary Meaning Surveys, in* Trademark and Deceptive Advertising Surveys: Law, Science and Design 79, 89 (Shari Seidman Diamond & Jerre B. Swann eds. 2012).

[3] *See* Trademark Registration No. 564,885.

[4] *Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 500 (E.D. Pa. 2007).

[5] Trademark Registration No. 1,022,799.

[6] TMEP § 1213 (Oct. 2012).

flour—and could not be registered standing alone. Because WHEAT was disclaimed, the component word "THINS" is the distinctive part of the WHEAT THINS mark.

19. The control term CRACKER THINS is too similar to WHEAT THINS to serve as an appropriate control because it shares the word "THINS" and reminded respondents of the brand name WHEAT THINS. This similarity is demonstrated by respondents' answers to the survey questions: verbatim survey responses indicate respondents associated CRACKER THINS with Nabisco, the maker of WHEAT THINS. This improperly led respondents to a "one company" response for the control and inflated the level of noise in the survey.

20. Question 1 of the Cunningham Survey asked test group respondents if they associated PRETZEL CRISPS with only one company, more than one company, no company, or whether they didn't know or had no opinion. Control group respondents were asked about the name CRACKER THINS. Respondents who said "one company" were then asked the following open-ended questions allowing respondents to provide more information about their understanding, knowledge and/or feelings:

| | |
|---|---|
| Question 2 | "Why do you associate (PRETZEL CRISPS/CRACKER THINS) with only one company?" |
| Question 2a | "Anything else?" |
| Question 3 | "From what you know, what company do you associate with (PRETZEL CRISPS/CRACKER THINS)?" |
| Question 3a | "Why do you say (response to Question 3)" |
| Question 3b | "Anything else?" |

21. In total, 75 respondents in the control group said "one company" in response to Question 1 ("Do you associate CRACKER THINS with only one company, more than one company, no company, or don't you know?"). In response to Questions 2 and 3, over one-half (46) of these respondents mentioned Nabisco or WHEAT THINS— 29 said Nabisco and 13 said WHEAT THINS in response to Question 3; and 3 respondents said Nabisco and 1 said WHEAT THINS in response to Question 2. The fact that over half of the respondents associated CRACKER THINS with one company because they thought it was associated with WHEAT THINS or Nabisco, demonstrates that it was an improper control and failed to test for noise. The control merely shows that many consumers associate CRACKER THINS and WHEAT THINS with one company (Nabisco) but that is irrelevant to whether consumers associate PRETZEL CRISPS with one company.

22. As noted by Professor McCarthy, "often, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot."[7] Consider, for example, respondents who gave the following reasons for their "one company" response:[8]

---

[7] 6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §32:175 (4th ed. 2014).

[8] Responses to the open-ended Questions 2 and 3 are volunteered by respondents, that is, respondents are not asked whether any specific reason is or is not the cause of their one company response. As such, respondents' may have other reasons in mind that were not given.

|  | Question 2: Why do you associate CRACKER THINS with only one company? | Question 3: From what you know, what company do you associate with CRACKER THINS? | Question 3a: Why do you say (response to Question 3)? |
|---|---|---|---|
| Respondent 9 | "Wheat Thins comes to mind without hesitation." | "Wheat Thins." | "Association by experience." |
| Respondent 10 | "I thought of Wheat Thins by Nabisco." | "Nabisco." | "Because they make the only crackers I know with 'thins' in the name." |
| Respondent 28 | "I immediately think of Nabisco." | "Nabisco." | "I think of Wheat Thin crackers." |
| Respondent 32 | "Because I believe it's a specific product or brand." | "Wheat Thins." | "It sounds like the brand." |
| Respondent 35 | "The only one I think of are Wheat Thins." | "Wheat Thins." | "Is the one that comes to mind." |
| Respondent 41 | "Nabisco." | "Nabisco." | "It makes me think of Nabisco." |
| Respondent 43 | "Nabisco I think makes them." | "Nabisco." | "First thing that came to mind when I saw the name." |
| Respondent 59 | "Wheat Thins comes to mind." | "Nabisco." | "Because." |

23. In contrast, of the 95 test group respondents who said PRETZEL CRISPS is associated with only one company, only 3 mentioned Nabisco in responses to

Questions 2 and 3, with none mentioning WHEAT THINS as the reason. This further demonstrates that the control group respondents who gave Nabisco or WHEAT THINS responses are doing so for reasons other than simply guessing, the primary source of survey "noise."

24. As shown by respondents' answers, CRACKER THINS brought to mind Nabisco or WHEAT THINS. That is, the similarity of the control name with the word mark WHEAT THINS significantly influenced "one company" responses producing a level of reported survey "noise" beyond traditional measures such as simply guessing. As a result, the CRACKER THINS control provides no control at all. It does not provide a reliable estimate of survey "noise" because any "association" responses generated from the control may be the result of survey "noise" or association caused by the cue provided to respondents (the similarity of the control name with the WHEAT THINS mark resulting in a "one company" answer) or a combination of both.[9]

25. There is no way to tell the extent to which the reported survey "noise" generated with the CRACKER THINS control overestimates the level of survey "noise" and correspondingly underestimates net association. It is therefore not appropriate to use the Cunningham Survey 22.9% estimate of survey "noise" in determining net association, and it is not appropriate to subtract that percentage from the proportion of respondents (29.1%) who associated the test name PRETZEL CRISPS with only one company.

---

[9] Shari Seidman Diamond, *Control Foundations: Rationales and Approaches*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE AND DESIGN, 201, 214 (Shari Seidman Diamond & Jerre B. Swann eds., 2012).

### Frito Lay Lacks The Foundation to Conclude That
### Association Is Less Today Than Eight Years Ago

26. Frito-Lay concludes that the Cunningham Survey confirms that fewer consumers associate PRETZEL CRISPS with one company today than when the Mantis Survey was conducted eight years ago. This conclusion can only be based on the premise that the Cunningham Survey replicated the Mantis Survey in every respect. This clearly was not the case, which means that a fair and objective comparison between the conclusions of the two surveys cannot be made.

27. The relevant universe comprising individuals included in each survey was defined differently. The Cunningham Survey screened for individuals 18 years of age or older; whereas respondents in the Mantis Survey were between the ages of 24–39, the age range of Plaintiffs' target customer. The Cunningham Survey included individuals who purchased crackers and pretzels in the past 3 months or plan to do so in the next 3 months; the Mantis survey required respondents to have purchased crackers and pretzels in the past month and plan to do so in the next month. The Cunningham Survey included individuals who did any grocery shopping for their household; the Mantis survey required the individual to be the primary grocery shopper. Because the Cunningham Survey failed to survey the target customers who are primary grocery shoppers who regularly purchase crackers and pretzels and are in the target demographic, the Cunningham Survey includes people who are not in the target market and whose opinions are, therefore, less relevant. It is hardly surprising that consumers who are not in the target for these products are less likely to be familiar with brand names in the category.

28.  The context in which questions were asked also differs significantly between the surveys.  In the Cunningham Survey, respondents were told that PRETZEL CRISPS is used in connection with crackers or similar products.  The Mantis survey respondents were asked about their understanding of names regarding salty snack food products.

29.  Survey results are contingent on design elements.  Surveys that differ on any one or more of these elements may have a material effect on results.  Because of the failure to mirror the Mantis Survey universe and the context in which questions were addressed, a fair and objective comparison of the survey results cannot be made.  It is not possible, based on the Cunningham Survey, to know whether the proportion of respondents who associate PRTEZEL CRISPS with one company is any less in 2019 than it was in 2011 when the Mantis Survey was conducted.

### The Mantis Survey Adhered to Accepted Practices and Included Appropriate Control Stimuli

30.  In Frito-Lay's Response to Plaintiff's Cross-Motion for Summary Judgment, Frito-Lay critiques the Mantis Survey for "fail[ing] to include an external control."  This critique ignores the fact that the Mantis Survey included appropriate internal controls and adhered to accepted practices for the design of secondary meaning surveys.

31.  In the Mantis Survey, the two control stimuli were SUN CHIPS (a brand name) and ONION RINGS (a product type); the experimental stimulus was PRETZEL CRISPS.  The two control stimuli were included in the survey to measure the

meaningfulness of the data with respect to PRETZEL CRISPS. The majority of respondents—96.5% of all respondents and 97% of those with an opinion—correctly associated SUN CHIPS with only one company. The majority of respondents—72% of all respondents and 75.2% of those with an opinion—also correctly associated ONION RINGS with more than one company. As noted above, these findings demonstrate that respondents were familiar with various names regarding salty snack foods and that they understood the distinction between a name associated with one particular company and a name which refers to a type of product associated with more than one company.

32. In one-room array secondary meaning surveys, it is inappropriate to subtract the percentage associated with an internal control from the test percentage because the percentage of respondents who associated ONION RINGS with just one company does not reflect the level of mismeasurement that may be in the answers to the PRETZEL CRISPS responses; rather it may reflect consumers who have the actual belief that a product called ONION RINGS only comes from one company.

## CONCLUSION

33. In sum, by selecting an entirely inappropriate control name, the Cunningham Survey cannot provide a valid measure of secondary meaning. Further, there is no basis for Frito-Lay to conclude that fewer consumers associate PRETZEL CRISPS with only one company today compared to eight years ago when the Mantis Survey was conducted because the Cunningham Survey included a different respondent pool and asked the questions in a different context. Finally, Frito-Lay's critique that the Mantis Survey did not include an external control misunderstands an appropriate design

for secondary meaning surveys and ignores the fact that the Mantis Survey included appropriate internal controls.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28th day of August, 2019, in Chicago, Illinois.

_____
George Mantis