**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:17-CV-00652-KDB-DSC**

| | |
|---|---|
| **SNYDER'S LANCE, INC. AND PRINCETON-VANGUARD, LLC,** | |
| **Plaintiffs,** | |
| v. | **FINAL ORDER AND JUDGMENT** |
| **FRITO-LAY NORTH AMERICA, INC.,** | |
| **Defendant.** | |

In this case the Parties zealously dispute whether Plaintiffs' asserted trademark PRETZEL CRISPS is entitled to federal trademark registration. Indeed, this quarrel between two giants of the snack food industry is now more than a decade old and includes two precedential decisions of the Trademark Trial and Appeal Board ("TTAB" or "Board") and decisions from both the Federal Circuit and Fourth Circuit Courts of Appeals. By this Final Order and Judgment, after a full *de novo* review of the entire record before the TTAB and the additional evidence offered in this action, the Court now resolves the merits of Defendant Frito-Lay North America, Inc.'s ("Frito-Lay") challenge to the mark.

For the reasons discussed below, the Court will 1) deny the Parties' cross-motions for summary judgment; 2) affirm the TTAB's cancellation of the registration of the mark PRETZEL CRISPS for pretzel crackers on the Supplemental Register because the mark is generic; and 3)

1

affirm the TTAB's denial of Plaintiff Princeton-Vanguard, LLC's ("Princeton-Vanguard")[1] application to register PRETZEL CRISPS on the Principal Register for the same reason.[2]

## I.  LEGAL STANDARDS, RULING ON SUMMARY JUDGMENT MOTIONS AND STIPULATION WAIVING TRIAL

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Smith v. Collins*, 964 F.3d 266, 274 (4th Cir. 2020). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).  "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).  "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

The fundamental threshold issue in this action is whether Plaintiffs' mark PRETZEL CRISPS is generic and therefore not eligible for trademark protection. Whether an asserted mark is generic is a question of fact. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960,

---

[1] Princeton Vanguard's co-Plaintiff is Snyder's-Lance, Inc. ("Snyder's-Lance"), which is its parent company.

[2] Having determined that the mark is generic, the Court need not and does not decide the further issue of whether if the mark were found to be descriptive it has acquired distinctiveness (secondary meaning) with respect to its association with the Plaintiffs.

964 (Fed. Cir. 2015) (citing *In re Hotels.com, LP*, 573 F.3d 1300, 1301 (Fed. Cir. 2009))[3]; *see also Booking.com B.V. v. United States Pat. & Trademark Off.*, 915 F.3d 171, 179 (4th Cir. 2019) (the question of whether a proposed mark is generic is a question of fact that is subject to deferential review) (citing *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014)).

In reviewing the Parties' extensive supporting, opposition and reply briefs (together with thousands of pages of exhibits and the underlying record at the TTAB), it is obvious that the issue of genericness is genuinely disputed such that entry of summary judgment for any party would be inappropriate. Plaintiffs contend that it cannot be disputed that analysis of the mark, survey evidence, media references, etc. establishes that PRETZEL CRISPS is not generic. Frito-Lay's view of the record is markedly different. It argues that it is just as clear that the evidence shows that PRETZEL CRISPS is a generic mark. The truth of course lies somewhere in between the two extremes as there is at least some evidence that supports both sides. In sum, while the Court finds – on balance after carefully weighing all the evidence – that the mark is generic, that fact has plainly been genuinely disputed, requiring the Court to deny both Parties' motions for summary judgment, Doc. Nos. 28, 34.[4, 5]

---

[3] With respect to legal issues actually decided, the Court generally follows the earlier Federal Circuit opinion in this matter under the "law of the case" doctrine. That doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)); *see Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 522 (4th Cir. 2021). However, as discussed *infra*, notwithstanding the "law of the case," this Court must of course follow the subsequent rulings of the Supreme Court on any relevant issue.

[4] The issue of whether PRETZEL CRISPS has acquired secondary meaning is also genuinely disputed, so if the Court had reached that alternate factual issue (which it does not) it would similarly have not been proper to decide it on summary judgment.

[5] The Court previously denied both motions as moot, Doc. No. 83, based on the Court's earlier dismissal of the action. With the case now returned from the Court of Appeals for further proceedings, the Parties' summary judgment motions have been revived. *See* Text Order dated May 11, 2021 (following Doc. No. 93).

Upon the denial of summary judgment, this matter would normally proceed to a bench trial on the merits. However, as they did before the TTAB, the Parties have waived their right to present live testimony at trial and stipulated that the Court may fully consider and rule on all the issues presented based on the written record. The Court has agreed to do so, and this Order and Judgment thus reflects the Court's final determination of the facts and resulting ruling and judgment on the merits.

While the Parties agree that the Court may rule on the merits based on the existing record without hearing further evidence at trial, the Parties sharply disagree on the Court's standard of review of the TTAB's decision and the applicable burden of proof. With respect to the standard of review, Section § 1071(b) of Title 15 of the United States Code permits a party dissatisfied with a TTAB decision to appeal to the United States Court of Appeals for the Federal Circuit or to bring a civil action in federal district court. *See* 15 U.S.C. § 1071(a), (b); *Snyder's-Lance,* 991 F.3d at 529. If a civil suit is commenced in district court, the record before the TTAB must be admitted as evidence on either party's motion, but the parties are also permitted to "conduct discovery and submit further testimony and other new evidence." *Shammas v. Focarino*, 784 F.3d 219, 225 (4th Cir. 2015).

If new evidence is presented on a disputed question of fact, the district court must make *de novo* factual findings that take account of both the new evidence and the administrative record before the Board. *See Kappos v. Hyatt*, 566 U.S. 431 (2012). If no new evidence is admitted that relates to a disputed fact question, the reviewing court must apply the usual "substantial evidence" standard from the Administrative Procedures Act to the TTAB's findings of fact on that issue. *See Belmora, LLC v. Bayer Consumer Care AG*, 338 F. Supp. 3d 477, 483–84 (E.D. Va. 2018) ("[F]actual findings made by the Board which are untouched by new evidence presented to the

court are reviewed under the substantial evidence standard mandated by the Administrative Procedure Act."); *RXD Media, LLC v. IP Application Dev.*, 377 F. Supp. 3d 588, 591–92 (E.D. Va. 2019), *aff'd sub nom. RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361 (4th Cir. 2021).

Although Frito-Lay urges the Court to take a narrow view of these principles and apply the standard of review independently to each discrete factual question (e.g., consumer survey evidence), the Court declines that invitation to error. Here, as noted above, genericness is a question of fact, and various types of evidence potentially bearing on consumer perception of the mark must be weighed in the discretion of the Court. Plaintiffs have submitted additional evidence to the Court on numerous issues that the Court finds may relate to genericness, including media references, consumer surveys, etc. Therefore, the Court must review all the new evidence related to genericness along with the evidence submitted to the TTAB *de novo* to reach its final factual determination of whether the disputed mark is generic.

Nevertheless, the Supreme Court in *Kappos* made clear that even though the District Court reviews all the evidence *de novo*, it need not ignore the findings and conclusions of the administrative agency. In *Kappos*, the Supreme Court adopted the Federal Circuit's rule that "the district court may, in its discretion, 'consider the proceedings before and findings of the [administrative agency] in deciding what weight to afford an applicant's newly-admitted evidence.'" *Kappos*, 566 U.S. at 445 (quoting *Hyatt v. Kappos*, 625 F.3d 1320, 1335 (Fed. Cir. 2010)). Accordingly, while the Court will consider all the evidence *de novo*, it will also consider the TTAB's findings in weighing the evidentiary value that will be afforded the new evidence presented by the Parties. *See Id.* ("[W]e conclude that the proper means for the district court to accord respect to decisions of the [agency] is through the court's broad discretion over the weight

to be given to evidence newly adduced in the [] proceedings."); *see also* 3 McCarthy on Trademarks and Unfair Competition § 21:21 (5th ed.) ("McCarthy").

The burden of proof is more easily addressed. In the Federal Circuit decision in this matter, the court expressly held that Frito-Lay bears the burden to prove genericness by a preponderance of the evidence. *Princeton Vanguard*, 786 F.3d at 965, n.2. ("We agree with the Board that the burden was on Frito–Lay to prove genericness by a preponderance of the evidence. *See Am. Med. Rehab. Providers Ass'n. v. UB Found. Activities, Inc.,* Opp. No. 91158512, Canc'n No. 92043381, 2008 WL 4674613, at *3 (T.T.A.B. Sept. 23, 2008) ("In an opposition/cancellation, the opposer/petitioner has the burden of proving genericness by a 'preponderance of the evidence.'"); *Racine Indus., Inc. v. Bane–Clene Corp.,* 35 U.S.P.Q.2d 1832, 1838 (T.T.A.B. 1994) ("Opposer, as the party contending that the designation 'PCA' is a generic term for applicant's professional carpet cleaners' association, bears the burden of proof thereof."). This unambiguous ruling is binding on this Court, *see Snyder's-Lance,* 991 F.3d at 522, as Frito-Lay acknowledged at oral argument. Therefore, Frito-Lay must prove that PRETZEL CRISPS is generic by a preponderance of the evidence.

## II.    FACTS AND PROCEDURAL HISTORY

The pretzel, a simple mixture of water, flour and salt, is a well-known snack food with a long and colorful history dating back to the Middle Ages, when Catholic priests rewarded young children who learned their prayers with soft strips of baked bread dough folded to resemble arms crossed in prayer.[6]  German immigrants in the 1700's brought their "bretzels" (from the Old

---

[6] In medieval Europe, monks gave away pretzels as religious symbols to the poor to provide spiritual as well as literal sustenance. Thus, the pretzel became a sign of fulfillment, good fortune and prosperity. In 1529, pretzel bakers saved Vienna from ransacking by Ottoman Turks when they heard the invaders tunneling under the city during their early morning work and alerted the

6

German "brezitella" which is derived from the Latin for "arm" (*bracchiatus*)) to the United States and by 1861 a commercial pretzel bakery was making "hard" pretzels – a brittle, glazed and salted cracker-like version of the original soft pretzel – that could be shipped and stored in airtight containers. Over the ensuing years, pretzels became increasingly popular and have been baked and sold as snacks in many sizes, forms and names, including sticks, thins, crackers, chips, rods, rounds and, as at issue here, crisps. (*See* Doc. 35 at 9).[7] Over $500 million worth of pretzels are now sold annually in the United States, with the average American consuming about two pounds of pretzels a year. (https://positivelypa.com/pretzel-facts/ (accessed May 14, 2021)).

The use of the term "pretzel crisps" dates from, at the latest, the late 1990's. For example, in April 1998, an article in *Men's Health* suggested a recipe for a low-calorie snack mix consisting of "flat pretzel crisps and crunchy pretzel sticks." (Doc. 28-25 at 98–99). In 1999, *The San Francisco Chronicle* included "Honey-mustard pretzel crisps" on its list of "Hot" grocery items. (*Id.* at 96–97). In 2001, the *Charleston Gazette* recommended serving a dip recipe "at room temperature with pretzel crisps or crackers." (*Id.* at 95).

Princeton-Vanguard developed their pretzel snack product in 2004. Warren and Sara Wilson, experienced entrepreneurs who had launched several successful snack food brands,

_____

city leadership (thereby earning their own coat of arms which includes angry lions holding a pretzel). By the 17th Century, the interlocking loops of the pretzel had also come to symbolize undying love when couples in Switzerland began eating a pretzel in their wedding ceremonies to seal the bond of matrimony, which is reputed to be the origin of the phrase "tying the knot." *See* foodandwine.com/lifestyle/religious-history-pretzels (Updated April 17, 2019, accessed May 5, 2021); The Pretzel: A Twisted History (History.com Jan. 30, 2020).

[7] The word "pretzel" also entered the lexicon of the country. A "pretzel curve," named for Charles 'Pretzel' Getzein, a German-American pitcher, was an early name for a bending baseball pitch (now simply a curveball). "Pretzel logic" refers to "twisted" or illogical reasoning and "pretzelled" means "twisted, contorted, tangled." *See* https://www.lexico.com/en/definition/pretzel_curve, https://www.dictionary.com/e/pop-culture/pretzel-logic/; https://www.lexico.com/en/definition/pretzelled (all accessed May 14, 2021).

created a snack food product that took the middle slice of a pretzel and produced it in a flat, cracker form. (Opp'n No. 91195552 at A1533). Princeton-Vanguard named the product PRETZEL CRISPS and began marketing and selling their pretzels in the "deli snacks" section of the grocery stores and food markets. PRETZEL CRISPS have been a major commercial success and are a market leader among pretzel products, having enjoyed sales growth almost every year since the brand's launch. (Doc. Nos. 45-46; Doc. No. 32, Opp'n No. 91195552 at A543).

Since 2004, Plaintiffs have sold more than $1.25 billion dollars of Pretzel Crips to wholesalers and retailers (which translates into more than $2.5 billion in retail revenue). (Doc. No. 46 at ¶ 5). These sales are driven by an extensive marketing and advertising campaign. Snyder's-Lance has spent more than $50 million on advertising, marketing, and promoting the PRETZEL CRISPS brand through traditional marketing and advertising channels, as well as through social media, in-store demonstrations, and "seeding" events and contests. (Doc. No. 32, Opp'n No. 9119552 at A1539; Doc. No. 45 at ¶¶ 8–11). For example, in 2016 and 2017, Snyder's-Lance estimates it had 225 million consumer impressions from its print and online advertising of PRETZEL CRISPS, and its field marketing teams travelled the country to promote PRETZEL CRISPS, distributing some 600,000 product samples at various events. (*Id.*)[8]

The history of the mark in the USPTO also begins in 2004. On April 21, 2004, Princeton Vanguard filed U.S. Trademark Application Serial No. 78/405,596, seeking to register PRETZEL CRISPS in standard character format for "pretzels" on an intent-to-use basis under § 1(b) of the Lanham Act, 15 U.S.C. § 1051. The trademark examining attorney refused registration on the

---

[8] In 2018, Campbell's Soup Co. bought Snyder's-Lance, combining the company with Campbell's existing Pepperidge Farm business and other brands to create Campbell Snacks, an even larger company unit with additional marketing reach and resources.

Principal Register on grounds that the proposed mark was merely descriptive under 15 U.S.C. § 1052(e)(1). In response, Princeton Vanguard: (1) amended its identification of goods from "pretzels" to "pretzel crackers;" (2) disclaimed the exclusive right to use the term "pretzel" apart from the mark as a whole; and (3) requested registration on the Supplemental Register. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 109 U.S.P.Q.2d at 1950 & n. 1 ("TTAB Decision 1"). On July 26, 2005, Princeton Vanguard obtained Registration No. 2,980,303 for the PRETZEL CRISPS mark on the Supplemental Register as a descriptive mark. *Id*.

In late 2009, Princeton Vanguard filed U.S. Trademark Application Serial No. 76/700,802, seeking to register PRETZEL CRISPS in standard character format for "pretzel crackers" on the Principal Register. In its application, Princeton Vanguard identified October 6, 2004 as its first use of the mark in commerce, disclaimed the exclusive right to use the term "pretzel" apart from the mark as shown, and claimed acquired distinctiveness in the mark as a whole. *Id.* at 1950, n. 2.

On July 2, 2010, shortly after it was first published in May 2010, Frito–Lay filed a notice of opposition to Princeton Vanguard's Application Serial No. 76/700,802 to register PRETZEL CRISPS on the Principal Register. In its opposition, Frito–Lay argued that the term PRETZEL CRISPS is generic for pretzel crackers and thus is not registrable. In the alternative, Frito–Lay asserted that PRETZEL CRISPS is highly descriptive of a type of cracker product and has not acquired distinctiveness. *Id.* at 1950. Frito–Lay subsequently filed a petition to cancel Supplemental Registration No. 2,980,303 on the same grounds. The petition for cancellation was consolidated with the opposition proceeding.

The dispute went before the Trademark Board, where the Parties developed an extensive factual record before fact discovery closed in 2012. On February 28, 2014, in a precedential decision, the TTAB sustained Frito-Lay's opposition and cancellation actions, finding that

PRETZEL CRISPS is generic for pretzel crackers. *Id*. at 1960. Princeton-Vanguard appealed to the U.S. Court of Appeals for the Federal Circuit, which vacated and remanded the TTAB's decision after concluding the TTAB had applied the wrong legal standard. *See Princeton Vanguard,* 786 F.3d at 964–65. Because the Federal Circuit decided to remand for application of the correct legal test, it did "not analyze the parties' specific arguments with respect to the evidence of record." *Id*. at 970. Rather, the court directed the TTAB on remand to "consider evidence of the relevant public's understanding of the term PRETZEL CRISPS in its entirety." *Id.* at 969.

On remand to the TTAB, neither party sought to introduce new or additional evidence into the record. The TTAB ordered the Parties to rebrief the case on the original record, and the case was then considered on remand based on that record. *See Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 124 U.S.P.Q.2d 1184, 1204–06 ("TTAB Decision 2"). In its opinion on remand, the TTAB sought to follow the Federal Circuit's direction to consider the mark "in its entirety" and issued a second, more detailed opinion describing its analysis of the Parties' factual contentions and legal claims. Ultimately, the TTAB reached the same conclusion as it had in its first opinion – that the mark PRETZEL CRISPS was generic. Also, in the alternative, the Board concluded that if the mark was descriptive it had not acquired secondary meaning.

The Plaintiffs did not appeal the TTAB's opinion on remand to the Federal Circuit. Instead, on November 6, 2017, Plaintiffs filed a civil action in this Court seeking review of the TTAB's remand opinion pursuant to 15 U.S.C. § 1071(b). Ultimately, the Parties cross-moved for summary judgment and introduced new evidence. This matter was reassigned to the undersigned judge on June 14, 2019.

In the course of reviewing the Parties' respective motions for summary judgment, the Court determined that jurisdictional issues needed to be considered, and on October 21, 2019 the Court

dismissed this action without prejudice for lack of subject matter jurisdiction. Doc. No. 83. Plaintiffs appealed the dismissal. On March 17, 2021, the Fourth Circuit reversed that dismissal and remanded to this Court for further proceedings, expressing no opinion on the merits of the dispute, which the Court now considers for the first time. *See Snyder's-Lance*, 991 F.3d at 529.

## III. DISCUSSION

Trademark law protects the goodwill represented by particular marks and serves the twin objectives of preventing consumer confusion between products and the sources of those products, on the one hand, and protecting the "linguistic commons" by preventing exclusive use of terms that represent their common meaning, on the other. *Booking.com B.V.,* 915 F.3d at 175 (citing *OBX-Stock, Inc. v. Bicast, Inc*., 558 F.3d 334, 339–40 (4th Cir. 2009)).  In order to be protectable, marks must be "distinctive." To determine whether a proposed mark is protectable, courts ascertain the strength of the mark by placing it into one of four categories of distinctiveness, in ascending order: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *George & Co. v. Imagination Entm't Ltd*., 575 F.3d 383, 393–94 (4th Cir. 2009). Marks falling into the latter two categories are deemed inherently distinctive and are entitled to protection because their intrinsic nature serves to identify the particular source of a product. In contrast, descriptive terms may be distinctive only upon certain showings, and generic terms are never distinctive. *Booking.com B.V.,* 915 F.3d at 176.

Generic terms do not contain source-identifying significance—they do not distinguish the particular product or service from other products or services on the market. *George & Co.*, 575 F.3d at 394. Accordingly, generic terms can never obtain trademark protection, as trademarking a generic term effectively grants the owner a monopoly over a common term. Registration must be refused if a mark "is the generic name of any of the goods or services for which registration is

Case 3:17-cv-00652-KDB-DSC   Document 96   Filed 06/07/21   Page 11 of 53

sought." McCarthy § 12:57. If protection were allowed, a competitor could not describe his goods or services as what they are. *Booking.com B.V.,* 915 F.3d at 177 (citing *CES Publ'g Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975)). Once a term is deemed generic, it cannot subsequently become non-generic. *Id*. at 180.

Especially significant here, the law forbids trademarking generic terms, even when a putative mark holder engages in successful efforts to establish consumer recognition of an otherwise generic term. *Id*. at 193-94. "[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).[9] Therefore, even advertising, repeated use, and consumer association will not warrant affording trademark protection to a generic term. *See Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 821 (4th Cir. 2001) ("[T]he repeated use of ordinary words ... cannot give [a single company] a proprietary right over those words, even if an association develops between the words and [that company]."). In sum, courts have long sought to foreclose companies from monopolizing common terms, holding that no single competitor has the right to "corner the market" on ordinary words and phrases. *See Booking.com B.V.,* 915 F.3d at 193.

According to the test adopted long ago by the Supreme Court in *Kellogg Co. v. Nat'l Biscuit Co.,* a plaintiff seeking to establish a valid trademark as compared to a generic mark "must show

---

[9] The Supreme Court recently confirmed this principle in *United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2306–07 (2020), emphasizing that it "presupposes that a generic term is at issue." *Id*.  In other words, the determination of whether a mark is generic must be made separately and independently of the mark's commercial success and association with a particular company that results from extensive advertising and marketing (which would, of course, still be relevant to a determination of whether a descriptive mark had acquired secondary meaning).

that the primary significance of the term in the minds of the consuming public is not the product but the producer." 305 U.S. 111, 118 (1938). A mark is not generic simply because it plays some role in denoting to the public what the product or service is; rather, a mark may serve a dual function—that of identifying a product [or service] while at the same time indicating its source. Thus, "the critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Princeton Vanguard*, 786 F.3d at 965 (citing, *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.,* 782 F.2d 987, 989-90 (Fed. Cir. 1986)). In other words, would the mark be perceived by the purchasing public as merely a common name for the goods rather than a mark identifying the good's source? *Id*. at 766.

According to the Federal Circuit,[10] determining a mark's genericness requires "a two-step inquiry: First, what is the genus (or class) of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?" *Id.* at 990. The Parties do not dispute either the genus of goods or the relevant public. The genus of goods at issue is "pretzel crackers" and the relevant public are "ordinary consumers who purchase and eat pretzel crackers." *See Princeton-Vanguard*, 786 F.3d at 965.

*Booking.com*, the most recent Supreme Court opinion on the question of whether a trademark is generic, provides the Court clear guidance on the process for making the factual

---

[10] The Fourth Circuit follows a functionally similar three-step test: (1) identify the class of product or service to which use of the mark is relevant; (2) identify the relevant consuming public; and (3) determine whether the primary significance of the mark to the relevant public is as an indication of the nature of the class of the product or services to which the mark relates, which suggests that it is generic, or an indication of the source or brand, which suggests that it is not generic. *Booking.com B.V.,* 915 F.3d at 180.

finding on how the relevant public perceives the mark. Evidence of the public's understanding of the mark as either a common name or a mark identifying the good's source may be obtained from dictionaries; usage by the mark holder, consumers and others; consumer surveys;[11] publications and any other source of evidence bearing on how consumers perceive a term's meaning. *See Booking.com B. V.*, 140 S. Ct. at 2306–07; *Princeton Vanguard*, 786 F.3d at 965. Also, the public's primary understanding of a mark "is derived from it as a whole, not from its elements separated and considered in detail;" therefore, "it should be considered in its entirety." *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920). Although "a mark must be considered as a whole," this "does not preclude courts from considering the meaning of individual words in determining the meaning of the entire mark." *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 254 (4th Cir. 2001).

Further, for an asserted trademark such as PRETZEL CRISPS that is a "compound of generic elements" ("pretzel" and "crisps"),[12] the mark "is generic if the combination yields no additional meaning *to consumers* capable of distinguishing the goods or services." *Booking.com B. V.*, 140 S. Ct. at 2306. (emphasis in original). This principle is not inconsistent with consideration of a mark in its entirety. "An inquiry into the public's understanding of a mark requires consideration of the mark as a whole. Even if each of the constituent words in a combination mark is generic, the combination is not generic unless the entire formulation does not

---

[11] With respect to consumer surveys, the Supreme Court has specifically cautioned: "surveys can be helpful evidence of consumer perception but require care in their design and interpretation. See Brief for Trademark Scholars as Amici Curiae 18–20 (urging that survey respondents may conflate the fact that domain names are exclusive with a conclusion that a given "generic.com" term has achieved secondary meaning). … [McCarthy], § 12:49 ("Determining the distinction between generic and trademark usage of a word ... when there are no other sellers of [the good or service] is one of the most difficult areas of trademark law.")." *Booking.com B. V.*, 140 S. Ct. at 2307.

[12] At oral argument, Plaintiffs' counsel agreed that both "pretzels" and "crisps" are generic terms.

add any meaning to the otherwise generic mark." *In re Steelbuilding.com,* 415 F.3d 1293, 1297 (Fed. Cir. 2005).

To find if the combination of generic terms in an asserted trademark has "*additional*" meaning to consumers, the Court logically must first determine what meaning the generic elements would have to the relevant public.[13] See *Booking.com*, 915 F.3d at 184-85 ("when confronted with a compound term like PRETZEL CRISPS, courts may consider as a first step the meaning of each of the term's component marks…"). The TTAB analyzed the constituent terms "PRETZEL" and "CRISPS" at length in its two decisions. *See* TTAB Decision 2, 124 U.S.P.Q.2d at 1201-04.

The Board evaluated the "meaning of each to the consuming public as indicated by dictionary definitions and other competent sources." *Id.* at 1188. Princeton-Vanguard submitted a definition of "pretzel" as "[a] glazed brittle biscuit that is salted on the outside and usually baked in the form of a loose knot or a stick." *Id.* Warren Wilson, Princeton-Vanguard's Manager and co-founder, defined the "PRETZEL CRISPS" product as being a form of pretzel: "PRETZEL CRISPS crackers possess a unique shape, based on removing the middle slice from a traditional pretzel design." *Id.* Finally, Defendant's original identification of goods for Application Serial No. 78405596, as filed on April 21, 2004, stated simply "pretzels." After receiving an office action

---

[13] Plaintiffs repeatedly criticize the TTAB for analyzing the generic elements of PRETZEL CRISPS prior to/together with evaluating the mark as a whole and urge the Court to find that the Federal Circuit ordered that the TTAB could not even consider the generic nature of the words making up the mark. The Court does not read the Federal Circuit opinion to completely foreclose consideration of the generic meaning of "pretzel" and "crisps," (indeed, it would be difficult if not impossible to analyze a mark as a whole without any consideration of the consumer's understanding of the meaning of the words that make up the mark) but rather to emphasize that the TTAB was incorrect in not focusing more clearly on the analysis of the term "in its entirety." And, in any event, the Federal Circuit did not have the benefit of the Supreme Court's controlling opinion in *Booking.com*, which makes clear that this Court must logically consider the meaning of the "generic elements" of the compound mark to determine if the combination "has additional meaning" that can provide a source identifier as discussed above.

15

refusing its applied-for mark as generic, Defendant submitted an amendment to the identification re-characterizing the goods as "pretzel crackers." The Trademark Rules state that an "applicant may amend the application to clarify or limit, but not to broaden, the identification of goods and/or services . . ." Trademark Rule 2.71; 37 CFR § 2.71. Because the amendment to its identification was found to be acceptable, Princeton-Vanguard's identified "pretzel crackers" is by rule a subcategory of the broader product category "pretzel."

As to the term "CRISPS," the Parties submitted to the Board dictionary definitions of the term as meaning, in relevant part, "(noun) Something crisp or brittle;" and "(noun) Something crisp or easily crumpled." Frito-Lay's witness Pam Forbus testified that the "generic term 'crisp' or 'crisps'" had been used by Frito-Lay and others to identify their snack food items "since at least as early as 1959." Such products include Munchos potato crisps, Baked Lay's and Baked Ruffles potato crisps, Stacy's soy crisps, TRUENORTH nut crisps and FLAT EARTH fruit crisps and veggie crisps. *Id.* Moreover, Princeton-Vanguard previously used the term "CRISPS" in the nutrition facts labels displayed on its "PRETZEL CRISPS" product, referring to the number of "crisps" in a serving size. Also, in responding to requests for admission, Princeton-Vanguard admitted that "'crisps' can be used as a term for the product that is the subject of the Application." *Id.* Finally, the definition of the word "cracker," in pertinent part, is "a dry thin crispy baked bread product that may be leavened or unleavened." "Cracker," Merriam-Webster.com; https://www.merriamwebster.com/dictionary/cracker. (Accessed 11 May. 2021). "Crisps" may therefore also be "crackers."

Accordingly, based on the separate meanings of the two words, the term "pretzel" "crisps" would be perceived by a consumer to refer to a pretzel in the form of a crisp or cracker (or, alternatively, a cracker or crisp that tastes like a pretzel). So, the question is what additional

16

meaning can consumers find in the combination of the two generic words "pretzel" and "crisps" that can serve as an indication that the combined term may refer to a single source? Unlike booking.com (the combined mark identifies a specific company at that internet address) and American Airlines (consumers understand that there are numerous separately named airlines in the United States and don't refer to them collectively as "American Airlines"), there is no additional meaning that results from the combination of the generic terms that make up PRETZEL CRISPS in the minds of consumers. "Pretzel" "crisps" are pretzels in the shape or form of a cracker and "pretzel crisps," viewed together, would be perceived as the same thing. *See Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.*, 690 F. Supp. 1457, 1464 (D. Md. 1988), *aff'd*, 870 F.2d 654 (4th Cir. 1989) (acknowledging that mark must be considered as a whole, but also finding "arrangement of the words 'Convenient Food Mart' obvious and meaning nothing more than a convenient food mart").[14]  In sum, the Court finds that the combined term PRETZEL CRISPS adds no additional meaning to consumers that suggests the mark is not primarily a generic name.

The analysis of whether a combination of generic terms adds any meaning to the separate meaning of the generic words that make up the mark can also be considered from another angle, which is whether the disputed combined term can satisfy the basic elements of a "descriptive" term, which is the trademark category just beyond generic terms (and how Plaintiffs argue PRETZEL CRIPS should be categorized). "Descriptive" terms "immediately convey information concerning a feature, quality, or characteristic" of the producer's goods or services, not simply the good or service itself. *See In re North Carolina Lottery*, 866 F.3d 1363, 1367 (Fed. Cir. 2017)

---

[14] When asked at oral argument to identify any additional meaning or source identification that the combined term adds to its generic components, Plaintiffs' counsel simply reiterated their position that the Court should not consider the meaning of the component terms in any way (notwithstanding the clear recent direction from the Supreme Court in *Boooking.com*).

However, PRETZEL CRISPS does not convey any "feature, quality or characteristic" of "pretzel crackers" (the agreed genus of goods).[15] Instead, it is simply another name for the goods being sold. Accordingly, the failure of the combined term to convey any additional meaning that allows it to function as a "descriptive" term further supports a finding that the combined term is merely "a common name for the goods" which is appropriately placed in the lower category of generic goods.

Although the Court concludes that the combination of the generic elements "pretzel" and "crisps" does not create any additional meaning for consumers from which they can distinguish Plaintiffs' product and thus indicates that PRETZEL CRISPS is generic, the Court does not rest its finding of genericness on that finding. Rather, after considering *de novo* all the evidence offered by the Parties which bears on consumers' perception of the mark, the Court finds that, on balance, a preponderance of the evidence supports the conclusion that the mark, considered only in its entirety, is generic.

Before reviewing the evidence in detail, the Court notes two points relevant to its overall analysis. First, exercising its discretion, the Court views the more recent purported evidence of consumer perception (from both sides) as less probative than evidence closer to Princeton-Vanguard's registration applications and Frito-Lay's opposition. As discussed above, the law does not permit a generic mark to evolve into a descriptive mark or other type of non-generic mark based on the association of the product with a particular company (driven by the mark holder's marketing success). And, Plaintiffs themselves acknowledge that it "accords with [] common-sense reasoning that, as more consumers are exposed to PRETZEL CRISPS crackers' packaging prominently

---

[15] As with "additional meaning," when asked at oral argument why "pretzel crisps" is a descriptive term, Plaintiffs' counsel did not identify any "feature, quality or characteristic" of the goods that is reflected in the mark.

displaying the PRETZEL CRISPS mark and encounter the mark in advertisements and on social media, they will naturally come to view it as [a] brand name…" Doc. No. 78 at 17-18. So, the farther in time the evidence is from Plaintiffs' trademark applications, the more likely it is that the cumulative effect of Plaintiffs' sales efforts will limit the ability of the evidence to establish consumer perceptions of genericness as distinguished from secondary meaning resulting from Plaintiffs' successful marketing.

This is particularly true for Plaintiffs' "social media" evidence. In 2004, when the first trademark application was filed, "social media" likely referred to nothing more than the fact that journalists could often be found at a bar. Facebook was only founded the same year, with Twitter (2006), Instagram (2010) and Tik-Tok (2016) following and then later exploding in popularity. A tweet or Facebook or Instagram post in 2018, 14 years after Princeton-Vanguard's initial trademark application and 8 years after Frito-Lay's opposition, provides at best limited guidance about consumer perception when the mark was first registered. Accordingly, the Court finds that more recent evidence has less probative value on the question of genericness.[16]

Second, in making its factual determination of genericness, the Court has considered not just the "quantity" of evidence (the number of times the mark is allegedly used in some "trademark" sense) but also the "quality" of the evidence presented. In other words, the Court finds that not all bare mentions of the mark are equal. For example, many (indeed most) of the cited references to PRETZEL CRISPS appear in otherwise irrelevant financial documents or simply reflect the fact that Plaintiffs are marketing and selling the product[17] (i.e., term appearing in the

---

[16] However, more recent evidence would likely be more probative than earlier evidence on the issue of secondary meaning, which the Court does not reach.

[17] Plaintiffs argue that the Court should consider all such mentions (even the same article appearing in different publications) as persuasive relevant evidence because any use of the name as a brand "could … have [an] impact on readers' perception." *See* Doc. No. 41 at 2-3. This argument misses the question, which is what are *consumers'* perceptions, not how the materials published by Plaintiffs and others about their sales efforts or sales success in financial related documents might speculatively "impact" such perceptions.

reporting of results for Snyder's-Lance's second quarter of 2013, Doc. No. 42-6, p. 187, and article noting that "media sponsors include…Startup Digest, Pretzel Crisps, Modern Oats," Doc. No. 41-8, p. 231),[18] rather than more direct evidence of *consumer* perceptions (i.e., an article suggesting that a baked potato dip be served with "your favorite potato chips or pretzel crisps"), Doc. No. 42-9, p. 31. Thus, the Court has, as it must, not only "counted" the evidence but "weighed" it to reach the final conclusion that PRETZEL CRISPS is, on balance,[19] a generic term for the goods sold by Plaintiffs.

The Court evaluates each type of supporting evidence offered by the Parties as follows:

Dictionaries

As noted above, the Court may look to the dictionary for evidence of common usage to support a finding of genericness. *See* McCarthy, § 11:51 While the Parties have provided definitions of the words "pretzel" and "crisps" as discussed above, it appears that there are no dictionary definitions of the mark as a whole. *See* Doc. No. 41 at 5-6. Plaintiffs contend that the absence of dictionary definitions of "pretzel crisps" is "powerful evidence that the mark is not generic." Doc. 33 at 21. The Court disagrees. First, the authority offered by Plaintiffs in support

_____

[18] Indeed, as discussed more below, in many so-called "unsolicited" media references, the only use of PRETZEL CRISPS in the document is in a listing of products sold by the company in the standard "About Snyder's-Lance" or "About Campbell Soup" company description found at the end of a company press release. The Court finds these references are of little probative relevance in determining consumer perceptions.

[19] Plaintiffs criticized the TTAB's most recent decision for "cherry-picking" examples of generic use to support its conclusion that PRETZEL CRISPS is generic, and Plaintiffs may similarly find fault with this Court's reference to only a relative few media and other references of generic and trademark use. However, the record in this case spans thousands of pages, containing at least as many uses of the mark. Some of the references support a finding that the mark is generic and others support Plaintiffs' position. The Court has reviewed them all *de novo* and exercised its judgment and discretion to determine and balance their weight to come to its final conclusion. It is neither feasible nor necessary for the Court to detail its view on every mention of the mark. Instead, the Court will discuss several references that illustrate and exemplify the record to explain its decision.

of their position, *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 332–33 (D. Md. 2017),[20] notes that "[d]ictionary definitions are particularly helpful where a composite mark which was 'invented' by its holder is listed in the dictionary as the accepted designator for a unique product," citing *Nat'l Fed'n of the Blind, Inc. v. Loompanics Enterprises, Inc.*, 936 F. Supp. 1232, 1248 (D. Md. 1996) (in turn citing *Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 101 (2d Cir. 1989)). Here, although the Court does not find that Princeton-Vanguard invented the PRETZEL CRISPS name as discussed above, Plaintiffs contend they did. Thus, by their own version of the facts, the absence of a dictionary definition would appear to cut against rather than support their arguments.

More significant to the Court, while there is no dictionary definition of "pretzel crisps," there is also no dictionary definition of "pretzel crackers," "pretzel chips," or "pretzel thins," all of which Plaintiffs agree are generic terms. And, similarly, a reasonable search by the Court finds no dictionary definition of other non-pretzel generic snack food names such as "pita chips." In other words, names of particular food products, whether brand specific or generic, are unlikely to be in the dictionary, presumably because dictionary editors do not find the term noteworthy enough to warrant an entry of any type. *See* TTAB Decision 2, 124 U.S.P.Q.2d at 1193. Therefore, in the specific context of the facts presented here, dictionary definitions are not particularly helpful to either party beyond the meaning of the words that make up the mark as discussed above (as part of the question of whether the compound mark adds additional meaning to consumers).

---

[20] In *JFT Toys*, the Court agreed with the USPTO that a suggestive term, "Stomp Rocket," was not generic, finding that because of the lack of any dictionary reference to a rocket in the definition of "stomp" and no definition at all for "stomp rocket" that "the dictionary is unhelpful to Defendants." *JFJ Toys*, 237 F. Supp. 3d at 333.

<u>Usage by Plaintiffs</u>

The Parties have also proffered examples of the Plaintiffs' use of the mark for the Court to consider on genericness. While the vast majority of Plaintiffs' uses of the mark refer to PRETZEL CRISPS as a brand, three references from high ranking executives have been cited to the Court as evidence supporting generic use. In 2010, Maureen Phelan, VP of Sales for Snack Factory, told a major potential customer (Starbucks): "I have seen your new line of healthy snack foods in the stores & think Pretzel Crisps would be a great addition. We are the *original pretzel crisp company* about to introduce a new package which is much more appealing to your demographic than our current deli line." Doc. No. 28-11 at 51 (emphasis added). And, in 2009, Snack Factory's Vice President of Marketing Perry Abbenante asked a marketing firm for help coming up with a new name for an "umbrella brand" for the product, explaining that "Pretzel Crisps" consists of "two pretty generic words" and could be vulnerable to a challenge. ("Per our conversation, I was hoping you and PGW braintrust could mull over some creative names we might be able to use as an umbrella brand for Pretzel Crisps. Currently, we do have a copyright on the name Pretzel Crisps, but because it's a two pretty generic words [sic], there could be a challenge to it."). *Id*. at 48-50. Finally, the founder Mr. Wilson also used the term generically in a published interview, noting, "We have been able to take the middle out of pretzel making the pretzel crisp a thin crunchy cracker-like snack." Doc 28-25 at 80–81.

While evidence of the mark owner's generic use may be "strong evidence of genericness," McCarthy, § 12.13, there must be "repeated and consistent instances of such usage," *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d at 331, for that use to have a significant effect. Accordingly, although these statements by Plaintiffs' executives are generally consistent with the other evidence discussed below which supports a finding of genericness and have been considered, the Court does not view these apparently isolated instances as indicative of

22

general usage of the mark generically by Plaintiffs. Therefore, the Court does not find Plaintiffs' use of the mark generically to be "strong evidence" and gives it relatively little weight in the balance of evidence.

<u>Usage by Competitors, Industry Insiders and Others</u>

More significant to the Court than Plaintiffs' limited generic use, the record reflects use of pretzel crisps generically by competitors and food vendors. In 2010, Kraft introduced pretzel crackers under its RITZ MUNCHABLES mark, using "pretzel crisps" as the generic descriptor.[21] The generic nature of this use is evident from the way "pretzel crisps" was set off from Kraft Food's RITZ MUNCHABLES mark in different typeface and color. Princeton-Vanguard complained to Kraft and threatened litigation.

Plainly choosing to avoid a lengthy battle with an aggressive and similarly deep pocketed competitor (a decision which now may seem particularly prescient to Kraft in light of the decade long history of this case), Kraft entered into an Agreement and Mutual Release with Princeton-Vanguard in which Kraft was allowed to continue to use the mark generically for several months[22] but thereafter agreed not to use "pretzel crisps" "as a product descriptor" or a "trademark." Kraft made no concession, admission of liability or acknowledgement that Princeton-Vanguard was entitled to a registration for "pretzel crisps" or of "any fact" (but agreed that Princeton owns a

---

[21] All food items are required to list a "statement of identity" or "generic descriptor" to describe the food. The name established by law or regulation, or in the absence thereof, the common or usual name of the food, if the food has one, should be used as the statement of identity. If there is none, then an appropriate descriptive name, that is not misleading, should be used. Brand names are not considered to be statements of identity and should not be unduly prominent compared to the statement of identity. *See 21 CFR 101.3(b)* & *(d).*

[22] Kraft's distributors were allowed to continue to distribute and sell the Ritz Munchables pretzel crisps indefinitely so long as they were sold and distributed by Kraft as permitted in the agreement. *See* Opp'n No. 91195552 at A1796.

23

registration on the Supplemental Register, which of course was true at the time). Opp'n No. 91195552 at A1795, 1798.

Significantly, Kraft was careful to both note Frito-Lay's already pending opposition to Princeton-Vanguard's efforts to obtain a principal registration and include a provision allowing Kraft to resume generic use of the term should a court or trademark office find the term to be generic. *Id.* at A1794, 1798. Following the settlement, Kraft changed the generic descriptor "pretzel crisps" on its packaging to "pretzel thins" and "pretzel rounds" (two terms that Plaintiffs agree are not used as trademarks), demonstrating that Kraft considers all of these terms to be generic. *See* Doc. No. 33 at 17 ("Kraft subsequently adopted the terms 'pretzel thins' and 'pretzel rounds' to describe its products"; *see also* Opp'n No. 91195552 at A1543 (declaration from Warren Wilson testifying that "pretzel thins" and "pretzel rounds" are "generic descriptors").

Also in 2010, the food delivery company Diet Gourmet offered for sale on its snack menu "Pretzel crisps, grapes, … cheese and … dipping sauce" in the same generic way that it listed "Baked pita chips, roasted garlic hummus …." and "bagel chips." *Id*. at A1787. Mr. Wilson sent a letter to the Diet Gourmet food delivery company demanding that the company stop using the term "pretzel crisps" without indicating that the term is a trademarked brand. *Id*. at A1785. There is no evidence in the record of a response by Diet Gourmet.

Similarly, in 2011, Pretzels, Inc. used "pretzel crisps" generically in promotional materials for its Trussetts "Crispy Pretzel" snack product (the information sheet for the product referenced the "pretzel crisps market" and the company was listed in a trade show program guide as selling "pretzel crisps."). Again, Princeton-Vanguard complained, *Id.* at A1945-1946, and the matter was resolved without litigation when Pretzels, Inc. agreed to revise its promotional materials "notwithstanding the industry's use of the generic term 'pretzel crisps'." *Id*. at A1942.

More recently, Plaintiffs have continued to object to other companies' ongoing generic use of the mark (even after the TTAB ruled the mark was generic and ordered the registration cancelled). For example, in 2018 Wish Farms posted a recipe on its website for "Blueberry Pretzel Crisps" (Doc. No. 45-9 at 3). The recipe did not feature Plaintiffs' product, and the term "Pretzel Crisps" was used generically to refer to the recipe itself. *Id.* Claiming that PRETZEL CRISPS was at that time a "registered trademark" (ignoring the TTAB's decision that the registration should be cancelled), Snyder's-Lance demanded that the small company cease using "pretzel crisps" (unless it changed the recipe to include Plaintiffs' product). Wish Farms agreed to change the recipe name but declined to "alter the recipe" to include Plaintiffs' product, noting that "the photos were done with a different product and the quickest way that we could address your concern was to simply change the name," *id.* at 7. [23]

As another example, in 2017, Plaintiffs sent a cease-and-desist letter to Betty Jane Homemade Candies over the use of the term "Pretzel Crisps" as a generic ingredient in its "Betty's Bites" snack. Doc. No. 71-6 at 2-3. "Pretzel Crisps" was listed alongside other ingredients including "Caramel," "Milk Chocolate," and "Sea Salt" and was used in the same manner as those other generic terms. *Id.* In response to the letter, Betty Jane's owner stated that he "assumed [pretzel crisps] was a descriptor term for the type of pretzel item (similar to pretzel rod for example, describing the pretzel product)." *Id.* at 8.

All of these examples show that the third parties involved believed "pretzel crisps" was a commonly understood generic term, without any intent by the third parties to copy or trade on Plaintiffs' purported mark or goodwill. In response, Plaintiffs argue that their successful policing

---

[23] Also in 2018, Columbia County Bread and Granola used "pretzel crisps" generically on its flatbread snack product. Snyder's-Lance sent a cease and desist letter which resulted in the company removing the term from its packaging. *See* Doc. 45-10 at 2-4.

efforts "support the conclusion that others in the industry recognize PRETZEL CRISPS as a brand name," Doc. No. 33 at 17. The Court disagrees. In the Court's view, after reviewing the particular circumstances and communications described above, the various agreements not to use "pretzel crisps" do not reflect any "recognition" that PRETZEL CRISPS is a brand name. Rather, the agreements represent the considered practical judgment of the accused companies (which in all cases but one were significantly smaller enterprises) that it wasn't worth the cost to resist Plaintiffs' threats. On the contrary, the Court finds the generic use by these unrelated companies to be a clear indication of public perception that "pretzel crisps" is a name for a type of pretzel snack rather than a brand name. Indeed, Plaintiffs' ability to successfully use its trademark registration (even after the TTAB ruling that it should be cancelled) to deny others the ability to use a common product name only emphasizes the power Plaintiffs have wielded to clear the marketplace of similarly named products[24] and the importance of not allowing generic terms to become registered trademarks.

In contrast to the generic use of the mark by competitors and others who sought to use pretzel crisps to describe a product or snack, the Court does not find Plaintiffs' evidence from a few hand-picked industry insiders, who do millions of dollars a year of business with Plaintiffs, to be significantly probative of consumer perception of genericness (as distinguished from evidence of commercial success and secondary meaning). Defendant submitted declarations from four

---

[24] Beyond its success in policing the mark, Plaintiffs argue more generally that the absence of competitors using pretzel crisps to describe their products is compelling evidence that their mark is viewed as a brand and there are "equally acceptable" alternative names that allow competitors to name their products. As discussed more below, the Court disagrees both that the absence of other companies using the pretzel crisps name is evidence that the term is viewed as a brand (in light of Plaintiffs' aggressive "enforcement" activities) and that the several names suggested as "equally acceptable" generic alternatives are all in fact "equal."

distributors, testifying that the term is not used generically in the industry. The TTAB summarized and evaluated this evidence as follows:

> John O'Donnell testified that "[o]f the snack foods that we supply to retailers, Snack Factory's product is the only product that uses the term PRETZEL CRISPS. I am not aware of any other product on the market that uses PRETZEL CRISPS." Gary Plutchok testified that PRETZEL CRISPS is a "trade name," and that generic terms include "pretzel crackers, pretzel chips, or flat pretzels." Salvatore D'Agostino testified that "business contacts, including national and regional retailers . . . uniformly use the PRETZEL CRISPS mark to refer only to Snack Factory's pretzel crackers;" and Mark Finocchio testified that he was not aware of anyone else using the term "PRETZEL CRISPS" to describe snack foods before 2004 or since. While these declarations inform us of the personal knowledge and opinions of the four declarants, they represent a very small subsection of snack food distributors. Together, they appear to account for only about 6 to 10 percent of the distributorship of Defendant's product, primarily in the northeast, and to some extent the southeastern United States. More to the point, they are distributors, not end consumers of Defendant's product, and to the extent they purport to convey the views and comments of such consumers, such commentary constitutes speculation and inadmissible hearsay. *See In re Pacer Technology*, 338 F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003) (submitted affidavits "all signed by individuals in the artificial nail business, at most purport to represent the views of a small segment of the relevant market."); *see also Mag Instrument, Inc. v. Brinkman Corp*., 96 USPQ2d 1701, 1723 (TTAB 2010) ("There is no evidence to suggest that this was a random selection of possible declarants." None, "except possibly one, is described as an end consumer.").

TTAB Decision 2, 124 U.S.P.Q.2d at 1194-95.

The Court has reviewed the updated declarations filed by these witnesses, Doc. Nos. 36-39, and finds, in the exercise of its discretion, that they add little probative weight to the evidence. If anything, the more recent declarations amplify the inherent bias found by the TTAB, the hearsay (and double hearsay) nature of the declarations to the extent they purport to testify about consumer perceptions (and retailers' views on consumer perceptions), and their lack of relevant force. *See* Decl. of Gary Plutchok ¶ 4 [Doc. 36] ("I began working with Snack Factory as one of its first distributors of PRETZEL CRISPS in 2005, and I have been worked [sic] with Snack Factory and Snyder's-Lance ever since."); Decl. of John O'Donnell ¶ 4 [Doc. 37] (explaining that his company and Snyder's-Lance have been working together since 2004 and recounting the many millions of dollars

27

of business it receives from Plaintiffs); Decl. of Mark Finocchio ¶ 4 [Doc. 38] (noting that his company "has sold Snyder's-Lance Pretzel Crisps since 2004" and the millions of dollars of business it has done with Plaintiffs as a result); Decl. of Salvatore D'Agostino ¶ 4 [Doc. 39] ("I began working with Snack Factory as a broker of Pretzel Crisps brand crackers in 2004, and I have worked with Snyder's-Lance since it acquired the brand in 2012."). There is no dispute, as these declarations attest, that Plaintiffs have developed a very strong business in selling their PRETZEL CRISPS. However, that fact does not answer the question before the Court - are they doing all that business using a generic mark?

<u>Media References</u>

In the TTAB and this Court, Plaintiffs have offered in total approximately 1800 "media references" from 2004 to 2018 in support of their position that PRETZEL CRISPS is not generic. The Court has separately reviewed every one of these proffered references.[25] For the reasons discussed below, after considering not only the number but also the probative nature and quality of the references (as well as some illustrative current advertisements), the Court finds that, on balance, the cited media references favor a finding that consumers primarily perceive "pretzel crisps" as a term that identifies a common name for the goods rather than a mark identifying the good's source.

The "media reference" evidence comes to the Court as exhibits to the Declaration of Christopher Lauzau, who says that he is a "Senior Legal Research Analyst" employed by Plaintiffs' law firm Debevoise & Plimpton LLP. *See* Doc. Nos. 41-42. There is no evidence that Mr. Lauzau has any legal education or particular training or expertise in trademark law (although the Court expects he has received appropriate supervision as a non-attorney staff member of the

---

[25] There were approximately 60 articles where, because of the length of the articles (about 1,000 pages long), Plaintiffs (quite properly) included only the search results, which the Court reviewed rather than the full text of the article.

law firm). And, as a member of Plaintiffs' legal team, he is (and should be in accordance with the rules of professional responsibility) inherently biased in favor of his firm's clients. Accordingly, the Court will consider the contentions of Mr. Lauzau not as settled "facts," as repeatedly portrayed by Plaintiffs, but rather as "attorney" argument as to what the documents (which the Court has independently reviewed in detail)[26] show.

Mr. Lauzau conducted two LexisNexis database searches for the terms "pretzel crisp," "pretzel crisps" and/or "pretzelcrisp." Doc. No. 41 at 2-3. The results included articles from both print publications and Internet blogs. The first search, conducted in April 2012 for the TTAB proceedings, covered the time period from October 2004 to April 2012. *Id*. Overall, there were 331 articles included in the results. Because the database did not filter out punctuation or short words such as "the" or "of," there were some results that are not applicable to the search, which he removed. He also removed entries that appeared multiple times in the same publication but included in his analysis 26 duplicate articles that appeared in different publications.

Mr. Lauzau reviewed 260 references after this winnowing process. He opines that a total of 216 (83%) "clearly" referred to PRETZEL CRISPS as a brand name of snacks produced by Snack Factory or its licensees, 36 (14%) referred to that phrase "in a way that may have been a generic reference," and 8 results (3%) were unclear (but adds that he believes that "contextual

---

[26] The TTAB found, and this Court agrees, that even an expert opinion, which Mr. Lauzau's Declaration is not, cannot be substituted for the Court's judgment. *Cf. Edwards Lifesciences Corp. v. VigiLanz Corp*., 94 USPQ2d 1399, 1402 (TTAB 2010) ("[T]he Board is responsible for determining whether the marks are similar, and we will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts.") (citing *Fisons Ltd. v. UAD Laboratories, Inc.*, 219 USPQ 661, 663 (TTAB 1983) ("The opinions of witnesses, even expert witnesses, on the question of likelihood of confusion "are entitled to little if any weight and should not be substituted for the opinion of the tribunal charged with the responsibility for the ultimate opinion on the question." (citations omitted)).

clues suggest that the author was speaking about Snack Factory's PRETZEL CRISPS crackers."). However, his declaration does not reveal how he made the subjective decision to classify the references nor does it even identify which of the references he put in each category.[27]

The second search covered the period from April 21, 2012 to October 23, 2018. There were 1,469 articles included in the results. After eliminating duplicated entries (including duplicated articles that appear in different publications), there were a total of 895 unique articles. Mr. Lauzau claims that "786 (87.8%) used PRETZEL CRISPS as a trademark, 24 (2.7%) were false positives, and 85 (9.5%) used the term in an arguably generic fashion." Although in this second search he again did not explain how he reached his decision to place the references in the respective categories, he did include a notation on each article as to how it was categorized.[28]

The Court's conclusions from its review and analysis of the references differ markedly from Mr. Lauzau's. Even if the Court were to accept Mr. Lauzau's classification of the references (which it does not), the Court finds numerous flaws in his analysis. First, and most importantly, it is misleading to simply add up the references and conclude that the highest number of "hits" reflects an accurate assessment of consumer preferences. Not all references are equal, far from it. Instead, the nature, depth and source of the references must be considered to fairly draw any conclusions from the collection of articles.

---

[27] With respect to the second search, Mr. Lauzau has at least indicated how he classified the various references but curiously has failed to do so with respect to the first search (even after being criticized for not doing so). The Court finds this lack of transparency to be a significant additional reason to discount his claims about the first search.

[28] The Court notes that it is some indication of the subjectiveness (and perhaps the care) with which Mr. Lauzau completed his task that in at least one case *the same article* was classified once as a "generic" reference and once as a "trademark" use. *See* Doc. No. 42-6, p. 144 and 42-6, p. 146.

After reviewing all the references individually, the Court finds that they can be grouped into several categories for analysis (in addition to duplicates which represented over 36% of the references reviewed):

<u>Press Releases / Other Plaintiff Created References / Business References</u>

A majority of the articles (close to 60%), reflect Plaintiffs' business affairs, financial results and executive employment changes. *See, e.g.*, Doc. No. 41-10, p. 31 (reporting financial results for the first quarter of fiscal 2016); 41-11, p. 22 (declaring "a regular quarterly cash dividend of $.16 per share on the outstanding shares of Snyder's-Lance, Inc."); 41-11, p. 128 (stating that Snyder's-Lance has received "a consensus rating of 'Buy'" from six ratings firms); 41-12, p. 20 (announcing that Snyder's-Lance stock dropped 2.2%); 41-13, p. 46 (transcribing Snyder's-Lance's second-quarter 2015 earnings call); 42-2, p. 227 (announcing that Snyder's-Lance plans to release 2014 third quarter results on November 4, 2014); 42-9, p. 15 (announcing that Snyder's-Lance CEO David Singer is retiring); 41-11, p. 29 (announcing the promotion of three VMG employees to Vice President); 41-12, p. 51 (stating that the team for First Aid Shot Therapy, a healthcare company, is comprised of executives that were responsible for the launch and success of Pretzel Crisps, as well as other products); 41-4, p. 187 (Campbell Completes Acquisition of Snyder's Lance); 41-10, p. 218 (reporting the acquisition of Diamond Foods by Snyder's Lance); 42-3, p. 155 (announcing that Snyder's-Lance plans to acquire Baptista's Bakery Inc., the company that makes Pretzel Crisps); 42-3, p. 245 (issuing a job vacancy with Snyder's-Lance for a Sanitation Manager job); and 42-2, p. 181 (announcing the launch of limited edition cookie sandwiches as part of Lance's product line).

While each of these articles nominally include the words "Snack Factory Pretzel Crisps" or "Pretzel Crisps" somewhere in the article, the articles provide no information to the Court from

31

which it can assess whether *consumers* perceive "pretzel crisps" as generic or a brand. A single (but very typical) example is sufficient to demonstrate why these articles should be given little or no weight. Mr. Lauzau designated as "trademark" use an article entitled "*Campbell Soup Company Recommends Shareholders Reject 'Mini-Tender' Offer by Ponos Capital LLC.*" *See* Doc. No. 41-4 at 38-39. The article has nothing at all to do with the Pretzel Crisps product. However, at the end of the article there is a standard paragraph prepared by Campbell Soup which begins, "About Campbell Soup Company." Included in Campbell's self-description is the following: "Led by our iconic Campbell's brand, our portfolio includes Pepperidge Farm, Bolthouse Farms, Arnott's, V8, Swanson, Pace, Prego, Plum, Royal Dansk, Kjeldsens, Garden Fresh Gourmet, Pacific Foods, Snyder's of Hanover, Lance, Kettle Brand, KETTLE Chips, Cape Cod, **Snack Factory Pretzel Crisps**, Pop Secret, Emerald, Late July and other brand names." *Id.* (emphasis added). This is the only reference to Snack Factory Pretzel Crisps in the article. Thus, even abiding the highly questionable speculation that any meaningful number of members of the relevant public viewed the article and considered the term at issue among the long listing of the Campbell "portfolio," the mere inclusion of a refence to the name under which Campbell Soup sells one of its products does not establish how consumers view the name. Moreover, a substantial percentage of these business and financial articles come from Plaintiffs or their affiliated companies themselves and, therefore, to the extent they have any relevance at all, they reflect nothing more than how Plaintiffs (as distinguished from consumers) refer to their pretzel snack product. [29]

Lawsuit References

---

[29] In addition to articles submitted by Mr. Lauzau, Plaintiffs submitted articles from trade publications regarding their products through Rachel Sasser, Director of Marketing for Snyder's-Lance. Doc. 45. Ms. Sasser describes these articles as "unsolicited," but many of them appear to be press releases issued by Plaintiffs themselves. *See, e.g.*, Doc. No. 45-5 at 29, 30, 32, 33; Doc. No. 45-6 at 4, 5, 15, 27, 33; Doc. No. 45-7 at 19, 20–21; Doc. No. 45-8 at 26, 35.

The list of media references that Mr. Lauzau counts as equal "trademark" references also includes a number of articles (approximately 4%) that discuss the court decisions related to this dispute. *See, e.g.,* 41-11, p. 92 (discussing the Princeton Vanguard case as part of a blog series on trademark-related decisions); 41-12, p. 22 (illustrating what a compound term is in trademark law by explaining the TTAB's analysis of "pretzel crisps" in the Princeton Vanguard case); 42-1 p. 34 (providing a summary of the Princeton Vanguard case). Like the business and financial articles discussed above, the Court gives these articles little or no weight as a relevant indication of consumer perception.

### False Positive and Indeterminate References

Approximately 3% of the articles were "false positives" that did not include the terms that were searched in any relevant context and, similarly, approximately 3% of the articles could not be classified by the Court for lack of information or context about the article or other reasons.

Accordingly, the Court finds that adding together the business articles, lawsuit articles, false positives and indeterminate articles approximately 70% of the articles offered by Mr. Lauzau have little or no probative value with respect to the question of genericness.

### Generic References

The Court finds that approximately 13% of the articles reflect generic use of "pretzel crisps." *See*, *e.g.*, 41-11, p. 96 (comparing "veggie straws, pretzel crisps, pistachios, popcorn, and orange juice" with "chips, candy bars, and soda" in an article about healthy vending machines); 41-3, p. 30, #193 (mentioning both Ritz Munchables Pretzel Crisps and Snack Factory Pretzel Crisps); 41-10, p. 217 (explaining how the author dips her "own pretzel crisps" in chocolate); 42-5, p. 29 (describing a recipe for spinach and artichoke dip and suggesting that it be served with pretzel crisps); 42-9, p. 31 (suggesting that a baked potato dip be served with "your favorite potato

33

chips or pretzel crisps"); 41-13, p. 32 (describing a school lunch idea that includes "[h]ummus with carrots, red peppers, green peppers, pretzel crisps and dried fruit"); 42-2, p. 176 (describing the menu at Betony, which includes homemade pretzel crisps); 42-3, p. 121 (explaining how Skinnygirl creator Bethenny Frankel plans on offering pretzel crisps and pita chips as products); 42-5, p. 109 (suggesting that a dip, for which the recipe is provided, be served with "your favorite potato chips or pretzel crisps");[30] *see also* TTAB Decision 2, 124 U.S.P.Q at 1190-91 (quoting numerous other generic references). In these articles, "pretzel crisps" are used without any particular reference to the term as a brand or to Plaintiffs. Many reference "homemade" or "my own" "pretzel crisps." And, in a number of the articles, including several of those cited above, "pretzel crisps" are listed in a parallel manner with other food items such as "popcorn" or "chips," further emphasizing that the term is being used generically.

Further, other media articles cited by Frito-Lay reflect strong evidence of generic use, including the use of "Pretzel Crisps" as a category for the taste test among several different brands of pretzel crackers. *See* Doc. No. 28-13 at 17-18 (January 2009 San Francisco Chronicle article determining that Snack Factory came in third in a taste test comparing Pepperidge Farm, Trader Joe's other brands which are generically referenced as "pretzel chips," "pretzel crackers" and "pretzel crisps" in the article); *Id*. at 15 (2009 Consumer Reports article using "Pretzel crisps" as a category to compare "New York Style" and "Pepperidge Farm" brand pretzel snacks without any mention of Snack Factory brand); Doc. No. 28-11 at 2 (2010 Chefs Best taste test for "Pretzel Crisps" declaring Pepperidge Farm the category winner and making clear generic use of the term – "what makes a great pretzel crisp?," "the best pretzel crisps will be dark gold.." "moderate

---

[30] Also, Plaintiffs excluded from their generic results references to other companies providing "pretzel crisps." *See, e.g.*, [Doc 42-2] at 253 (referring to "Stacy's Pretzel Crisps"); [Doc. 42-6] at 131 (using the term "Pretzel Crisps" to refer to "Stacy's Bake Shop crisps.").]

saltiness will most define the basic taste profile of top-quality pretzel crisps.."). In sum, the Court finds that the articles in which "pretzel crisps" is used generically provide clear affirmative evidence that consumers primarily view the term "pretzel crisps" as a type of goods rather than a brand name.

<u>"Brand" Identification References</u>

The remaining articles (approximately 20%) can be generously described as articles in which PRETZEL CRISPS may be referred to as a brand or the use of the term appears to refer specifically to Plaintiffs' product. However, for the reasons discussed below, the Court finds, in the exercise of its judgment, that a substantial percentage of those references should be given only a limited weight.

While a number of the articles use Pretzel Crisps in a way that indicates it is viewed as a brand, *see, e.g.*, 41-2, p. 11, #13 (comparing the ingredients in Tostitos and Pretzel Crisps to discover the better snack); 42-2, p. 174 (describing Wheat Thins, Triscuits, and Pretzel Crisps as options for a healthier alternative to chips); 42-4, p. 155 (suggesting that Pretzel Crisps are used to make pretzel s'mores for children in an article about unique s'mores recipes), many more articles are similar to the "business" articles discussed above in that they only describe or reflect Plaintiffs' sales efforts.

That is, the articles simply reflect the fact that Plaintiffs are active participants in the marketplace rather than more direct evidence of consumer perceptions. See, e.g., 41-2, p. 2, #2 (listing exhibitors, including Pretzel Crisps, at an Earth Day Fair); 41-2, p. 3, #3 (advertising Pretzel Crisps and mentioning the nutrition facts, flavors, and store placement); 41-2, p. 4, #4 (discussing Snack Factory's partnership with Alice.com, its new line of Pretzel Crisps, and the "Rethink Your Snack Survey" that it released); 41-2, p. 28, #33 (listing Komen's corporate

sponsors, one of which is Pretzel Crisps); 41-2, p. 39, #48 (discussing Snack Factory's Super Bowl campaign and events that they have sponsored); 41-2, p. 64, #84 (listing the brands, including "Snack Factory Pretzel Crisps," that are providing products for the Charity Style Lounge during Fashion Week); 41-2, p. 67, #89 (describing Snack Factory Bold & Spicy Pretzel Crisps, including the price, nutrition information, and new packaging); 42-10, p. 249 (describing the availability and price of Pretzel Crisps Dark Chocolate Peppermint flavor in an article about holiday supermarket products); 42-10, p. 234 (announcing the winner of a Pretzel Crisps recipe contest advertised on Facebook); 42-10, p. 45 (listing new supermarket products from the past year and mentioning Snack Factory Dark Chocolate & Peppermint Pretzel Crisps).

Again, evidence that a product has become a success and associated with a particular company cannot change a generic term into a non-generic brand. Thus, the Court's judgment, considering all aspects of these articles, is that they are entitled to relatively less weight than the generic articles discussed above, even though they are more numerous.

Moreover, as noted above in the Court's review of both the business and the "brand identification" articles, many of the cited articles refer to Plaintiffs' product as "Snack Factory Pretzel Crisps" rather than simply "Pretzel Crisps." The Court finds this is significant and undercuts Plaintiffs' argument that the term PRETZEL CRISPS is, *standing alone*, perceived as a brand.[31] The wide prevalence of using Snack Factory as a clear brand identifier preceding "Pretzel Crisps" makes it more likely that consumers perceive pretzel crisps as a product name rather than

---

[31] Indeed, in some of Plaintiff's purchasing contracts, the Product Description is "Pretzel Crips" and the "Extended product desc." is "Thin, flat pretzel crisps," while the "Trademark" is listed only as "Snack Factory." Doc. No. 32, Opp'n No. 9119552 at A1985, A1990.

36

a second brand name.[32]  Recent advertisements easily found by the Court on the internet vividly

demonstrate this point.



The Costco ad pictured above is contained in an advertising circular for the period May 19,

2021 to June 13, 2021. *See* https://www.costcoinsider.com/costco-may-and-june-2021-coupon-

book/ (accessed May 21, 2021). In the top two panels, Costco is offering a special price on both

Snack Factory Pretzel Crisps and Stacy's Pita Chips. The ad uses both Snack Factory and Stacy's

as the brand names and then "Organic," "Pretzel Crisps" and "Pita Chips" as generic product

descriptors for the snacks. The Court also notes the difference in how "Cheerios" and "Sunny D"

are both referred to only by their brand names in the bottom two panels. Thus, this ad is a striking

---

[32] Plaintiffs' argue that "Snack Factory Pretzel Crisps" is no different than saying "Frito-Lay's cool ranch DORITOS." Doc. No. 78 at 12. The Court disagrees. Beyond the absence of any evidence that DORITOS are often referred to as "Frito-Lay Doritos" in communications describing the brand, DORITOS is not even arguably the name of a class or type of food.

example of how Snack Factory (brand name) and "pretzel crisps" (product name) are often viewed differently when used together.

Similarly, in the ad for Publix supermarket pictured below, Snack Factory is used as the brand name and pretzel crisps the product name in the same way that "Ithaca" and "Whisps" are the brand names for "hummus" and "cheese crisps."



https://www.publix.com/savings/weekly-ad (Valid 5/19/2021 – 5/25/2021) (accessed May 21, 2021).[33]

In summary, for all the reasons discussed above, the Court finds, after a careful *de novo* review, that the media references offered into evidence and discussed above on balance support a finding that Frito-Lay has established by a preponderance of evidence that PRETZEL CRISPS is a generic term.

---

[33] With respect to grocers, Plaintiffs argue that it is significant that online grocers sell PRETZEL CRISPS products under categories such as "pretzel crackers," "pretzels," chips & pretzels," or "popcorn & pretzels," and do not recognize a "pretzel crisps" category of products. Doc. No. 35 at 17. The Court disagrees. While it is of some relevance that grocers don't commonly recognize a "pretzel crisps" category, the import of that evidence is very limited as it also appears that other names for pretzel snacks such as "pretzel thins," "pretzel chips," and "pretzel rounds" that the Parties agree are generic "category" names don't have their own categories in grocers' online stores.

<u>Consumer Surveys</u>

Pursuant to the Supreme Court's directive in *Booking.com* and the Federal Circuit decision in this matter,[34] the Court also considers – cautiously – the survey evidence presented by the Parties. At the TTAB, Plaintiffs submitted two surveys and related expert declarations, one from Dr. E. Deborah Jay (the "Jay Survey") on genericness and the other from George Mantis (the "Mantis Survey") on secondary meaning. Frito-Lay submitted one survey and a related declaration from Dr. Alex Simonson on genericness. In this Court, Plaintiffs have filed additional declarations from both their experts and Frito-Lay has submitted an Expert Report and Declaration from Professor Isabella Cunningham on secondary meaning. None of the Parties have challenged the credentials of any of the experts, and the Court finds that all of them are well qualified to express their opinions. Accordingly, all of the expert reports and declarations have been considered *de novo*, although for the reasons discussed below the Court finds the Jay Survey and the Mantis Survey most instructive.

Dr. Jay, founder and President of Field Research Corp., conducted what is commonly known as a "Teflon" survey in an attempt to test how consumers perceive the term PRETZEL CRISPS. Named after a survey performed to determine if "Teflon" was a valid trademark, a Teflon survey gives the survey participants an explanation of the generic versus trademark

---

[34] Prior to *Booking.com*, in the Fourth Circuit and elsewhere consumer survey evidence was not considered in cases where, as here, the mark was not a coined term. *See, e.g., Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.* 240 F.3d 251, 255, 57 USPQ2d 1884, 1886 (4th Cir. 2001) ("Hunt does not claim to have first coined the term 'crab house.' Therefore, it is not necessary to determine whether the term has become generic through common use, rendering Hunt's consumer survey irrelevant."); TTAB Decision 2, 124 U.S.P.Q. at 1202-04 (collecting cases). However, as discussed above, such evidence was considered by the Supreme Court in *Booking.com* and the Federal Circuit instructed the TTAB to consider survey evidence in this matter. Accordingly, the Court has considered the evidence, with due regard for the limitations of such evidence cited by the Supreme Court (which had led many courts to not consider the evidence in these circumstances as noted).

distinction and then asks respondents to identify whether a term refers to a brand name or a common name. *See* McCarthy § 12:16. ("A 'Teflon survey' is essentially a mini-course in the generic versus trademark distinction, followed by a test.").

A randomized "double-blind" phone survey was conducted between February 16 and 25, 2010. The eligibility criteria were defined as adults who had "personally purchased salty snacks for themselves or for someone else in the past three months or think that they would do this in the next three months." As a gateway, in accordance with the Teflon format, survey respondents were given an explanation of the difference between brand and common names, and then asked both whether BAKED TOSTITOS is a brand or common name, and whether TORTILLA CHIPS is a brand or common name. Only those who answered both questions correctly were allowed to proceed with the survey. Initially 500 adults were questioned regarding their eligibility to participate in the survey. Of those, 347 of the 500 met the eligibility requirements to take the mini-test, and only 222 of the 347 answered both questions correctly on the mini-test and were thus considered "qualified respondents" who were allowed to take the survey. In describing the "representativeness" of these 222 participants to all adult U.S. consumers, Dr. Jay reported in her TTAB declaration that the participants were younger than a truly representative sample and not geographically representative in that consumers in the South were underrepresented. *See* Opp'n No. 91195552 at A4425-4426.

In the survey itself, participants were questioned about a number of terms and asked whether they are "brand" or "common" names, with the option available for participants to say that they didn't know or had not heard of a name.

For the 222 respondents who participated in the Jay survey, the results were as follows:

| Name | Brand | Common Name | Don't know/Haven't Heard |
|---|---|---|---|
| SUN CHIPS | 96% | 3% | <1% |
| CHEESE NIPS | 85% | 13% | 2% |
| **PRETZEL CRISPS** | **55%** | **36%** | **9%** |
| FLAVOR TWISTS | 48% | 34% | 18% |
| GOURMET POPCORN | 25% | 72% | 3% |
| ONION RINGS | 8% | 91% | 1% |
| MACADAMIA NUT | 7% | 92% | <1% |

Based on these results, Dr. Jay concluded in her report that "the majority of consumers understand the term PRETZEL CRISPS to function as a brand name."

While the Court does not find fault with Dr. Jay's expertise, survey methodology or the execution of the survey, it does question her conclusion and confidence in the results. First, even taking the results at face value, the survey suggests only a small majority of respondents (55%) believed that PRETZEL CRISPS is a brand, as compared to the vast majority who correctly identified Sun Chips (96%) and Cheese Nips (85%).

41

Moreover, Plaintiffs and Dr. Jay cite the 55% result without any discussion of the inherent "margin of error" in the survey. In a footnote to her initial declaration in the TTAB, Dr. Jay acknowledged that "[a]nalyses based on the overall sample of 222 completed interviews have a maximum sampling error of approximately +/-7 percentage points at the 95% confidence level." *Id*. at A874. She also admitted that "there are other potential sources of error in surveys besides sampling error," but expressed her opinion that "the overall design and execution of the survey minimized the potential for other sources of error." *Id*.

The "margin of error" in surveys should be considered in whether and how much to rely on their results. *See vonRosenberg v. Lawrence*, 413 F.Supp.3d 437, 449 n.9 (D.S.C. 2019) (finding that a 5.6% error rate was a "wide margin of error" relevant to the weight that should be given to a trademark survey on genericness where, considering the error rate, the "rate of [survey respondents] who responded "category" rather than "trademark" would fall below 50%, thus arguably negating its ability to show that a "majority" of individuals consider the mark generic. *See* 2 McCarthy on Trademarks and Unfair Competition § 12:6 (5th ed.) (for genericness, "majority use controls")"); *Borinquen Biscuit Corp. v. M.V. Trading Corp*., 443 F.3d 112, 120 n. 6 (1st Cir.2006) (concluding that an expert report's "small sample size and large margin of error [10%] combined to cast considerable doubt on its statistical integrity"); *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1226 (D. Colo. 2001) (finding that when the margin of error (4.7%) was accounted for, "the resulting percentage becomes less statistically significant"). This seems especially important in circumstances like here in which the answers of only 222 survey respondents are purported to fairly represent the consumer perceptions of over 100 million adults in the United States.

42

Using a 7% margin of error, the range of those who view PRETZEL CRISPS as a brand within the margin of error is 48% to 63%. In other words, without discounting the results of the Jay Survey in any manner (even for the other sources of error Dr. Jay references), a finding that fewer than a majority of respondents perceived PRETZEL CRISPS as a brand is within the survey's margin of error. Indeed, if the percentages of those who believed that the term is a brand or common name are fully adjusted up or down for the margin of error then the difference between them could be very small, 48% to 43%.

However, beyond consideration of the margin of error (which still leaves a small relative but not absolute majority identifying the mark as a brand), the Court finds there are a number of reasons that suggest the survey results should be discounted in addition to considering the margin of error. First, as mentioned above, Dr. Jay acknowledges that the survey population is not representative of the relevant population, either by age or geography. However, the amount and direction of the survey error or uncertainty as a consequence of these disparities is not quantified or estimated.

Moreover, the answers of the survey respondents with respect to a number of the "control" terms do not inspire confidence in the survey results and appear to reflect that the survey respondents' choices may have been driven, in significant part, by commercial success or notoriety rather than a valid assessment of the distinction between generic and trademark names. While over 90% of respondents correctly identified "macadamia nuts" and "onion rings" as generic names, 25% incorrectly identified "gourmet popcorn" as a brand. More significantly, less than half of respondents correctly identified FLAVOR TWISTS (which are twisted corn chips) as a brand. The Court finds that this failure indicates that the bulk of survey respondents did not fully understand the distinction between common names and brands. The mark FLAVOR TWISTS is

43

plainly not a common name (TWISTS is certainly not a common name for corn chips, if it has any "common" meaning at all).

So, what accounts for the vast difference in correct answers for CHEESE NIPS and SUN CHIPS, which are also brands? Simply put, the difference likely lies in marketing and commercial success. CHEESE NIPS and SUN CHIPS are more well-known and successful than FLAVOR TWISTS as a name standing alone (indeed if the survey had included the full product name FRITOS FLAVOR TWISTS the Court expects the results may have been markedly different). Thus, the failure of respondents to correctly identify FLAVOR TWISTS as a brand suggests that a substantial portion of the survey results reflect secondary meaning (the association of a product with a particular source) rather than a recognition of genericness.[35]

Accordingly, it is the Court's judgment – based on the fact that less than a majority of respondents may have believed PRETZEL CRISPS is a brand name (taking into account the survey's margin of error), the other limitations and concerns about the survey results discussed above and the Supreme Court's warning to be cautious in relying on consumer surveys purporting to measure genericness – that the results of the Jay Survey are, at best, inconclusive. Thus, the Court does not agree that the survey indicates that consumers "primarily" perceive PRETZEL CRISPS as a brand.[36]

---

[35] While genericness and secondary meaning are different concepts, they are not easily disentangled, particularly for successful products. Indeed, a product may have a leading market share with a generic name. *See Kellogg*, 305 U.S. at 118 (shredded wheat).

[36] Compare, for example, the consumer survey results reported in the District Court decision in Booking.com, in which the plaintiff produced a Teflon survey which revealed that 74.8 percent of respondents identified BOOKING.COM as a brand name. *Booking.com B.V. v. Matal*, 278 F. Supp. 3d 891, 915 (E.D. Va. 2017).

The Mantis Survey casts even more doubt on Plaintiffs' claims that PRETZEL CRISPS is perceived by consumers as a brand rather than a common name. Although the Mantis Survey was prepared by Mr. Mantis and offered by Plaintiffs to show secondary meaning, the TTAB found, and this Court agrees, that because the survey was conducted as a Teflon survey it can also provide additional evidence related to genericness.[37] *See* TTAB Decision 2, 124 U.S.P.Q. at 1199; *see also In re Country Music Association, Inc.,* 100 USPQ2d 1824, 1834-35 (TTAB 2011) ("Finally, although the consumer survey conducted by Dr. Ford was submitted in connection with the issue of genericness, the acquired distinctiveness of the term COUNTRY MUSIC ASSOCIATION among the relevant purchasing public can be inferred from the results. By categorizing the term COUNTRY MUSIC ASSOCIATION as a brand name, 85% of the respondents were saying, in effect, that they associated the term with the product or services of only one company."); *March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.,* 310 F. Supp. 2d 786 (N.D. Tex. 2003), *aff'd* 120 Fed. Appx. 540 73 USPQ2d 1599 (5th Cir. 2005) (finding Teflon survey by Mr. Mantis offered to prove genericness was also relevant to show secondary meaning).

The TTAB described the Mantis Survey and its relevance to genericness as follows:

> The [Mantis Survey] was conducted via online participation, between August 26 and August 30, 2011. There were 400 survey participants. Respondents were invited by email to participate in the survey and were told it was about "salty snack foods." Individuals were then asked prescreening questions. To be included in the survey, individuals had to, among other things, be the "primary grocery shopper," be "between the ages of 24 and 39," and "have purchased crackers and pretzels in the past month and will purchase crackers and pretzels in the next month."
>
> Survey respondents were informed during the screening process about the difference between "brand" and "common" names and then allowed to proceed

---

[37] At oral argument, Plaintiffs' counsel conceded that Mr. Mantis' survey was a "Teflon" type survey (although he later argued that the Court should not consider the survey on the issue of genericness because participants were only asked if they associated the term with one or more than one company). The Court does not find this attempt to distinguish Mr. Mantis' acknowledged Teflon survey persuasive as discussed below.

with the survey only if they correctly associated BAKED TOSTITOS with "only one company" and TORTILLA CHIPS with "more than one company." For those who proceeded with the study, two control names were given, and the same questions were asked. The results are shown as follows:

| NAME | Only One Company | More | Don't Know |
|------|------------------|------|------------|
| SUN CHIPS | 96.5% | 3% | .5% |
| ONION RINGS | 23.8% | 72% | 4.3% |
| **PRETZEL CRISPS** | **38.7%** | **47.8%** | **13.5%** |

Based on the survey, Mr. Mantis found that 38.7% of the respondents associated the name "PRETZEL CRISPS" with only one company. On that basis, he stated: "It is my opinion that the name 'PRETZEL CRISPS,' used in conjunction with a salty snack food product, has acquired secondary meaning."

Plaintiff retained Dr. Ivan Ross to rebut the findings of Mr. Mantis. Keeping in mind that the rebuttal was as to a survey offered to show acquired distinctiveness, Dr. Ross' main objection to the Mantis survey is that although Mr. Mantis said that he conducted the survey for the purpose of establishing secondary meaning, Mr. Mantis's methodology actually analyzes genericness.[56] Plaintiff specifically argues that the Mantis survey was conducted in the manner of a Teflon-style survey, in that participants were asked whether they associate each term with one company or with more than one company. In this regard, during the initial mini-course, participants were specifically instructed as to the differences between "brand" and "common" names:

> Some names are brand names. A brand name refers to a product associated with one particular company. Other names are common names. A common name refers to a type of product associated with more than one company.

As such, participants were told that if they associated a term with "one particular company" then it is a "brand name," and vice-versa. With this instruction given to all participants in the survey, we find it logical to consider all those who said they associated the term "PRETZEL CRISPS" with "one particular company" thus also found the term "PRETZEL CRISPS" to be a "brand name" rather than a "common name," and that all those who said they associated the term "PRETZEL CRISPS" with "more than one company" thus also found the term "PRETZEL CRISPS" to be a "common name" rather than a "brand name." In this regard, only 38.7% of participants, which is rather less than 50%, found the term to be a brand name.

Accordingly, we find that although the Mantis survey was conducted and offered for the purpose of showing secondary meaning, if we had considered the

other two surveys on the question of genericness, the Mantis survey should also have been considered on the issue of genericness. Since substantially less than half of the Mantis survey respondents associated the term "PRETZEL CRISPS" with a single source, this survey weighs in favor of finding genericness. We note, in this regard, that even if we were to split the 13.5% percent of "don't know" responses, as suggested by Defendant with regard to the Simonson survey, then adding 6.75% to each of the "only one company" and "more than one company" tallies, we still have less than a majority who associate the term with one company, and more than half who associate the term with more than one company, and so we have the same result.

TTAB Decision 2, 124 U.S.P.Q.2d at 1199-1201.

After its own *de novo* review, the Court agrees with the TTAB's analysis of the Mantis Survey. Regardless of the purpose for which it was created, the Mantis Survey participants were specifically told that "brand" names are used by only one company and "common" names are used by multiple companies, took a test, then answered the questions about one company or multiple companies for the various marks. Although, Mr. Mantis argues that he didn't specifically ask the participants if each term was a "brand" or "common" name, in light of the clear instructions given at the beginning of the survey, the Court finds this survey is close to the functional equivalent. Therefore, the Mantis Survey is clear evidence that its consumer respondents primarily perceived PRETZEL CRISPS as a "common" (i.e., generic) name associated with more than one company in accordance with the instructions they were given. Accordingly, the Court finds that the Mantis Survey supports a finding that PRETZEL CRISPS is a generic mark.[38]

The Court need not devote much discussion to either the Simonson or Cunningham Survey, although for different reasons. The TTAB found the Simonson Survey would only be entitled to "limited weight" and, in any event, the results of the Simonson Survey were inconclusive, with

---

[38] The Mantis Survey does not provide a margin of error, but even a large margin of error of the magnitude of the Jay Survey (and a survey of 400 respondents would have a substantially lower margin of error) would not lift the number of those who believed that "Pretzel Crisps" was a brand name into a majority of respondents.

41% of survey respondents identifying PRETZEL CRISPS as a "category" or common name and 41% saying it is a brand name. Therefore, the Court, after *de novo* review, also concludes that the Simonson Survey adds little weight to the evidence for either side. Finally, the Cunningham Survey also does not impact the Court's factual determination that PRETZEL CRISPS is generic. The Cunningham Survey was offered only on the issue of secondary meaning and, unlike Mr. Mantis' survey, it was not conducted in the Teflon survey format so it cannot be used in the genericness inquiry. Thus, the Court need not and does not reach the merits of the Cunningham Survey.

In sum, considering all the available evidence, the Court, finds that, on balance, the survey evidence slightly favors[39] an affirmative finding that consumers primarily perceive PRETZEL CRISPS as a common or generic name.

Google and Social Media References

Plaintiffs also offered evidence of Google searches and social media mentions on Twitter to support their position that PRETZEL CRISPS is not generic. Specifically, Plaintiffs' attorneys' employee Mr. Lauzau (whose work and conclusions the Court criticized with respect to media references above) conducted a Google search for the term "pretzel crisps" in October 2018 that he alleges shows "based on my review of results" that 87 (90%) of the first 97 results "used the term PRETZEL CRISPS as a trademark or referred directly to Princeton Vanguard's product." Doc. No. 41 at ¶ 8. With respect to Twitter, another of Plaintiffs' law firm's non-attorney staff members (Elliot Beaver) conducted a subjective review of social media mentions of "Pretzel Crisps" on Twitter from

---

[39] Even if the Court were to find that all the survey evidence was on balance inconclusive that would not affect the Court's ultimate factual determination that there is sufficient affirmative evidence to conclude that PRETZEL CRISPS is a generic mark.

April 1, 2018 through October 24, 2018 and concluded that a majority of tweets (63%) "referenced the PRETZEL CRISPS brand in a non-generic fashion." *See* Doc. No. 44 at ¶ 3.

However, the Court does not find either the Google search or the Twitter analysis persuasive on the issue of genericness. First, as discussed above, these searches have only a limited usefulness in establishing whether PRETZEL CRISPS is generic due to the more than a decade (and $50 million in advertising and marketing expenditures) that has passed since the challenged registration of the mark in 2005. Again, the repeated use of ordinary words cannot give a single company a proprietary right over those words, even if an association develops between the words and that company. *Am. Online,* 243 F.3d at 821.

Second, for the Google search, the same concerns that the Court expressed about Mr. Lauzau in connection with media references (that he has no training in trademark law and is plainly not an impartial witness) apply here as well. Also, as with the list of media references, Mr. Lauzau does not indicate how he determined which of the search results used PRETZEL CRISPS "as a trademark" nor does he distinguish between search results that reflect the Plaintiffs' own websites (which are 3 of the first 5 results) or websites that were sponsored by Plaintiffs (*see*, e.g., Doc. 42-11 at 4 (recipe provided by Plaintiffs to Allrecipes.com) and those websites that reflect independent trademark references. Indeed, the vast bulk of the Google search results simply identify websites of large companies offering PRETZEL CRISPS for sale. (*See Id.* at 2 (Amazon.com, Walmart.com, etc.)). Again, there is no dispute that Plaintiffs have developed a very large business selling their pretzel product; however, the typical commercial sales efforts associated with that business – including the websites featured in the Plaintiffs' Google search, do not reflect *consumer* perceptions of genericness. Instead, to the extent they have relevance to this action at all, they may be mostly evidence of secondary meaning, an issue that the Court does not reach. Accordingly, the Court gives the Google results little weight.

Similarly, it is undisputed that Plaintiffs have developed a large social media presence as part of their marketing efforts. As of October 2018, the PRETZEL CRISPS brand had over 47,800 followers

49

on Twitter. *See* Doc. No. 45 at 5. Mr. Beaver, a "litigation case manager" at Plaintiffs' counsel's law firm, claims to have "personally reviewed" each of 1137 tweets and 132 hashtags but does not indicate which ones he identified as brand references, generic references, neither, or false positives or how he reached his conclusions (and like Mr. Lauzau there is no evidence that he has any training or expertise in trademark law).

Moreover, Mr. Beaver counted as "brand references" all tweets posted by Plaintiffs, all tweets with Plaintiffs' twitter handle (@pretzelcrisps) or the hashtag #snackfactory and all tweets that reference "Snack Factory" or include an image of Snack Factory products. *See* Doc. No. 44 at ¶¶ 6–8. As with Plaintiffs' own press releases, none of Plaintiffs' tweets or those sponsored by Plaintiffs (which account for a substantial percentage of the tweets and over three-quarters of the hashtags), *id.,* provide any probative evidence of consumer perceptions. Rather, they simply reflect Plaintiffs' efforts to "brand" and promote their own product.

Further, merely referencing Plaintiffs or their hashtag does not necessarily make the use of "pretzel crisps" in a tweet a brand reference. As with the Google search results discussed above, use of the disputed product name in the normal course of business communications, here on Twitter, does not reveal whether or not a consumer understands the product *name* primarily as a brand or a type of goods. Instead, it just reflects consumer engagement with the product,[40] which, again, may be relevant to secondary meaning but not necessarily genericness.[41] Simply put, it is unremarkable and unconvincing that communication about a product mentions the product name.

_____

[40] The Court also is concerned that a focus on those relative few consumers who are most engaged with the product through Twitter would be a misleading sample in determining how the "relevant public," i.e., average or typical consumers perceive the product name.
[41] Indeed, Plaintiffs stated in their Reply Brief that "the only conclusion that can be drawn from communications addressed to Snyder's-Lance is that those consumers associate PRETZEL CRISPS with Snyder's-Lance." Doc. No. 78 at 14.

And, because consumer perception of a term may be "mixed," that is, reflecting both generic use and brand awareness, *see Booking.com*, 278 F.3d at 902, a bare reference to the product name does not answer the more difficult question before the Court of how consumers *primarily* perceive the term. So, after a *de novo* review of the evidence, the Court finds, for all the reasons discussed above, that Plaintiffs' evidence of Twitter communications is unpersuasive.

<u>Other Available Product Names</u>

Finally, Plaintiffs argue that the availability of other product names for "pretzel cracker" snacks supports their claim that PRETZEL CRISPS is not generic. First, regardless of the availability of similar names for a product, a generic name cannot be registered as a trademark thereby granting exclusive use of the name of a product to a single company. *See Ale House Mgmt., Inc. v. Raleigh Ale House*, 205 F.3d 137, 141 (4th Cir. 2000) (affirming summary judgment finding term ALE HOUSE generic, while also noting alternative generic names like "bar," "lounge," "pub," "saloon," and "tavern"); *see also McCarthy* § 12:9 ("There is usually no one, single and exclusive generic name for a product. Any product may have many generic designations. Any one of those is incapable of trademark significance.").

Second, the Court does not find that the names suggested, while generic, are necessarily "equally acceptable" alternatives. For example, Plaintiffs claim that "pretzel thins" and "pretzel rounds" are equivalent generic names. However, "pretzel thins" is also a name used for regularly shaped thin pretzels and "pretzel rounds" is used for small, rounded pretzel pieces as well as snacks that look more like Plaintiff's "pretzel crisps" product. Therefore, a company could reasonably conclude that "pretzel crisps" is a better description for a small, rounded pretzel product.

Moreover, the absence of other companies using the name "pretzel crisps" to describe their products is neither "compelling evidence" as urged by Plaintiffs nor even surprising. As discussed above, Plaintiffs have aggressively "policed" the mark. Thus, the obvious reason no one else uses

51

the name is they will be threatened with legal action. In such circumstances, the relative absence of competitive use of the name simply reflects a practical business judgment rather than any acknowledgement that "pretzel crisps" is not generic.

## IV.    CONCLUSION

In conclusion, there is no dispute that Snack Factory Pretzel Crisps is a hugely successful product, due in no small part to Plaintiffs' extensive marketing efforts and the PRETZEL CRISPS trademark registration they received and have enforced to clear the field of similarly named products. However, no matter how much commercial success the product enjoys, Plaintiffs are not entitled to monopolize the common name of the product being sold. Summarizing the evidence on the genericness of the mark, considered as a whole, the Court finds that the combination of the acknowledged generic elements of the compound mark "yields no additional meaning to consumers capable of distinguishing the goods" and, independently, usage by competitors, media references and consumer surveys (as well as some use by Plaintiffs) reflects that, on balance, consumers primarily perceive "pretzel crisps" to be a common / generic name.[42] Therefore, for all the reasons discussed above, the Court finds that Frito-Lay has carried its burden to prove by a preponderance of the evidence that PRETZEL CRISPS is a generic mark, and this Court will affirm the TTAB and order the cancellation of the registration of the mark.

---

[42] Dictionaries, most used by Plaintiffs, Google entries and social media posts do not significantly impact the Court's analysis as discussed above.

**V.    ORDER**

**NOW THEREFORE IT IS ORDERED THAT:**

1. The Parties' Motions for Summary Judgment (Doc. Nos. 28 and 34) are **DENIED;**

2. The TTAB's cancellation of the registration of the mark PRETZEL CRISPS for pretzel crackers on the Supplemental Register is affirmed, and the United States Patent and Trademark Office is hereby directed to cancel the mark on the Supplemental Register;

3. The TTAB's denial of Princeton-Vanguard, LLC's application to register PRETZEL CRISPS on the Principal Register is affirmed and Frito-Lay's opposition to that application is sustained; and

4. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 4, 2021

Kenneth D. Bell
United States District Judge